ORAL ARGUMENT NOT YET SCHEDULED

**No. 25-5387**

---

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———————————

FRIENDS OF THE EARTH U.S., et. al.,

*Plaintiffs-Appellants,*

v.

EXPORT-IMPORT BANK OF THE UNITED STATES, et. al.,

*Defendants-Appellees,*

TOTALENERGIES EP MOZAMBIQUE AREA 1, LIMITADA,

*Intervenor-Appellee.*

———————————

On Appeal from the United States District Court for the District of
Columbia, No. 1:25-cv-02235 (Hon. Carl J. Nichols)

---

**OPENING BRIEF OF PLANTIFFS-APPELLANTS
PUBLIC COPY—SEALED MATERIAL DELETED**

---

Richard L. Herz*
Tamara A. Morgenthau
Lindsay A. Bailey
Michelle C. Harrison
EarthRights International
1400 K St. NW Suite 750
Washington, DC 20005
(202) 466 5188
rick@earthrights.org
*Counsel for Appellants*

* Based in CT; admitted in NY; does
not practice in DC's courts

## CERTIFICATE AS TO PARTIES, RULINGS UNDER REVIEW, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Plaintiffs-Appellants Friends of the Earth—U.S. and Justiça Ambiental, certify as follows:

A. **Parties and Amici**. Plaintiffs-Appellants in this matter are Friends of the Earth—U.S. (FOE) and Justiça Ambiental (JA). Plaintiffs are non-profit organizations. Plaintiffs have no parent corporations and no publicly held corporation owns 10 percent or more of their stock.

FOE is a 501(c)(3) non-profit environmental organization founded in 1969 and headquartered in Washington, D.C. FOE is a membership-based organization with over 226,000 members located across all 50 states and the District of Columbia. FOE's mission is to defend the environment and champion a healthier and just world by reducing greenhouse gas emissions and reliance on fossil fuels and ensuring environmental and social justice, human dignity, and respect for human rights. FOE is the U.S. chapter of Friends of the Earth International a global network of grassroots environmental groups working in 70 countries to promote environmental sustainability, social justice, and respect for human rights.

JA is a private nonprofit environmental organization founded in 2004 in Mozambique, operating across the country. JA is also a member of Friends of the Earth International. Based on this affiliation, JA is sometimes known (especially internationally) as Friends of the Earth Mozambique. JA's mission is to generate a culture of civil engagement in Mozambique through the active involvement of citizens in development decisions relevant to environmental justice issues, in Mozambique and throughout the world. As a core part of its mission, JA helps local residents and communities address the environmental, economic, and social threats they face, particularly from large-scale resource extraction projects.

Defendants-Appellees in this matter are the Export-Import Bank of the United States, James Cruse, James Burrows, and Spencer Bachus III. Defendant-Intervenor in this matter is TotalEnergies EP Mozambique Area 1, Limitada.

B. **Rulings Under Review**. The ruling under review is Judge Carl J. Nichols of the U.S. District Court for the District of Columbia's October 10, 2025 Memorandum Opinion denying Plaintiffs' motion for a preliminary injunction. *Friends of the Earth—U.S. v. Export-Import*

*Bank of the United States*, No. 1:25-cv-02235-CJN (D.D.C. Oct. 10, 2025) (district court DE 53). No official citation to this decision exists.

C. **Related Cases.** There are no related cases.

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ......................................................4

ISSUES PRESENTED............................................................................5

STATUTES..............................................................................................6

STATEMENT OF THE CASE ...............................................................6

I.  Statement of facts...........................................................................6

  A.  EXIM's loan for the Project. ...................................................6

  B.  The Project's restart will harm local communities. ...........8

  C.  Plaintiffs have spent almost two decades providing services to communities directly impacted by the Project....................................11

II.  Procedural history. ......................................................................14

STANDARD OF REVIEW ...................................................................15

SUMMARY OF ARGUMENT ..............................................................15

ARGUMENT ........................................................................................19

I.  Plaintiffs have standing. ..............................................................20

  A.  Plaintiffs have standing because EXIM denied them a means of redress.......................................................................................22

  B.  Plaintiffs have standing because EXIM's loan will increase the burden on Plaintiffs to provide their services....................................30

II.  Plaintiffs' claims are likely to succeed on the merits .......................35

  A.  Section 635a(c)(10)(A) required EXIM to conduct notice and comment.......................................................................................35

  B.  EXIM's procedures required notice and comment. .........................51

iv

C.  EXIM failed to comply with NEPA. ................................................. 54

D.  The district court erred in finding that EXIM's obsolete 2019 economic analysis justified the 2025 approval. .................................. 61

D.  EXIM denied Plaintiffs information it was required to divulge. ... 61

III.   The district court correctly held that Plaintiffs are likely to suffer irreparable harm. ................................................................................... 71

IV.   The balance of equities strongly favor temporary relief. ................ 73

V.  The preliminary injunction factors strongly favor temporary relief. 75

CONCLUSION ...................................................................... 76

# TABLE OF AUTHORITIES

## Cases

*Abramski v. United States*,
573 U.S. 169 (2014) ................................................................. 46

*Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*,
789 F.2d 931 (D.C. Cir. 1986) ....................................................... 22, 23

*AFL-CIO v. DOL*,
778 F. Supp. 3d 56 (D.D.C. 2025) ................................................... 30

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) ...................................................................... 71

*Animal Legal Def. Fund v. Rollins*,
2025 U.S. Dist. LEXIS 210427 (D.D.C. Oct. 24, 2025) ....................... 29

*ASPCA v. Animal & Plant Health Inspection Serv.*,
2025 U.S. Dist. LEXIS 213496 (D.D.C. Oct. 29, 2025) ....................... 29

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Com.*,
449 F.2d 1109 (D.C. Cir. 1971) ...................................................... 55

*Capital Area Immigrants' Rights Coal. v. Trump*,
471 F. Supp. 3d 25 (D.D.C. 2020) ................................................... 30

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ........................................................ 71

*Citizens Against Rails-To-Trails v. Surface Transp. Bd.*,
267 F.3d 1144 (D.C. Cir. 2001) ...................................................... 55

*Citizens Alert Regarding the Env't v. EPA*,
102 F. App'x 167 (D.C. Cir. 2004) .................................................. 57

*Citizens Alert Regarding the Env't v. EPA,*
  259 F. Supp. 2d. 9 (D.D.C. 2003) ....................................................57, 58

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...............................................................34

*Coalition for Humane Immigrant Rights v. DHS,*
  780 F. Supp. 3d 79 (D.D.C. 2025) ...................................................29

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
  144 F.4th 296 (D.C. Cir. 2025).....................................................28, 29

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) .....................................................15

*Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.,*
  85 F. Supp. 3d 387 (D.D.C. 2015) ..................................................66

*Delta Airlines v. Exp.-Imp. Bank of U.S.,*
  718 F.3d 974 (D.C. Cir. 2013) ......................................................65

*Dep't of Commerce v. New York,*
  588 U.S. 752 (2019) ..............................................................33, 34

*Dillon Tr. Co. LLC v. United States,*
  162 Fed. Cl. 708 (Fed. Cir. 2022).....................................................64

*Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.,*
  707 F.3d 462 (4th Cir. 2013) .......................................................68

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) ......................................................20, 32

*Equal Rights Ctr. v. Post Properties Inc.,*
  633 F.3d 1136, (D.C. Cir. 2011) ....................................................30

*FDA v. Alliance for Hippocratic Medicine,
    602 U.S. 367 (2024) ...................................................3, 21, 26, 27, 28, 33

Fertilizer Inst. v. EPA,
    935 F.2d 1303 (D.C. Cir. 1991) .............................................................48

Friends of the Everglades, Inc. v. Noem,
    2025 U.S. Dist. LEXIS 163085 (S.D. Fla. Aug. 21, 2025)...............55, 57

Hallstrom v. Tillamook Cty.,
    493 U.S. 20 (1989) .................................................................................41

Idaho Farm Bureau Fed'n v. Babbitt,
    58 F.3d 1392 (9th Cir. 1995).................................................................48

Indian River Cnty. v. Rogoff,
    201 F. Supp. 3d 1 (D.D.C. 2016) ..........................................................58

Jibril v. Mayorkas,
    20 F.4th 804 (D.C. Cir. 2021)...............................................................20

Kyle v. Wadley,
    24 F. Supp. 884 (W.D. La. 1938)..........................................................45

League of Women Voters of the United States v. Newby,
    838 F.3d 1 (D.C. Cir. 2016) .............................................................71, 72

Loper Bright Enters. v. Raimondo,
    603 U.S. 369 (2024) ...............................................................................56

Lujan v. Defs. of Wildlife,
    504 U.S. 555 (1992) ...............................................................................33

LULAC v. Exec. Office of the President,
    780 F. Supp. 3d 135 (D.D.C. 2025) .......................................................29

Media Matters for Am. v. Paxton,
    138 F.4th 563 (D.C. Cir. 2025).............................................................15

*Mendoza v. Perez,*
   754 F.3d 1002 (D.C. Cir. 2014) ..............................................21

*Minn. Pub. Int. Rsch. Grp. v. Butz,*
   498 F.2d 1314 (8th Cir. 1974) ..............................................58

*N.D. v. Reykdal,*
   102 F.4th 982 (9th Cir. 2024) ..............................................73

*N.W. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.,*
   496 F. Supp. 3d 31 (D.D.C. 2020) ..........................................31

*Nat'l Conservative Political Action Comm. v. FEC,*
   626 F.2d 953 (D.C. Cir. 1980) ..............................................66

*Niz-Chavez v. Garland,*
   593 U.S. 155 (2021) ..........................................................36

*Novartis Pharms. Corp. v. Johnson,*
   102 F.4th 452 (D.C. Cir. 2024) ............................................37

*\*People for the Ethical Treatment of Animals (PETA) v. USDA,*
   797 F.3d 1087 (D.C. Cir. 2015) .................3, 5, 20, 21, 22, 23, 25, 26, 28

*PG&E v. FERC,*
   113 F.4th 943 (D.C. Cir. 2024) ............................................50

*Pursuing Am.'s Greatness v. FEC,*
   831 F.3d 500 (D.C. Cir. 2016) ..............................................20

*Save Jobs USA v. U.S. Dep't of Homeland Sec.,*
   111 F.4th 76 (D.C. Cir. 2024) ..............................................26

*Seven County Infrastructure Coal. v. Eagle County,*
   145 S. Ct. 1497 (2025) ......................................................55

*Sierra Club v. EPA,*
   671 F.3d 955 (9th Cir. 2012) ..............................................67

*Sierra Club v. FERC*,
  145 F.4th 74 (D.C. Cir. 2025)................................................................56

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  64 F. Supp. 3d 128 (D.D.C. 2014) .........................................................57

*Sierra Club v. USDA*,
  777 F. Supp. 2d 44 (D.D.C. 2011) .........................................................57

*Small Refiner Lead Phase-Down Task Force v. EPA*,
  705 F.2d 506 (1983) ...............................................................................48

*Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*,
  967 F.2d 598 (D.C. Cir. 1992) ...............................................................63

*United Spinal Ass'n v. O'Malley*,
  2024 U.S. Dist. LEXIS 121504 (D.D.C. 2024)......................................30

*United States v. Torres*,
  115 F.3d 1033 (D.C. Cir. 1997) .............................................................26

*Univ. of D.C. Faculty Ass'n / NEA v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*,
  163 F.3d 616 (D.C. Cir. 1998) ...............................................................63

*VFD Consulting, Inc. v. 21st Servs.*,
  425 F. Supp. 2d 1037 (N.D. Cal. 2006)..................................................45

*Vill. of Barrington v. Surface Transp. Bd.*,
  636 F.3d 650 (D.C. Cir. 2011) ...............................................................40

*Vote Forward v. DeJoy*,
  490 F. Supp. 3d 110 (D.D.C. 2020) .......................................................72

*Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*,
  139 S. Ct. 36 (2018) ...............................................................................64

*Whitman-Walker Clinic, Inc. v. U.S. HHS,*
    485 F. Supp. 3d 1 (D.D.C. 2020) ............................................................32

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ....................................................................................20

**Statutes**

*12 U.S.C. § 635 ........................................4, 18, 42 , 47, 48, 61, 62, 63, 65

*12 U.S.C. § 635a ..................................3, 18, 23, 35, 39, 41, 42, 47, 65, 66

*12 U.S.C. § 635i-5................................................................................24, 48, 69

42 U.S.C. § 4332 ....................................................................................54

42 U.S.C. § 4336 ....................................................................................54

42 U.S.C. § 4336e ............................................................................54, 59

5 U.S.C. § 706(2)....................................................................................63

**Other Authorities**

ACLED, *Mozambique Conflict Monitor Update:* 13-26 October 2025,
    https://acleddata.com/update/mozambique-conflict-monitor-update-29-
    october-2025..........................................................................................10

Alex Perry, *TotalEnergies accused of complicity in war crimes over
    Mozambique container massacre,* Politico (Nov. 18, 2025),
    https://www.politico.eu/article/totalenergies-accused-complicity-war-
    crimes-mozambique-container-massacre/.................................................7

Armed Conflict Location & Event Data Project (ACLED), *Mozambique
    Conflict Monitor Update: 4 - 17 August 2025*) ......................................10

Black's Law Dictionary (4th ed. 1968) .....................................................37

Black's Law Dictionary (6th ed. 1990) .....................................................40

European Commission's Emission Database for Global Atmospheric
Research, European Commission, Emissions Database for Global
Atmospheric Research, GHG emissions for all world countries, 2025
Report,
https://edgar.jrc.ec.europa.eu/report_2025?vis=ghgtot#emissions_table
.....................................................................................................................10

EXIM, *Economic Impact Procedures and Methodological Guidelines* ..61,
65, 66, 67

EXIM, *Environmental and Social Due Diligence Procedures and
Guidelines* ........................................................23, 50, 52, 53, 54, 58, 69

EXIM, Environmental and Social Project, Information and Concerns,
https://www.exim.gov/policies/exim-bank-and-
environment/environmental-and-social-project-information-and-
concerns ............................................................................................70

EXIM, Pending Transactions, https://www.exim.gov/policies/exim-bank-
and-environment/pending-transactions (last visited Nov. 19, 2025)...51

Francois de Beaupuy, *TotalEnergies CEO Says Mozambique LNG
Project 'Ready' to Restart*, Bloomberg (Sept. 29, 2025),
https://www.bloomberg.com/news/articles/2025-09-29/totalenergies-
ceo-says-mozambique-lng-project-ready-to-restart ...............................9

Merkley Slams EXIM Bank for Failing to Provide Congressional
Notification of Mozambique LNG Project, Jeff Merkley Senator for
Oregon (Aug. 5, 2025), https://bit.ly/4p5x2yn ......................................50

*TotalEnergies and partners lift force majeure on $20 billion
Mozambique LNG project*, Reuters (Oct. 25, 2025),
https://www.reuters.com/sustainability/climate-energy/totalenergies-
partners-liftforce-majeure-20-billion-mozambique-lng-project-2025-10-
25.........................................................................................................9

U.S. Envtl. Prot. Agency, *Overview of Greenhouse Gases*,
    https://www.epa.gov/ghgemissions/overview-greenhouse-gases (last
    visited Nov. 19, 2025)................................................................................59

United Nations, *What Is Climate Change?*,
    https://www.un.org/en/climatechange/what-is-climate-change (last
    visited Nov. 19, 2025)................................................................................59

**Regulations**

12 C.F.R. § 408.4(b)(1) ...............................................................................59

## GLOSSARY OF ABBREVIATIONS

**EXIM**     Defendant-Appellee Export-Import Bank of the United States

**FOE**      Plaintiff-Appellant Friends of the Earth—U.S.

**JA**       Plaintiff-Appellant Justiça Ambiental

**NEPA**     National Environmental Protection Act

**PETA**     People for Ethical Treatment of Animals

## INTRODUCTION

Defendant Export-Import Bank of the United States ("EXIM") unlawfully approved a $4.7 billion loan to subsidize a foreign corporation's construction of a highly controversial liquefied natural gas project ("the Project") in Mozambique. Plaintiffs-Appellants appeal the district court's denial of their preliminary injunction motion.

The Project is located in an area beset by an active conflict. Although EXIM originally approved a loan for the Project in 2019, it never disbursed any money. In 2021, the operator, French company TotalEnergies SE ("Total"), halted construction and declared *force majeure* after al-Shabab, a brutal insurgency, seized a nearby town, killing hundreds of people. Soon after, Mozambican forces protecting the Project reportedly raped women, and imprisoned, tortured, and murdered hundreds of men at the Project's gate. Security forces continue to commit abuses, and al-Shabab continues to target the Project and surrounding villages.

This led other potential Project lenders to carefully re-evaluate their financing. But EXIM charged on. In March 2025, its new acting Board hurriedly approved this loan, without, among other things,

1

providing notice and an opportunity to comment, violating clear provisions of the Export Import Bank Act of 1945 ("Bank Act"), 12 U.S.C. §§ 635-635t, the National Environmental Protection Act ("NEPA"), 42 U.S.C. § 4321 et seq, and EXIM's procedures. Plaintiffs Friends of the Earth U.S. ("FOE") and Justiça Ambiental ("JA") filed suit, and sought to prevent EXIM from disbursing taxpayer money while the district court considered the loan's legality.

The district court denied Plaintiffs' motion despite finding Plaintiffs had shown irreparable harm, as they "and the communities they serve will likely be harmed" if the loan proceeds. JA0595. The Project's restart will make local people al-Shabab targets, exacerbate the conflict, and displace more people from their land and fishing grounds. This will require Plaintiffs to provide more, but far less effective, services to those injured. Conversely, for EXIM and Total, temporary relief will impose only minimal burden, if any; the Project has been officially paused for over four years and remains so. The equities favor maintaining the *status quo*: temporarily preventing funding from leaving the United States.

The district court, however, held Plaintiffs' claims are unlikely to succeed. It found Plaintiffs likely lack standing for most of their claims, even though it *agreed* that because EXIM denied Plaintiffs a means of redress, they were injured and have standing under *People for the Ethical Treatment of Animals (PETA) v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015). But the district court, citing *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), declined to follow this Court's precedent. District courts lack such freedom, and *PETA* and *Alliance* are perfectly consistent. The district court incorrectly dismissed other standing arguments in a footnote.

The district court also erred on the merits. It held that, because EXIM initially approved Project funding in 2019, the Bank Act imposed no obligations in 2025, even though the Board's 2025 approval was necessary for any loan to proceed. But the Act requires notice and comment for any "final consideration" of a major transaction. 12 U.S.C. § 635a(c)(10). The 2025 approval was EXIM's "final consideration" of whether to lend Total billions of dollars; it could have said "no."

The Act also requires EXIM to analyze its transactions' economic effects. 12 U.S.C. § 635(e). But it never considered the undisputed fact

that the Project will hurt U.S. producers and workers because liquified natural gas will now be in oversupply when production begins.

EXIM's reliance on stale comments and obsolete analyses—thereby ignoring current reality—is patently arbitrary. Since 2019, the economics have changed, the Project and nearby villages have become insurgent targets, and forces protecting the Project have reportedly committed grave human rights abuses. Total has not replaced land it took. Diverse parties, including United States Senators from both political parties, have publicly raised these and other concerns.

Moreover, the district court erred by deferring to EXIM's decision to forgo a NEPA analysis, even though it never explained its refusal.

Because all three preliminary injunction factors—irreparable harm, balance of the equities, and likelihood of success—favor relief, the Court should reverse the district court's decision and remand for the district court to preliminarily enjoin Defendants from disbursing funds pursuant to the unlawful 2025 approval.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. It denied Plaintiffs' preliminary injunction motion on October 10, 2025.

JA0563. Plaintiffs filed their notice of appeal on October 29. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## ISSUES PRESENTED

1.    The district court held that Plaintiffs likely have standing under *PETA*, 797 F.3d 1087, but refused to apply it. Was the district court obligated to apply *PETA*?

2.    Restarting the Project will force Plaintiffs to provide more and more burdensome services to local people. Did the district court err in summarily rejecting standing based on this injury as speculative on grounds that it depended on acts of the insurgents and the government, where it is undisputed that many of the harms Plaintiffs will try to redress have nothing to do with the conflict?

3.    The Bank Act requires EXIM to provide notice and permit comment before "final consideration of a long-term transaction" of this size, and to assess "any serious adverse effect" on U.S. industry and employment before authorizing support. Are Plaintiffs likely to succeed on their claims that EXIM was required to solicit comment and conduct an economic analysis before the Board's 2025 loan approval?

5

4. Did the district court err in deferring to EXIM's unexplained decision not to apply NEPA?

## STATUTES

All relevant statutes are included in the Addendum.

## STATEMENT OF THE CASE

### I.    Statement of facts.

### A.    EXIM's loan for the Project.

In April 2015, an American-led consortium asked EXIM for a $5 billion loan for a liquified natural gas facility in Mozambique. JA0269. EXIM provided notice and sought comment from Congress and the public. JA0269-70, JA0307, JA0325. EXIM conducted a Detailed Economic Impact Analysis based on 2019 predictions for market conditions when production was scheduled to start in 2024. JA0344-54. The Board approved the loan in September 2019. JA0270. In May 2020, the Board approved a revised loan, making French company Total the lead sponsor and Project operator. JA0270.

Before EXIM disbursed any funds, JA0750, al-Shabab's insurgency engulfed Cabo Delgado, where the Project is located. JA0106-7, JA0644-50. In March 2021, al-Shabab seized Palma, many

Project contractors' base, killing hundreds and beheading many victims. JA0645. Total declared *force majeure*, halting the Project. JA0245.

Soon after the Palma massacre, Mozambican forces operating out of the Project's gatehouse reportedly lured hundreds of civilians to the Project site, accused them of being insurgents, raped women, locked men in shipping containers and starved, tortured and murdered detainees. JA0108. There are investigations underway in numerous countries into these abuses, including into Total's alleged complicity, and other export credit agencies are undertaking new diligence and reconsidering their commitments. JA0143-51.[1]

The conflict has killed thousands and at its peak displaced over a million people, with hundreds of thousands still displaced today. JA0109. Insurgents and Mozambican forces allegedly continue to commit grave rights violations, including killing, sexual assault, and enforced disappearance. JA0108-09, JA0644-53.

---

[1] *See also* Alex Perry, *TotalEnergies accused of complicity in war crimes over Mozambique container massacre,* Politico (Nov. 18, 2025), https://www.politico.eu/article/totalenergies-accused-complicity-war-crimes-mozambique-container-massacre/ (reporting criminal complaint "formally accused" Total "of complicity in war crimes and torture").

By January 2024, Total wanted to resume the Project despite the conflict. EXIM's loan is one quarter of the potential funding, JA0113-14, and Total ████████████████████████████████████████ ████████████████████████████████. And Total could not access EXIM funding unless the Board approved new loan terms and conditions. JA0580 n.6. So Total requested Board approval of a new agreement that included a four-year extension of the completion and repayment dates in the old loan, ██████████████████████████ ██████. JA0271, JA0750-59. Under these terms, production would not commence until at least 2029. JA0147.

On March 11, 2025, EXIM posted the agenda for its March 13 board meeting, listing the Project for approval. JA0180. EXIM provided no other notice nor any opportunity to comment. JA0180. On March 13, EXIM's Board approved the $4.7 billion loan. JA0260.

**B.     The Project's restart will harm local communities.**

In October 2025, after the district court ruled, Total lifted *force majeure*.[2] Total said it will move "very quickly" towards full operations,

---

[2] *See TotalEnergies and partners lift force majeure on $20 billion Mozambique LNG project*, Reuters (Oct. 25, 2025), https://www.reuters.com/sustainability/climate-energy/totalenergies-

and is only waiting for the Mozambican government to approve an

amended Project plan.[3]

The Project has already taken hundreds of farmers' homes and

land, often without their consent and adequate compensation, and

blocked fisherpeoples' access to the sea. JA0613-16 ¶¶ 69-84, JA0764-66

¶¶ 6-11; JA0768 ¶ 18. When the Project restarts, it will displace more

families and prevent more fishermen from making a living. JA0612 ¶

64, JA0764-68 ¶¶ 12-20.

The Project threatens endangered fauna and pristine mangroves

and reefs in the Quirimbas Archipelago, a United Nations Biosphere

Reserve. JA0617-19 ¶¶ 85-94; JA0771-77 ¶¶ 29-49. It will also

significantly contribute to climate change, with estimated annual direct

emissions of 13 million metric tons of $CO_2$ equivalent, which exceeds

that of 73 countries.[4]

---

partners-liftforce-majeure-20-billion-mozambique-lng-project-2025-10-25/.

[3] Francois de Beaupuy, *TotalEnergies CEO Says Mozambique LNG Project 'Ready' to Restart*, Bloomberg (Sept. 29, 2025), https://www.bloomberg.com/news/articles/2025-09-29/totalenergies-ceo-says-mozambique-lng-project-ready-to-restart.

[4] European Commission's Emission Database for Global Atmospheric Research. European Commission, Emissions Database for Global Atmospheric Research, GHG emissions for all world countries, 2025

The Project will exacerbate the conflict, exposing local people to further violence. JA0631 ¶ 40, JA0642 ¶¶ 7-8, JA0654-66 ¶¶ 65-73. Even prior to its 2019 approval, EXIM understood that "the insurgency is highly likely to target the Project throughout its lifecycle." JA0333. And since the insurgents see significant propaganda value in attacks near the Project, they target nearby villages. JA0110, JA0655-56 ¶¶ 68-72. In August 2025, al-Shabab attacked villages near the Project; in October 2025, militants "expand[ed] their reach across Cabo Delgado," attacked civilians in Palma, and beheaded a Project security guard.[5] Insurgents also target the region's main highway, and insurgents and the military both have checkpoints at which people are extorted, abused, and disappeared. JA0169, JA0634-35 ¶¶ 156-64, JA0647 ¶ 37, JA0648 ¶ 43, JA0650 ¶ 52, JA0652 ¶¶ 56-57.

Because of the ongoing risks, Total announced in May 2025 that it will create a security enclave for the Project that permits access only by

---

Report, https://edgar.jrc.ec.europa.eu/report_2025?vis=ghgtot#emissions_table.
[5] Pls. Reply at 2 (DE 38) (citing Armed Conflict Location & Event Data Project (ACLED), *Mozambique Conflict Monitor Update: 4 - 17 August 2025*); ACLED, *Mozambique Conflict Monitor Update:* 13-26 October 2025, https://acleddata.com/update/mozambique-conflict-monitor-update-29-october-2025.

ship and air. JA0657 ¶ 77. This requires more security forces. JA0658

¶ 78. That may benefit Total, but Mozambican forces are implicated in a

pattern of abuses against local civilians. JA0108-09, JA0630-31 ¶¶132-

39, JA0657 ¶ 76. And while insurgents will target local communities

because of the Project, Total's strategy leaves them outside the

perimeter, and thus more vulnerable to insurgent attack. JA0657-60

¶¶ 77-85; JA0769 ¶ 23.

### C. Plaintiffs have spent almost two decades providing services to communities directly impacted by the Project.

Plaintiffs are nonprofit organizations that work to safeguard

human health, defend human rights, and protect the environment.

JA0119 ¶¶ 7-8, JA0598-99 ¶¶ 3, 7-8. They provide services to help

people protect their rights and interests from threats from projects like

this one. JA0121-28 ¶¶ 10-34, JA0599-600 ¶¶ 9-14.

Plaintiffs have provided services to local people to protect their

rights and prevent or address injuries for the nearly twenty years, since

Total's predecessors began exploration. JA0559 ¶¶ 9-11, JA0778 ¶ 51.

JA is a service hub for local communities, offering advice, information,

research, social work, support for legal action, environmental

11

monitoring, and representation. JA0600 ¶ 12-14, JA0778 ¶¶ 51-52. FOE

provides services to affected people with and through JA. JA0119-20 ¶¶

8-9.

First, Plaintiffs provide critical information about the Project to

local people. JA0126 ¶¶ 26-28, JA0603 ¶¶ 26-27. Environmental impact

statements, harm mitigation plans, and other Project documents are

often unavailable to affected communities due to language,

technological and other barriers. JA0126 ¶ 27, JA0603 ¶ 26.

Second, Plaintiffs investigate the Project and its impacts on

communities and the environment and assess whether Total and its

financiers are meeting their legal obligations. JA0127 ¶¶ 29-30,

JA0601-02 ¶¶ 15-25, JA0779-80. They use this research to help

communities understand the Project's effects and their rights.

Third, Plaintiffs help communities protect their rights and

interests by facilitating Project-affected people's participation in notice

and comment, due diligence, and other redress procedures that enable

Plaintiffs to raise their rights and concerns, and seek remedies from,

the Mozambique government, Total, EXIM, and other foreign actors.

JA0120-22 ¶¶ 12-16, JA0604-06 ¶¶ 28-41, JA0781-82 ¶¶ 65-67.

Plaintiffs have facilitated community engagement and shared community concerns with Project decision-makers, including in consultations with Total on resettlement and in government-led consultations around the 2012 Environmental Impact Assessment process. JA0604-05 ¶¶ 32-35. JA has also collected over 1,300 complaints about the resettlement process from people whose lands were taken by the Project. JA0602 ¶ 22. JA is continuing to investigate these claims and helping the displaced seek redress. *Id.*

Plaintiffs have regularly helped community members engage with EXIM. JA0122-25, JA0606-09. For instance, in 2016, Plaintiffs raised communities' concerns regarding displacement and economic and environmental harms through EXIM's notice and comment process that informed its due diligence. JA0123, JA0607.

Plaintiffs have also presented community members' concerns about resettlement, environmental impacts and insurgent and military violence to EXIM through its grievance mechanism and elsewhere. JA0124, JA0606-09. As the conflict escalated, Plaintiffs urged EXIM to conduct new due diligence prior to any new loan approval. JA0607-08 ¶¶ 48, 50.

13

Plaintiffs have expended substantial time and resources due to the 2025 final approval and will continue to do so to serve those that the Project has and will harm. JA0128-29, JA0609-13.

## II.    Procedural history.

FOE and JA filed suit challenging EXIM's decision on July 14, 2025. On July 21, 2025, Plaintiffs moved for a preliminary injunction to prevent EXIM from releasing funds until this case is resolved. Total intervened. On October 10, 2025, the district court denied Plaintiffs' motion for preliminary relief. JA0563.

The district court concluded Plaintiffs had shown irreparable harm and the balance of the equities were relatively equal. JA0591-95. However, it found Plaintiffs' claims were unlikely to succeed. It concluded Plaintiffs likely had standing under *PETA*, but opined that after *Alliance*, *PETA* is no longer valid. JA0572-74. In a footnote, it dispensed with Plaintiffs' showing that the increase in demand for more, and more burdensome services also injured them. JA0571 n.1**.** While it correctly held that Plaintiffs likely have informational standing for their NEPA and economic analysis claims because they would have used information EXIM ought to have provided, JA0574-76, the district

14

court concluded that all of Plaintiffs' substantive claims failed. The court found that the Bank Act did not impose any obligations on EXIM in 2025, JA0577-88, and deferred to EXIM's unexplained conclusion that NEPA does not apply. JA0588-90.

Plaintiffs timely appealed.

## STANDARD OF REVIEW

This Court reviews a district court's weighing of the preliminary injunction factors—likelihood of success, irreparable harm, and balance of the equities—for abuse of discretion, factual findings for clear error, and standing questions *de novo. Media Matters for Am. v. Paxton*, 138 F.4th 563, 573 (D.C. Cir. 2025). Legal conclusions are also reviewed *de novo. Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009).

## SUMMARY OF ARGUMENT

The district court erred in refusing to preliminarily enjoin EXIM's illegal funding. All three preliminary injunction factors—irreparable harm, balance of the equities, and likelihood of success on the merits— favor temporary relief. As the court recognized, resuming the Project will cause Plaintiffs and the communities they serve irreparable harm.

15

Since any harms to EXIM and Total are comparably minimal, the balance of the equities favors temporary relief.

The district court found that Plaintiffs likely lack standing for many of their claims, and are unlikely to prevail on the merits, but neither is correct.

Plaintiffs have organizational standing. First, the district court correctly found that because EXIM barred Plaintiffs from participating in EXIM's redress mechanisms on behalf of the people they serve, Plaintiffs have standing under this Court's decision in *PETA*. JA0572-73 (citing 797 F.3d at 1095). That should have ended the inquiry.

Instead, the district court refused to follow this Court's precedent, reasoning that *Alliance* "casts doubt" on *PETA*. JA0574. But even a Circuit panel could not disregard Circuit precedent unless *Alliance* eviscerated it—and *PETA* is consistent with *Alliance*. Both found that an organization cannot merely spend its way into standing. But when, as here and in *PETA*, an agency forecloses an avenue of redress, it injures organizations reliant on that avenue to prevent harm.

Second, because EXIM's funding allows the Project to restart, and will thereby make local people an al-Shabab target, harm the

16

environment, and displace more people from their land and fishing grounds, Plaintiffs will have to provide more, and more burdensome services: helping clients to remediate harms rather than preventing them.

The district court summarily and incorrectly stated that these injuries are speculative because they are based on the acts of insurgents or the Mozambican government. But the *Project itself* will harm the environment and displace local people.

Nor is it speculative that the Project will bring the conflict to the area. The district court ignored Plaintiffs' expert and EXIM's own analysts, and Defendants presented no contrary evidence.

Plaintiffs' claims are also likely to succeed on the merits. First, the Bank Act required EXIM to conduct notice and comment before the March 2025 approval, but EXIM did not. The Act's text is unambiguous. EXIM must allow comment before any Board meeting for "final consideration of a long-term transaction" worth more than $100 million. 12 U.S.C. § 635a(c)(10)(A). EXIM's 2025 decision was the "final" time the Board "consider[ed]" whether to make $4.7 billion in taxpayer funds available to Total.

The district court ignored the statute's plain meaning. Looking to "statutory context," the court found that the "final" consideration was not the *last* time the Board considered a loan to the Project, but the *first*. Plain meaning permits no such finding.

The district court also failed to enforce Congress's prohibition on EXIM subsidies for foreign transactions that harm U.S. economic interests. The Bank Act requires the Board to take into account "any serious adverse effect" on U.S. industry and employment before authorizing support, 12 U.S.C. § 635(b)(1)(B), and prohibits lending for overseas commodity production in specified circumstances that are present here, unless the Board determines that the benefits to U.S. exporters outweigh the harm to Americans.

EXIM ignored considerable evidence that this loan will cause "substantial injury" in the United States. It refused to assess this risk based on current market forecasts, relying instead on outdated predictions from 2019 that are plainly wrong. That violated the Bank Act's clear text and EXIM's own procedures. The district court erred as a matter of law in finding otherwise.

18

The district court also misconstrued NEPA. It improperly deferred to EXIM's cursory, unreasoned assertion that the approval was not a major federal action. Agencies have no discretion to decide whether NEPA applies, and even where NEPA provides agencies leeway, they must provide *some* reason for their decisions.

Because all three of the preliminary injunction factors favor relief, this Court should reverse and remand for the district court to preliminarily enjoin EXIM from distributing funds while the court reviews its illegal acts.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors merge where the government is a party because "the government's interest is the public interest." *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016). All of the

factors—likelihood of success on the merits, irreparable harm and
balance of the equities—favor a preliminary injunction.

## I.      Plaintiffs have standing.

A party has Article III standing where it has or likely will suffer
an injury, that likely was or will be caused by defendant, and the injury
likely would be redressed by the requested relief. *Jibril v. Mayorkas*, 20
F.4th 804, 813-14 (D.C. Cir. 2021). In a preliminary injunction motion,
plaintiffs must provide evidence "that, if taken to be true,
demonstrate[s] a substantial likelihood of standing." *Elec. Privacy Info.
Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d
371, 377 (D.C. Cir. 2017) (quotation marks omitted).

An organization is injured if the defendant's act "injured the
organization's interest" and it "used its resources to counteract that
harm." *PETA*, 797 F.3d at 1094 (cleaned up). The organization must
show a "concrete and demonstrable injury to [its] activities." *Id.* at 1093
(quotation marks omitted). The challenged acts must have affected the
organization's "core" activities, rather than merely compromising its
"social interests." *Alliance*, 602 U.S. at 394.

Plaintiffs have suffered three "'concrete and demonstrable injur[ies] to [their] activities,'" that are not just "'a setback to the organization[s'] abstract social interests,'" *PETA*, 797 F.3d at 1094 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)): (1) EXIM denied them a means of redress; (2) EXIM's funding will require them to provide more but less effective services to Project-affected people; and (3) EXIM withheld information that Plaintiffs would use in providing these services.

The district court erred in holding that the first type of injury no longer establishes standing, and that the second was speculative. It correctly held Plaintiffs have informational standing.

Most if, not all, of Plaintiffs' injuries flow from procedural violations, which have diminished causation and redressability requirements. *Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014); JA0573. Regardless, EXIM's final approval and imminent disbursal of the loan will harm Plaintiffs by enabling the Project to proceed. These harms can be redressed through an order vacating the final approval because that would undo the procedural violations and pause EXIM's funding while EXIM follows the required procedures. JA0573.

21

**A.    Plaintiffs have standing because EXIM denied them a means of redress.**

**1.    The district court correctly found Plaintiffs satisfy PETA.**

In *PETA*, this Court held that when an agency denies an organization a means of redress it would use to advance its mission, it has suffered a concrete injury that confers standing. 797 F.3d at 1095. An organization excluded from an agency's means of redress has a personal stake in challenging that exclusion.

PETA had standing because the Department of Agriculture impaired its ability to bring violations to the attention of the agency charged with preventing them. *Id*. The agency injured PETA by depriving it of a means to "seek redress for bird abuse" through its complaint mechanism. *Id*.

*PETA* applied *Action Alliance of Senior Citizens of Greater Philadelphia v. Heckler*, 789 F.2d 931 (D.C. Cir. 1986). 797 F.3d at 1094. There, the organization had standing because agency decisions that made an administrative review process meaningless denied it "avenues of redress," "inhibit[ing]" its operations and causing "an injury both concrete and specific to [its] work." *Heckler,* 789 F.2d at 937-38.

The district court recognized that Plaintiffs "suffered a comparable injury." JA0573. Prior to the 2025 approval, EXIM excluded Plaintiffs from two processes that enable parties to prevent or remedy specific harms to specific people.

First, the Bank Act requires EXIM to solicit comments that go to the Board to inform its decision of whether, or with what conditions, to provide financing. 12 U.S.C. §§ 635a(c)(10)(C), (E).

Second, EXIM's due diligence procedures require EXIM to receive comment and engage with interested parties in reviewing the environmental and social risks to local communities and the plans to mitigate those risks. EXIM, *Environmental and Social Due Diligence Procedures and Guidelines* ("*Environmental and Social Procedures*") § I ¶¶ 8, 9, § III C, § IV B, Final Commitments ¶ 2, https://www.exim.gov/policies/exim-bank-andenvironment/procedures-and-guidelines. As a result of this review, EXIM can impose conditions and only disburse funding if those conditions are met, or it can deny funding entirely. *Id.* § IV B ¶ 6; *see also* JA0333, JA0722-23, JA0751-53. Indeed, EXIM has acknowledged that Plaintiffs' 2016 comments led

23

EXIM to raise their concerns with the borrower and attempt to address them. JA0325-26.

Had EXIM allowed comment before its March 2025 decision, Plaintiffs would have raised local peoples' concerns that the Project (1) will exacerbate the conflict and make villages a target; (2) has not provided land to replace farms it seized, in violation of EXIM's resettlement requirements; (3) will cause substantial environmental degradation; and (4) will shatter livelihoods by denying fishermen's access to the sea and taking more farmland. *Supra* 9-11; JA0611, JA0776.

EXIM could avoid these harms by withholding financing or imposing conditions. 28 U.S.C. § 635i-5(a)(2); *Environmental and Social Procedures* § I ¶ 22, § IV B ¶ 6. But instead, it denied Plaintiffs "access to ..... avenues of redress they wish to use" to prevent and remedy those harms. That injured Plaintiffs in precisely the same way the Department of Agriculture injured PETA's efforts to prevent bird abuse. *PETA*, 797 F.3d at 1094.

Thus, the district court rightly found that "EXIM's refusal to follow alleged procedural requirements removed an avenue" of redress,

"forcing [Plaintiffs] to dedicate even more time and resources to provide local people with information and services to protect local people's rights and ameliorate harms from the Project." JA0573 (cleaned up). It also concluded that Plaintiffs met the causation and redressability requirements. *Id.*

Because the district court correctly concluded that Plaintiffs have suffered the same injury as the *PETA* plaintiffs, they likewise have standing.

### 2. *PETA* is binding.

While agreeing that Plaintiffs satisfy PETA, the district court refused to apply it, asserting incorrectly that *Alliance* "casts doubt" on *PETA*. JA0574. This was an error of law. "[D]istrict judges, like panels of this court, are obligated to follow controlling circuit precedent until either [the Circuit], sitting *en banc*, or the Supreme Court, overrule it." *United States v. Torres*, 115 F.3d 1033, 1036 (D.C. Cir. 1997). A decision is only "overruled" for these purposes where its reasoning is "eviscerated." *Save Jobs USA v. U.S. Dep't of Homeland Sec.*, 111 F.4th 76, 79-80 (D.C. Cir. 2024).

*Alliance* hardly eviscerated *PETA's* reasoning. Both applied the *same* requirement that the plaintiff suffer concrete injury. In *Alliance*, medical organizations sought to challenge the approval of a drug they would never prescribe, and claimed standing based solely on "incurring costs to oppose" the approval. 602 U.S. at 372-74, 394. In the passage the district court quoted, *Alliance* merely reiterated that "'an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action.'" JA0573 (quoting 602 U.S. at 394).

Like *Alliance*, *PETA* also required the plaintiff to suffer "a concrete and demonstrable injury to its activities" to find standing. 797 F.3d at 1093 (quotation marks omitted). *PETA* applied this Court's established two-part test, asking whether the agency "'injured the [organization's] interest'" and "the organization 'used its resources to counteract that harm.'" *Id.* at 1094 (quoting *Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1140 (D.C. Cir. 2011)). Thus, *Alliance* and *PETA* both held that an expenditure of resources (this Court's second

requirement) alone does not demonstrate an injury to the organization's interest (this Court's first requirement).

In *PETA* (and *Heckler*), unlike *Alliance*, there was a concrete injury to the Plaintiffs' activities: the defendant harmed the organization by precluding it from seeking redress through the agency's complaint mechanism. *PETA* simply notes one way a plaintiff can meet *PETA* and *Alliance*'s concrete injury requirement. By contrast, there was no injury in *Alliance*; Alliance was not barred from participating in any redress process, it just disagreed with the agency's decision. Accordingly, *Alliance* does not address, let alone *"*eviscerate" *PETA* and *Heckler*'s holding that denial of a means of redress is a concrete injury.

Indeed, *Alliance* and *PETA* are aligned. Alliance lacked standing because the regulations imposed no "impediment" to its work. 602 U.S. at 395. *PETA* (and *Heckler)* correctly recognized that excluding an organization from a means of redress is such an impediment.

*PETA* and *Alliance* are consistent for another reason: both applied *Havens Realty*. *PETA* held denial of "avenues of redress" is "the same type of injury"—impairment of an organization's activities—that established standing in *Havens*. 797 F.3d at 1094 (quotation marks

27

omitted). And *Alliance* recognized there was standing in *Havens* because the defendant interfered with plaintiff's core activities, 602 U.S. at 395-96, just as in *PETA*.

The district court's suggestion that a panel of this Court "recognized that *Alliance []* casts doubt on 'the foundation of [its] organizational injury precedents,'" is incorrect. JA0574 (quoting (citing *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 144 F.4th 296, 315 (D.C. Cir. 2025)). The panel merely said that *Alliance* "described *Havens Realty*—the foundation of our organizational injury precedents—as an 'unusual case' and cautioned against extending it beyond circumstances in which the challenged action 'directly affected and interfered with [a plaintiff's] core business activities.'" 144 F.4th at 315 (quoting 602 U.S. at 395-96). As noted, *PETA* was well within *Havens*' ambit, finding standing precisely because the defendant interfered with plaintiff's activities.

Far from "cast[ing] doubt" on *PETA*, that panel *applied* it, holding that the plaintiff did not assert an injury "analogous to the harms … that supported organizational standing in" *PETA* and *Heckler*. *Id.*; *see also Animal Legal Def. Fund v. Rollins*, No. 22-3146, 2025 U.S. Dist.

LEXIS 210427, at *40 (D.D.C. Oct. 24, 2025) (*Ctr. for Biological Diversity* "reads *PETA* broadly").

The district court also cited *Coalition for Humane Immigrant Rights v. DHS*, 780 F. Supp. 3d 79 (D.D.C. 2025), JA0574, but that decision applied *PETA* as "binding precedent." 780 F. Supp. 3d at 89 & n.2. Other courts have too, after *Alliance*.[6] Indeed, courts have found standing under *PETA*. For instance, an organization that facilitated consumer participation in an agency complaint system had standing where an agency unlawfully disclosed consumers' confidential information, rendering the complaint system ineffective and thereby denying a means of redress. *AFL-CIO v. DOL*, 778 F. Supp. 3d 56, 75-76 (D.D.C. 2025). Similarly, an organization that assisted people with spinal cord injuries had standing to challenge a requirement making it harder to obtain benefits, because it suffered a concrete injury, "[j]ust as

---

[6] *Animal Legal Def. Fund*, 2025 U.S. Dist. LEXIS 210427, at *40; *ASPCA v. Animal & Plant Health Inspection Serv.*, 2025 U.S. Dist. LEXIS 213496, at *25-26 (D.D.C. Oct. 29, 2025); *see also LULAC v. Exec. Office of the President*, 780 F. Supp. 3d 135, 180 (D.D.C. 2025) (prior D.C. Circuit organizational standing precedent "is consistent with" *Alliance*.)

in [*PETA*]." *United Spinal Ass'n v. O'Malley*, No. 20-cv-2236, 2024 U.S. Dist. LEXIS 121504, *20-21 (D.D.C. 2024).

Because *PETA* applied the same concrete injury requirement as *Alliance*, and recognized the same injury as *Havens*, *Alliance* did not eviscerate *PETA*. The district court was therefore required to apply *PETA* as controlling authority.

**B.     Plaintiffs have standing because EXIM's loan will increase the burden on Plaintiffs to provide their services.**

An organization that provides services is harmed when a defendant's acts "might increase the number of people in need of" those services or decrease the services' effectiveness. *Equal Rights Ctr. v. Post Properties Inc.*, 633 F.3d 1136, 1139 (D.C. Cir. 2011) (citations omitted). So too where a defendant's acts force an organization to provide more burdensome or complicated services. *Capital Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 39 (D.D.C. 2020); *N.W. Immigr. Rts. Project v. U.S. Citizenship & Immigr. Servs.*, 496 F. Supp. 3d 31, 46-47 (D.D.C. 2020).

The Project will displace more people from their land and fishing grounds and exacerbate the conflict. *Supra* 9-11. Impacted people are

turning to Plaintiffs for services and will continue to do so in greater numbers. *Infra* 31-35. But Plaintiffs will be forced to use less effective, more difficult means to secure after-the-fact remedies rather than preventing injuries before they occur. This confers standing.

The district court did not dispute this law or the facts. Yet, it summarily rejected standing in a footnote, stating this injury was "based on speculation about what third parties, namely Islamic insurgencies and the Mozambican government, will do[.]" JA0571. But many of Plaintiffs' injuries flow directly from Project activities—not the conflict. And extensive unrebutted evidence—and recent attacks—show that those injuries that are related to conflict are not speculative.

### 1.    Plaintiffs have injuries that do not involve insurgents or the Mozambican government.

The district court's holding that Plaintiffs' injury is speculative erred in ignoring that the *Project*—not the government or insurgents— will displace more people from their land, damage the environment, limit fisherpeoples' sea access and otherwise harm livelihoods. *Supra* 9-11. These facts were not seriously disputed.[7] Regardless, courts assess

---

[7] The only dispute was about resettlement. Total claimed resettlement is complete, JA0246 ¶ 49, but Total has not provided promised

standing with facts "taken to be true." *Elec. Privacy Info. Ctr.*, 878 F.3d at 377.

When the Project causes or threatens harm, community members turn to Plaintiffs, who are already receiving new requests for help. JA0600 ¶ 12, JA0602 ¶ 22, JA0778 ¶¶ 51-52, JA0787-88 ¶¶ 79-80, 82. The district court did not dispute this. Organizations can predict that people will seek their help as they have in the past. *See, e.g.*, *Whitman-Walker Clinic, Inc. v. U.S. HHS*, 485 F. Supp. 3d 1, 21-22 (D.D.C. 2020).

Restarting the Project will force Plaintiffs to provide more and more burdensome services. After being precluded from avoiding injury by commenting and participating in the due diligence process, Plaintiffs can only help local people seek after-the-fact remedies for the harms they will suffer. These services are far less effective and more difficult to provide than engaging up-front in processes to prevent the Project from harming local people at all. JA0115 ¶ 41, JA0132-33 ¶¶ 53-54, JA0611-12 ¶¶ 62-65, JA0783-785.

---

replacement land to many. JA0616 ¶ 81, JA0764-66. Once the Project resumes, Total or its contractors will take more land. JA0612 ¶ 64, JA0766-68.

For example, JA already assists over a thousand people with resettlement complaints. JA0602 ¶ 22. Resuming the Project harms those efforts by making it far less likely Total will ever provide these farmers with promised but as-yet unprovided replacement land. JA0783 ¶ 69. JA will also need to help families whose lands will be seized because of the restart to seek compensation. *Id.*; JA0612 ¶ 64.

### 2. Plaintiffs' conflict-related injuries are not speculative.

Plaintiffs will also suffer *other* harms that do flow from the conflict. To prove injuries based on third parties' acts, Plaintiffs need only show that the "third parties will likely react in predictable ways." *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019); *accord Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992); *Alliance*, 602 U.S. at 382. Plaintiffs have done so here.

Unrebutted evidence showed that the Project fuels the conflict, the area is a target, and restart will likely lead to attacks on surrounding communities. *Supra* 10-11. The Project's *own* Security Consultant warned EXIM that "the insurgency is highly likely to target the project throughout [its] lifecycle." JA0333. And while the Project makes nearby villages a target, Total will create a security enclave *for itself* that

33

leaves villages even *more* vulnerable to al-Shabab. *Supra* 11.

Defendants provided no contrary evidence. Nor could they. In October

2025, Al-Shabab attacked civilians in Palma. *Supra* 10.

In short, it is entirely "predictable" that a Project restart will

result in harm to the Project's neighbors. *Dep't of Commerce*, 588 U.S.

at 768. The district court cited *Clapper v. Amnesty Int'l USA*, 568 U.S.

398, 410 (2013), which involved a "highly attenuated" five-step causal

chain, but this case is nothing like *Clapper*. No one disputes the nearby

communities are now an al-Shabab target. By exacerbating the conflict,

the Project will increase the need for Plaintiffs' services to victims.

JA0606, JA0620 ¶ 98, JA0630 ¶ 134, JA0768-69 ¶¶ 21-22.

Indeed, even if the Project does not *incite* violence, EXIM's

decision to greenlight its relaunch *during a conflict* makes it more

difficult and dangerous for JA to provide services. JA0115-17, JA0636

¶ 169. Addressing new displacement and other harms will require JA

staff to make more frequent trips to the area they often cannot,

diminishing JA's effectiveness. JA0636 ¶ 169, JA0785-86. Travelling to

this conflict zone puts JA staff at risk, particularly when they must rely

on the dangerous main highway. JA0625 ¶ 120, JA0632-36, JA0647-52,

JA0656-58, JA0783-86. Total's new plan to avoid using roads recognizes the roads are unsafe.

The difficulty and expense of traveling to the region has already decreased JA's ability to attend meetings, respond to emergencies, and bring in experts. JA0635-36 ¶¶ 165-167. JA has been forced to stop working with communities that are too dangerous to visit, and reduce support that would require travel to or from Cabo Delgado. JA0633-36. These difficulties will likely increase as the Project exacerbates the conflict and makes communities an al-Shabab target.

## II.    Plaintiffs' claims are likely to succeed on the merits.

### A.    Section 635a(c)(10)(A) required EXIM to conduct notice and comment.

The Bank Act provides that "[b]efore any meeting of the Board for final consideration of a long-term transaction" worth more than $100 million EXIM "shall provide a notice and comment period." 12 U.S.C. § 635a(c)(10)(A).

Under this provision's ordinary meaning, the March 2025 Board meeting was for "final consideration" of a "long-term transaction" and thus triggered the notice and comment requirements. Instead of applying that straightforward text, the district court adopted a

convoluted analysis, based on pieces of "statutory context," that altered the text's plain meaning. JA0581-83.

Courts assume "statutory terms bear their ordinary meaning" unless evidence suggests otherwise. *Niz-Chavez v. Garland*, 593 U.S. 155, 163 (2021). The "context" the district court cited provides no such contrary evidence. The Act's references to "applications" do not override the statute's clear notice and comment requirement. Nor does the Act's provision requiring an additional comment period when a material change is made to an application during an ongoing notice and comment period. And even if that provision did apply, it would require notice and comment here. The Act's context and purpose confirm what the plain text says: notice and comment is required for a final consideration, like the one here.

1.  **The ordinary meaning of "final consideration of a long-term transaction" includes EXIM's March 2025 approval.**

When interpreting a statute, courts "look to the ordinary meaning of its key terms." *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024). The definition of a "transaction," when the word was added to the statute, was an "act or agreement, or several acts or

agreements having some connection with each other ..... by which the legal relations of [] persons between themselves are altered." Transaction, Black's Law Dictionary (4th ed. 1968).

In March 2025, EXIM's Board obviously approved a "transaction." The approval altered the parties' legal rights and obligations. As Defendants concede, Total could not access EXIM funds absent the Board's 2025 approval. JA0580, n.6. That alone establishes EXIM approved a transaction, and EXIM itself described it that way. JA0260 ("EXIM Board … Votes to Proceed with $4.7 Billion … Transaction…"); JA0271.

Even taking the district court's incorrect reading that the Board merely approved an extension of dates for disbursement, construction, and the start of production by four years, that is still a transaction because it changed the parties' legal obligations. But the approval

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████ The Board also approved other changes to, for example, ██████████████

████████████████████████████ Cumulatively, the Board changed

nearly all of the ██████████████████████████████

████████████████████████████████████████████████

████████████████████████

The March 2025 meeting was the Board's "final consideration" of the transaction. "Final" obviously means "last." As Total conceded, "final consideration" means when the Board gave "careful thought" to the transaction that resulted in the final decision to fund. Total Op. to Plfs Mtn. for Preliminary Injunctive Relief 24-25 (ECF 25) (quotation marks omitted). The 2025 meeting was the Board's last—indeed *only*—consideration of the new terms and conditions that will actually govern the transaction. And since the Board could have voted "no," it was the final decision to fund the Project. It was thus the Board's "final consideration" of this discretionary "transaction." Accordingly, the statute's clear terms required EXIM to engage in notice and comment before agreeing to provide Total $4.7 billion in taxpayer funds.

### 2.    Statutory context confirms the ordinary meaning.

#### i.    The Bank Act's references to "applications" does not exempt final considerations of transactions from notice and comment.

The district court noted that a different subsection refers to "applications," and found notice and comment is therefore "concerned with applications for a loan." JA0581 (citing 12 U.S.C. § 635a(c)(10)(C)). Assuming (erroneously) that the Board's approval merely "extend[ed] the dates in a previously approved loan," the district court concluded this is "fundamentally different than the kind of 'final consideration of a long-term transaction' at the end of the application process contemplated by the Bank Act." JA0581 (citing 12 U.S.C. § 635a(c)(10)(C)). Even if the approval merely extended dates, this was legal error.

First, unlike the other subsections, § 635a(c)(10)(A) specifically says "consideration" of a "transaction" *not* an "application." Where Congress includes particular language in one subsection but omits it in another, it is generally presumed Congress acts intentionally. *Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650,

39

661 (D.C. Cir. 2011). Nothing in the statutory context suggests that when Congress said "transaction" it actually meant "application."

But even if an "application" is what triggers notice and comment, the Board was considering an application. Application refers to any "request or petition." Application, Black's Law Dictionary (6th ed. 1990) Nothing in the word "application" excludes a request for financing where EXIM had previously committed funds. The district court assumed that only a *first* request for financing is an application, and subsequent or amended requests are not. But the Act requires notice and comment before the "*final* consideration" of a transaction, not the first.

Moreover, as the district court recognized, when the Board met in 2025, there was no credit agreement that Total could draw on, JA0580, n.6; the Board was not obligated to approve financing. So even assuming Total was seeking to amend a previous application, Total was requesting, *i.e.* "applying," for financing. And because a "transaction" may refer to a series of agreements, it does not matter if the Board previously approved an application for a Project loan.

EXIM understood that in processing Total's request for an amendment, it was considering Total's underlying application. The 2025 Board Memoranda included "analyses of the application," Def. Opp. to Plfs. Mtn. for Preliminary Injunction 4 (ECF 28), ███████████ ████████████████████

Second, Congress already distinguished between two "kind[s] of 'final consideration'" of transactions in § 635a(c)(10)(A): those over $100,000,000 require notice and comment, those under do not. Where Congress creates one exception, courts may not infer others. *United States v. Johnson*, 529 U.S. 53, 58 (2000). Congress is assumed to have known how to create different categories and have acted intentionally. *Id*. Congress provided no exception where EXIM extends dates, let alone where there would be no funding without Board approval.

Third, § 635a(c)(10)(C)'s references to applications do not *narrow* § 635a(c)(10)(A)'s general notice and comment requirement. § 635a(c)(10)(C)(i)(I) requires EXIM to publish notice "of the application proposing the transaction." But even an amended application is an application proposing a transaction. A requirement about *how* to

provide notice does not change the requirement of *when* to provide notice: before "final consideration of a long-term transaction."

The district court also cited § 635a(c)(10)(E), JA0581, which requires EXIM staff to provide comments to the Board before the Board "tak[es] final action on an application." The last approval, the 2025 approval, was the Board's "final action" on the application.

### ii.    The material change provision does not exempt EXIM from notice and comment.

The second piece of context the district court cited does not alter the text's plain meaning either. In addition to requiring notice and comment before final consideration of a transaction, Congress mandated that "[i]f a material change is made to an application ..... after a notice with respect to the application is published," EXIM must provide an "additional" comment period. 12 U.S.C. § 635a(c)(10)(D)(i).[8] The district court found that this provision "confirms that some types of modifications do not trigger additional notice and comment," and asked whether there was a material change, not whether the Board's 2025

---

[8] A similar section requires an additional comment period under the economic analysis provision. 12 U.S.C. § 635(e)(7)(B)(iii).

approval was its "final consideration of a long-term transaction."

JA0581-82. That was error.

This provision requires an "additional" comment period in the

specific circumstances where EXIM makes a material change *during* or

*after* a comment period, but before the Board's meeting to finally

consider the transaction. It thus protects the comment period's integrity

by ensuring it is not undermined by eleventh hour changes. It does not

*exempt* EXIM from notice and comment before a final consideration or

approval. And it surely is not used to decide whether EXIM must

permit comment in the first place.

Here, the issue is not whether the Board needed to permit

"additional" comment, but whether it needed to allow *any* comment. In

2025, the Board was considering whether to fund the Project, and met

to finally consider the transaction. EXIM did not make changes to the

loan after a comment period on that decision started. It failed to permit

comment on that decision at all.

Even if the district court were correct that the material change

provision governs here, notice and comment was still required, because

the new agreement included material changes. The district court

incorrectly described the changes as only "extending several dates in a previously approved loan," and said that is "significantly different" than the statute's illustrative example of increasing the loan amount by 25 percent. JA0582. But the court also held that changing "financial obligations or anything else of substance" *would* be material changes. JA0582.

Those things changed here. Indeed, EXIM's 2025 Board memo *specifically states* ████████████████████████████ ████████████████████████████.

Total could not draw on the old loan; approving financing that Total can access changes the parties' "financial obligations." The district court also disregarded the extensive changes "of substance" regarding ████████████████████████████████ ████████████████████████████ These also change the parties' financial obligations, ████████████ ████████████████████████████████ ████████████████.

Last, extending dates alone changes the parties' "financial obligations," because the interest rates and repayment schedule are

different. And the duration of a contract and time for disbursement, performance, and repayment are fundamental terms of "substance." *See, e.g.*, *VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1053 (N.D. Cal. 2006).

Delaying the start date of production by five years is also material, since the Bank Act requires EXIM to assess economic impact by determining whether foreign production will be in surplus "at the time [it] will first be sold." 12 U.S.C. § 635(e)(1)(A)(i). The prognosis for the global liquified natural gas market for that new date has shifted drastically since 2019.

Moreover, the district court's suggestion that only changes to the loan's terms matter is legal error. Factors outside of the loan document—like the substantially changed security context—also materially affect the loan itself. EXIM's own policies recognize that changes to the terms and conditions that could affect the borrower's ability to repay its loans are "material." JA0410. But changes to the operating environment, like the conflict, can affect Total's ability to repay even under the same terms.

The district court's conclusion that nothing material has changed from the 2019 approval is jaw-dropping. In addition to the contract terms and conditions, *force majeure*, human rights abuses by Project security, and the insurgency's targeting of the area entail substantial legal, financial, reputational, and moral risk to EXIM and jeopardize people's lives. And a coming liquified natural gas glut will render this Project not just unnecessary, but harmful to U.S. economic interests. These changes are material.

> ### iii.    Context confirms that EXIM must conduct notice and comment before a new final consideration.

In *Abramski v. United States*, 573 U.S. 169, 179-80 (2014), which the district court cited, JA0581, the Supreme Court rejected a statutory interpretation that would undermine the statute's "goals" and would "address[] not the substance of a transaction, but only empty formalities." But by calling the approval an amendment that merely extended dates, the district court elevated form over substance, ignoring the purpose and impact of the amendment (and numerous other substantive changes, *supra* 37-38), to create an operative loan where there was none before. The district court turned *Abramski* on its head,

JA0581, using context to undermine the statute's ordinary meaning *and* its purpose. In fact, both the surrounding statutory provisions and the statute's goals suggest Congress intended for EXIM to conduct public notice and comment here.

The Bank Act provides that EXIM must give notice to Congress prior to "final approval[]" of a loan over $100 million. 12 U.S.C. § 635(b)(3). The public notice period is "concurrent with" the Congressional notice period. *Id.* § 635a(c)(10)(A). As the district court acknowledged, "nothing in the text surrounding [the Congressional notice] provision expressly indicates that it is concerned with applications or only applies where there is a material change." JA0582. The fact that EXIM must provide public notice "concurrent with" notice to Congress, combined with the fact that the purportedly limiting language does not limit the latter, confirms it does not limit the former. Otherwise, EXIM would be required to provide notice to Congress that is not "concurrent with" any public notice.

The district court's interpretation would also undermine the Bank Act's goals. Congress required EXIM to conduct notice and comment for its largest projects for good reason: EXIM lends vast sums of taxpayer

47

dollars to foreign projects that can have enormous economic, environmental and foreign policy implications, and impacts on EXIM's own balance sheet. The Bank Act directs EXIM to consider these factors, 12 U.S.C. §§ 635(b)(1)(B), 635i-5(a)(2), and they are of keen public interest.

Notice and comment both informs the public what EXIM is doing with its money and enables the public to inform EXIM about the risks and impacts it may not identify on its own, thereby improving the quality of agency decisionmaking. *See Small Refiner Lead Phase-Down Task Force v. EPA*, 705 F.2d 506, 547 (1983) (discussing notice and comment's general purposes).

Old comments addressing a different context cannot possibly inform EXIM about current issues, including those the Bank Act requires it to consider. For affected parties, "[t]he opportunity to participate is not meaningful unless it occurs reasonably close to the time in which the [agency] makes a decision." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995). The public must be given a new opportunity to comment on a decision if "the basis" for a decision "changed significantly," *id.*, or on the "first occasion to offer new and

48

different criticisms which the agency might find convincing." *Fertilizer Inst. v. EPA*, 935 F.2d 1303, 1311 (D.C. Cir. 1991) (citation omitted).

Since EXIM's 2019 approval, an insurgency overran the Project area, forcing Total to shut down for years, and presenting new risks for the Project and local people. Changes to the global liquified natural gas market and the production timeline now make it clear that the Project will harm the U.S. economy and U.S. jobs. These are precisely the kinds of harms the Bank Act directs EXIM to consider, with public input. But EXIM did not let anyone comment.

New comments surely would have provided EXIM critical information on concerns that have arisen since the first approval. Plaintiffs would have commented on the ongoing problems with the resettlement process; new information about the environmental impact assessment; the likelihood that the Project will exacerbate the conflict; the militarization of the region; the alleged rapes and murders carried out by forces securing the Project; and the adequacy of any plans to address the Project's risks and impacts. Yet EXIM denied Plaintiffs the opportunity to comment on these issues.

Others likely would have raised additional concerns. Senator Sullivan, for example, has objected to U.S. tax dollars "underwriting a foreign liquified natural gas project that competes with American exports" and "undercuts" President Trump's policy of promoting U.S. domestic energy dominance. JA0187. Senator Merkley has criticized EXIM for failing to permit comment given material changes to the Project and its "impact on American jobs, the environment and human rights."[9]

\* \* \*

A court "must seek the 'single, best meaning' of a statute, not just permissible interpretations." *PG&E v. FERC*, 113 F.4th 943, 949 (D.C. Cir. 2024) (quoting *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024)). The single, best interpretation here is the plain meaning: EXIM must permit comment before "final consideration of a long-term transaction."

---

[9] Merkley Slams EXIM Bank for Failing to Provide Congressional Notification of Mozambique LNG Project, Jeff Merkley Senator for Oregon (Aug. 5, 2025), https://bit.ly/4p5x2yn.

**B.    EXIM's procedures required notice and comment.**

EXIM also failed to provide interested parties the notice and an opportunity to comment on the Project's environmental and social impacts that its Environmental and Social Procedures require.

In processing an application for financing, EXIM must post project information on the Bank's Pending Transactions website; that provides notice that EXIM is considering financing a project and is accepting comments. *Environmental and Social Procedures* § I ¶¶ 8-9, s.IV, B ¶ 2.[10] This must be done when it is processing an application, *id.* § I ¶ 8, and at least thirty days prior to both "any Bank action with respect to financing of the application," *id.* § I ¶ 9(2), and "any decision by EXIM Bank to authorize a Final Commitment." *Id.* § IV, B ¶ 2. Prior to the March 2025 approval, EXIM never gave notice that it was considering granting this required approval and financing the Project, and thus

---

[10] EXIM, Pending Transactions, https://www.exim.gov/policies/exim-bank-and-environment/pending-transactions (last visited Nov. 19, 2025) (EXIM "makes available" information on projects "under consideration for financing" "to foster transparency and elicit useful information" concerning their impacts; interested parties may provide information on environmental and social issues related to a project.)

provided no opportunity to comment on the Project's dramatically changed risk. JA0129-30 ¶¶ 40-42.

The district court erred in holding that the Procedures are "concerned with *applications* for a loan-not amendments to a previously approved loan." JA0584. The previous loan was inoperative. JA0580, n.6. In 2025, the Board did not merely approve an amendment, it decided to issue a loan. Even assuming it did so by considering an amended application, it was still considering an application for a loan. *Supra* 40.[11]

The district court likewise erred in stating that "modifying the dates of a previously approved loan does not concern the 'financing of [an] application.'" JA0584. Date changes alone "concern the 'financing,'" but the amendments changed far more. *Supra* 37-38. Changes to the loan's timeline, the schedule for disbursements, ████████████ ███████████████████████████████████████████████ ███████████████████████████ are clearly actions that impact financing.

---

[11] Regardless, the Procedures apply from the time the borrower submits their application through the life of a loan. *See Environmental and Social Procedures* § I ¶¶ 2, 21-22, § III, A, § IV, A, § IV, B, ¶¶ 2-3, 6, § V; JA0253, JA0332-33.

MATERIAL UNDER SEAL DELETED

*Id.* Making the loan operable surely concerns the "financing of the application."

The court's suggestion that "an amendment to the dates" is "distinct from a decision by EXIM regarding 'an application for a Final Commitment,'" JA0585, is equally unpersuasive. It is undisputed that prior to the March 2025 approval, EXIM was not committed to fund the Project; it could have declined. JA0260, JA0271 ¶¶ 17-18, JA0580, n.6. The 2025 approval was EXIM's Final Commitment.

Finally, failure to conduct new notice and comment—and reliance on outdated comments—was arbitrary and capricious. *Supra* 46-50. Pre-2019 comments could not address the armed conflict, risks to communities from the Project restarting, or the issues with displacement—key areas of the Procedures' focus. *See Environmental and Social Procedures* Annex A, § 4; JA0328-329, JA0332-333. ███████

████████████████████████████████████████████████

██████████████████████████████████ [12] EXIM previously stated that the risks to "local communities" from the conflict "should not be

---

[12] Plaintiffs' complaint challenges the adequacy of the due diligence conducted, but those claims were not part of the motion on appeal as they require the administrative record.

underestimated," JA0329, and that their "security" "is a key area of concern." JA0333. ████████████████████████

████████████████████████████████████████████ ████

did not let interested parties comment on these risks, even though such information would have been critical to any prudent decisionmaker.

### C.     EXIM failed to comply with NEPA.

NEPA requires federal agencies to assess the impact of any "major Federal action[] significantly affecting" environmental quality, 42 U.S.C. § 4332(2)(C), *accord* 42 U.S.C. § 4336(b)(1), that has effects not "located entirely outside" the United States. 42 U.S.C. § 4336e(10)(B)(vi); *Environmental and Social Procedures* § I ¶ 18. EXIM's multi-billion-dollar loan is "major" by any reckoning, and the Project will have worldwide effects; its annual direct emissions of approximately 13 million metric tons of $CO_2$ equivalent exceeds that of 73 countries. *Supra* 10.

EXIM nonetheless claimed it had no NEPA obligations, asserting in a single sentence that its loan is not a "major Federal action" and offering no explanation. JA0184. The district court deferred to EXIM's bald conclusion. That was error. JA0589-90. Its holding that EXIM

could decide, without providing any grounds, that NEPA simply does not apply effectively placed EXIM's decision beyond the reach of NEPA's mandates and judicial review.

Whether NEPA applies is a question of law, subject to *de novo* review; an agency's conclusion never even received *Chevron* deference. *See Citizens Against Rails-To-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150-51 (D.C. Cir. 2001). NEPA's procedural requirements simply are not optional. *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Com.*, 449 F.2d 1109, 1114-15 (D.C. Cir. 1971).

The district court relied on *Seven County Infrastructure Coalition v. Eagle County*, 145 S. Ct. 1497 (2025), but *Seven County* did not overturn *Citizens* and *Calvert Cliffs'. See Friends of the Everglades, Inc. v. Noem*, 2025 U.S. Dist. LEXIS 163085, at *78 (S.D. Fla. Aug. 21, 2025), *stayed* 2025 U.S. App. LEXIS 23012 (11th Cir. Sept. 4, 2025). Indeed, *Seven County* noted that after *Chevron* deference's demise, an agency's statutory interpretation is reviewed *de novo*. 145 S. Ct. at 1511.

*Seven County* did not address the threshold question, at issue here, of whether NEPA applies at all. *If* NEPA applies, the agency

55

conducts an Environmental Assessment that asks if there is a "significant impact." If there is not, it issues a Finding of No Significant Impact; if there is, it prepares an Environmental Impact Statement. *Seven County* required deference "when determining whether an agency's EIS complied with NEPA," "[s]o long as the EIS addresses environmental effects," and noted that agencies have discretion in "determin[ing] whether and to what extent to *prepare an EIS* based on the usefulness of any new potential information." *Id.* at 1511-13 (quotation marks omitted) (emphasis added). But that has nothing to do with the antecedent question here, of whether NEPA applies at all.

The district court also afforded broad deference because NEPA defines "major Federal action" as one the agency "'determines is subject to substantial Federal control and responsibility.'" JA0589-90 (quoting 42 U.S.C. § 4336e(10)(A)). But even if a statute delegates discretion to an agency, courts "ensur[e] the agency has engaged in reasoned decisionmaking." *Loper Bright*, 603 U.S. at 395. Thus, *Sierra Club v. FERC*, 145 F.4th 74, 80 (D.C. Cir. 2025), which applied *Seven County* and which the district court cited, JA0589, held that an agency's actions

must be "reasonable and reasonably explained," and its factual findings must be supported by "substantial evidence."

EXIM did not explain why it thought the loan is not a "major Federal action." We have no idea. The district court deferred to EXIM's purported "determination[s]" that the Project was not subject to "substantial Federal control" and would not affect the U.S., but nothing in the record suggests EXIM ever made either finding. That is not reasoned decision-making, and there is no finding to defer to.

Regardless, any determination that there is no substantial Federal control is reviewed under the APA, and courts consider the evidence. *E.g.*, *Friends of the Everglades, Inc.*, 2025 U.S. Dist. LEXIS 163085, at *69-86. EXIM never denied the facts showing sufficient control. Nor could it. EXIM decides whether to provide funding and sets its financing's terms and conditions. EXIM can stop the Project because it cannot proceed without EXIM funding. This is substantial (and sufficient) control over the Project's outcome. *Citizens Alert Regarding*

*the Env't v. EPA*, 259 F. Supp. 2d. 9, 21 & n.10 (D.D.C. 2003); *Sierra Club v. USDA*, 777 F. Supp. 2d 44, 59 (D.D.C. 2011).[13]

Moreover, EXIM requires this Project to comply with EXIM's *Environmental and Social Procedures* and EXIM will monitor the Project to ensure it complies. *E.g. Environmental and Social Procedures* § I ¶¶ 20-21, § IV(B) Final Commitments ¶ 6, § V. EXIM conditioned the loan on various environmental procedures it required Total to implement, JA0298, and will maintain this control throughout the life of the loan. *Id.* § I ¶¶ 20-22, § IV(B) Final Commitments ¶ 6. This too is substantial control. *See Indian River Cnty. v. Rogoff*, 201 F. Supp. 3d 1, 16, 19 (D.D.C. 2016) (finding major Federal action where government provided significant loan and could condition it on recipient's compliance with environmental conditions). Contrary to the district

---

[13] The district court noted that NEPA's 2023 amendments "'call into question earlier decisions that interpreted 'major Federal action' more expansively.'" JA0590 n.13 (citing *Appalachian Voices v. FERC*, 139 F.4th 903, 927 (D.C. Cir. 2025) (Henderson, J., concurring)). But prior precedent on this issue is not inconsistent with the new definition. This Court has previously required a "showing that EPA had substantial control" over a grant to apply NEPA. *Citizens Alert Regarding the Env't v. EPA*, 102 F. App'x 167, 169 (D.C. Cir. 2004); *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 64 F. Supp. 3d 128, 150 (D.D.C. 2014) (defining major federal action as one where the government "must exercise substantial control over the otherwise private project").

court's holding, JA0590, EXIM's control over this loan *is* far more substantial than other agencies typically exert.

Finally, federal funding here is "sufficiently massive" to establish substantial control. *Citizens Alert*, 259 F. Supp. 2d. at 21 n.10. "[T]here is little question that when the federal government commits millions of dollars"—in this case, billions—"to build [infrastructure projects] that there is a major federal action." *Minn. Pub. Int. Rsch. Grp. v. Butz*, 498 F.2d 1314, 1319 (8th Cir. 1974).

EXIM has never denied that the Project's country-scale greenhouse gas pollution will harm the United States. But the district asserted without elaboration that increased emissions in Mozambique "is insufficient, on its own, to establish that it will have effects" here. JA0590. The science is otherwise. Greenhouse gases mix in the atmosphere, with roughly equal concentration all over the world regardless of their source.[14] Emissions from anywhere affect everyone.[15]

---

[14] U.S. Envtl. Prot. Agency, *Overview of Greenhouse Gases*, https://www.epa.gov/ghgemissions/overview-greenhouse-gases (last visited Nov. 19, 2025).
[15] United Nations, *What Is Climate Change?*, https://www.un.org/en/climatechange/what-is-climate-change (last visited Nov. 19, 2025).

The U.S. effects need not be significant, 42 U.S.C. § 4336e(10)(B)(vi), and there can be no question there will be effects here.

While EXIM's regulations "recognize" that cases where its foreign investments impact the United States are "relatively rare," JA0590-91 (citing 12 C.F.R. § 408.3), they acknowledge that in some transactions, "financing would be a major action." 12 C.F.R. § 408.4(b)(1). This Project's scale and impact are unique. If any such transactions exist, it is this one, EXIM's second-largest loan, where the recipient repeatedly said the Project would not move forward without EXIM's funds, EXIM can condition funding on extensive environmental measures and the Project will have U.S. effects that EXIM did not deny.

*   *   *

An agency's opinion that NEPA does not apply is not entitled to deference. But even if it were, deference involves a court weighing plaintiffs' argument against the agency's and placing a thumb on the agency's side of the scale. Here, EXIM utterly failed to justify its action. The Court cannot defer to EXIM when the only thing on its side of the scale was the thumb.

**D.    The district court erred in finding that EXIM's obsolete 2019 economic analysis justified the 2025 approval.**

Congress sought to ensure that EXIM financing does not harm American economic interests. It therefore barred EXIM from "extend[ing] any direct credit" to facilitate the overseas production of a commodity for export if EXIM "determines" that either: (i) "the commodity is likely to be in surplus on world markets at the time the resulting commodity will first be sold"; or (ii) "the resulting production capacity is expected to compete with United States production"; and "that the extension of such credit …will cause substantial injury" to U.S. producers. 12 U.S.C. §§ 635(e)(1)(A)-(B). By definition, there is "substantial injury if the [resulting production] equals or exceeds 1 percent of United States production." *Id*. § 635(e)(4). There is only one "[e]xception" to this prohibition: where the Board determines that the "short- and long-term benefits to industry and employment in the United States are likely to outweigh the ..... injury to United States

61

producers and employment of the same, similar, or competing commodity." *Id*. § 635(e)(3).

Section 635a-2 requires EXIM to implement "regulations and procedures… to insure full consideration" of the adverse economic effects of its financing. The procedures EXIM created under that directive require it to conduct a "Detailed Economic Impact Assessment" for *every* transaction that has a "risk of substantial injury"—*i.e.*, when it meets the statutory 1 percent threshold. EXIM, *Economic Impact Procedures and Methodological Guidelines* at 4-5 (Feb. 2025) ("*Economic Procedures*").

This analysis must consider the factors specified in §§ 635(e)(1)(A)-(B), and "the views of the public and interested parties." 12 U.S.C. § 635(e)(7)(A). EXIM must publish notice, seek comments from the public, Congress, and other agencies, *id.* § 635(e)(7)(B)(i), and provide those views to the Board "[b]efore" it "tak[es] final action on an

application for a loan," *id*. § 635(e)(7)(C). EXIM failed to comply with

these requirements.

> **1.   Although EXIM's support will cause "substantial injury," in the United States, EXIM failed to conduct the proper analysis or make the required findings to approve this Project.**

Neither EXIM nor Total dispute that (1) liquified natural gas will

be in global surplus in 2029-2030 when the Project's output "will first be

sold," or that (2) the output will compete with U.S. liquified natural gas

production. JA0191-96. And EXIM's documents confirm that the

Project's production will far exceed the one percent threshold for

"substantial injury." JA0346.

Nevertheless, EXIM failed to conduct any analysis based on

current data of the adverse economic impacts of expanding foreign

production during a global liquified natural gas glut, relying instead on

the Bank's outdated assessment from 2019. Nor did it solicit or consider

any external comments on this issue. Moreover, because the statutory

conditions of oversupply and substantial injury both exist here, EXIM

could not extend credit unless the "[e]xception" in Section 635(e)(3) was

met. But EXIM's Board never found that the benefits to U.S. industry

and employment will "outweigh" the harm to U.S. producers and employment. 12 U.S.C. § 635(e)(3).

Accordingly, the approval exceeded EXIM's authority under the Bank Act and the APA. It was *ultra vires*, "not in accordance with law" or required procedure, and taken "in excess" of statutory authority, or "short of statutory right." 5 U.S.C. § 706(2)(A), (C), (D); *Transohio Sav. Bank v. Dir., Off. of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) (holding that agency actions beyond delegated authority are *ultra vires* and should be invalidated); *Univ. of D.C. Faculty Ass'n/NEA v. D.C. Fin. Resp. & Mgmt. Assistance Auth.*, 163 F.3d 616, 620-21 (D.C. Cir. 1998) (courts look to agency's enabling statute to determine whether it has acted within the bounds of its authority).[16]

The district court erred as a matter of law in finding that the Bank Act did not require EXIM to conduct an up-to-date economic analysis before the 2025 decision. Noting that the Act's "prohibitions on extending credit apply only if 'the Bank determines' that the triggering conditions were met," and that notice and comment was required only

---

[16] The district court correctly concluded that Plaintiffs had informational standing to bring these claims. JA0586.

64

"if [EXIM] conducts a detailed economic impact analysis or similar study,'" JA0586 (quoting 12 U.S.C. §§ 635(e)(l), 635(e)(7)(A), (B)(i)), the district court concluded the use of "if" "'strongly suggests that detailed economic impact analysis is not expected to be performed for every financing decision.'" JA0586 (quoting *Delta Air Lines, Inc. v. Exp.-Imp. Bank of U.S.*, 85 F. Supp. 3d 387, 411 (D.D.C. 2015)). But that does not answer whether EXIM was required to do so *here*, or whether this financing violated the statute's substantive prohibitions.

Congress's use of "if" does not grant EXIM discretion to evade the statute's limitations by choosing not to assess a project's likely economic impacts. Rather, where a statute "sets forth relevant factors to guide the agency in the exercise of its discretion, the agency's discretion is limited even if permissive language is used." *Dillon Tr. Co. LLC v. United States*, 162 Fed. Cl. 708, 719 (Fed. Cir. 2022); *see also Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 36, 37 (2018).

The Bank Act directs EXIM "to take into account any serious adverse effect" a loan might have on U.S. industries or jobs, 12 U.S.C. § 635(b)(1)(B), and to consider "the factors set forth" in §§ 635(e)(1)(A)-(B) (*i.e.*, risk of global surplus, competition, and substantial injury), and

65

"the views of the public and interested parties." *Id.* § 635(e)(7)(A). *See also Delta Airlines v. Export-Import Bank of the U.S.*, 718 F.3d 974, 977 (D.C. Cir. 2013) (holding these provisions identify factors that the Bank must consider).

The *Economic Procedures* EXIM implemented pursuant to § 635a-2 set out *how* it will give "full consideration" to these factors. Specifically, EXIM must conduct a Detailed Economic Impact Assessment for every "transaction" that has a "risk of substantial injury." *Economic Procedures* at 4-5. This is such a transaction. EXIM cannot ignore Congress's directive to prevent domestic harm by refusing to follow the procedures Congress required it to adopt. *Delta Airlines*, 718 F.3d at 977 (holding that EXIM's implementation of its economic impact procedures was subject to judicial review and not "committed to agency discretion by law.")

The district court's reliance on *Delta Air Lines*, 85 F. Supp. 3d at 41, is therefore misplaced. That case held that EXIM could reasonably adopt categorical screens in its *Economic Procedures* to consider adverse economic impacts. Looking to 12 U.S.C. § 635a-2, *Delta* concluded Congress not "just permit[ted]" but "expected" EXIM to develop such a

66

policy for making adverse effects determinations. *Delta* 85. F. Supp. at 395. Congress's use of the word "if" "implies that the Bank *may create procedures* for distinguishing between those transactions that require detailed analysis and those that do not," and that EXIM may consider of adverse economic impacts by following those procedures. *Id.* (emphasis added).

Here, the district court did the opposite. It held that EXIM has free rein to decide *not* to conduct a detailed economic analysis that is *required by* its *Economic Procedures*. That conflicts with both *Delta* decisions.

An agency must follow its own procedures "or provide a rational explanation for [its] departure[]." *Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980). EXIM has not explained its refusal to conduct an up-to-date, detailed economic analysis as the *Economic Procedures* require. This was arbitrary and capricious.

67

MATERIAL UNDER SEAL DELETED

### 2. The district court erred as a matter of law in finding that EXIM could rely on obsolete forecasting from 2019.

The district court held that EXIM "reasonably relied" on the economic analysis it prepared for the 2019 loan approval, because that analysis forecast that a global oversupply was unlikely to emerge through the currently expected date of first production. JA0586-87.[17]

But that forecast is obviously incorrect, and here again, EXIM impermissibly violated its own procedures, which require it to consider the "most recently available" market forecasts when assessing oversupply. *Economic Procedures* at 8.

Moreover, it is arbitrary and capricious for an agency to rely on outdated or plainly erroneous analysis when more accurate, up-to-date evidence is available. *Sierra Club v. EPA*, 671 F.3d 955, 965-66 (9th Cir. 2012) (overturning agency action where it failed to consider new data that "told a different story than . . . earlier data"). Courts should not

---

[17] Inexplicably, the district court stated that "EXIM considered the updated state of the LNG market before it approved the 2025 extension." JA0586. No evidence supports this. The court cited only the 2019 analysis, JA0344-54, and ████████████████████████████
████████████████████████

68

"rubber stamp agency action that is arbitrary and capricious in its reliance on old data without meaningful comment on the significance of more current compiled data." *Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013).

It might have been reasonable to predict in 2019 that global liquified natural gas markets would be relatively balanced in 2029-2030.[18] But by March 2025, it plainly was not. A series of supply and demand shocks had transformed the market. Neither Total nor EXIM dispute that the best forecasting available to EXIM in March 2025 anticipated a considerable glut in 2029-2030. JA0193-95. EXIM's 2019 analysis is woefully out-of-date.

It beggars belief that EXIM would make a multi-billion-dollar funding decision based on an assessment of economic impact that EXIM must know is obsolete and inaccurate. No credible private-sector financier would refuse to consider the most up-to-date market projections to inform its decision-making. Indeed, EXIM uses current

---

[18] Even in 2019, EXIM forecasted the possibility of a massive oversupply growing from 2023-2030 and persisting through 2034-2035. JA0350.

data when assessing its own financial interests. ██████████████████

██████████████████████ For EXIM to give such short shrift to

protecting American economic interests violates the Bank Act and its

own procedures and is arbitrary and capricious.

### E. EXIM denied Plaintiffs information it was required to divulge.

The district court found EXIM did not unlawfully withhold

information because, in its view, EXIM was not required to do any

analysis or provide notice and comment prior to the March 2025

approval. JA0591. That too was error. Notice and comment, economic

analysis, and NEPA analysis were all required. *Supra* 35-68.

The Bank Act requires EXIM to disclose "supplemental

environmental reports" and monitoring reports. 12 U.S.C. § 635i-5(a)(1).

This requirement could not possibly apply only the first time EXIM

considers a loan; by definition, *supplemental* and *monitoring* reports are

created later, throughout the life of the loan. *See Environmental and

Social Procedures* § IV, B, ¶ 3, § V. ████████████████████

████████████████████████████████. FOE made

multiple requests for monitoring reports, to no avail. JA0130.[19] EXIM's

failure to disclose them was a clear violation.

### III. The district court correctly held that Plaintiffs are likely to suffer irreparable harm.

The district court concluded that "Plaintiffs have made a strong

showing that the Court's refusal to grant a preliminary injunction could

be beyond remediation." JA0593. EXIM's denial of Plaintiffs' right to

comment and to influence the due diligence process, including the

conditions placed on financing, and its failure to conduct a NEPA

analysis, are irreparable. The district court recognized that "requiring

[EXIM] to follow . . . procedural requirements after the fact would not,

on its own, remedy these violations." *Id*. And "the irreparability of

Plaintiffs' injuries is heightened given the risk that the funds for the

loan—even if later determined to have been improperly approved—will

be unrecoverable once withdrawn by Total." JA0593.

---

[19] *See* EXIM, Environmental and Social Project, Information and Concerns, https://www.exim.gov/policies/exim-bank-and-environment/environmental-and-social-project-information-and-concerns (last visited Nov. 13, 2025) (providing opportunity to apply for this information at any time, and that EXIM will usually provide information within 30 days).

Moreover, as a result of the Project's restart that the loan allows, local people Plaintiffs serve will suffer environmental harm, which "can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Farmers will lose their farms; fisherpeople will lose access to the sea. The Project will likely escalate the conflict and increase human rights abuses. Al-Shabab has already attacked nearby villages, and will likely continue to do so. *Supra* 10-11.

Plaintiffs must address these harms; they will face increased demand for their services, which will be more difficult and dangerous to provide. *Supra* 30-35. These obstacles "provide injury for purposes both of standing and irreparable harm." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016).

These harms are so "imminen[t] that there is a clear and present need for equitable relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (cleaned up). Indeed, the imminence has crystalized since the district court's finding: Total lifted *force majeure*. *Supra* 9. With disbursement presumably beginning soon

72

and construction anticipated to begin "quickly," the harm is imminent. The district court found "sufficient evidence" to conclude Total will likely withdraw the funds before the Court could rule on the merits. JA0586. "Damocles's sword does not have to actually fall . . . before the court will issue an injunction." *Newby*, 838 F.3d at 8-9.

The only way to prevent these harms while the Court considers the merits is through a preliminary injunction stopping EXIM from releasing funds and staying the approval.

## IV. The balance of equities strongly favor temporary relief.

The district court found the balance of equities to be equal. In fact, the equities favor a preliminary injunction preserving the parties' positions until the merits can be resolved. *Vote Forward v. DeJoy*, 490 F. Supp. 3d 110, 131 (D.D.C. 2020).

As the district court recognized, absent an injunction, Plaintiffs and local people will suffer serious, irreparable harm. JA0595. Moreover, Plaintiffs are likely to succeed on the merits, *supra* 20-70. That suggests preliminary relief serves the public interest; there is "no public interest in the perpetuation of unlawful agency action." *Newby*, 838 F.3d at 12. Where a statute "sets out a categorical requirement,"

73

the equities favor an injunction because "Congress has already done the relevant balancing." *N.D. v. Reykdal*, 102 F.4th 982, 996 (9th Cir. 2024). The district court failed to account for this, because it erred in assessing the merits.

The only harm the district court found weighing against temporary relief was the alleged reliance interests of those who assumed the loan would be available. JA0595. But the Project cannot be disrupted by a temporary pause, since it is already paused, until the government gives the final go-ahead. *Supra* 9. A pause would merely temporarily prevent EXIM from disbursing money it could not have disbursed for the nearly five years this Project has been on hold. While Total may have to wait to learn whether the 2025 approval will stand, it has already waited years during *force majeure*—waiting a bit longer will not cause significant additional harm. And no unlawfully approved project is too big to pause, particularly one that threatens grave irreparable harm, including to the U.S. economy.

The district court wrongly suggested that any reliance injuries likely increased because, until Plaintiffs sought preliminary relief four months after the Board's approval, parties would have assumed that

74

the loan is available. JA0595.[20] But if there were any such injuries, Defendants are sophisticated entities represented by expert counsel. They knew the risks of assuming the 2025 approval was valid despite its evident flaws.

The certain and severe harms to the environment, the U.S. economy, and some of the world's most vulnerable people easily outweigh the speculative injuries from a temporary pause on disbursement while the Court determines if it is legal.

## V.     The preliminary injunction factors strongly favor temporary relief.

As set forth above, all of the factors—likelihood of success on the merits, irreparable harm and balance of the equities—favor a preliminary injunction. The district court denied relief based on its erroneous conclusion that Plaintiffs were unlikely to succeed on the merits. JA0596. Because that conclusion is incorrect, the court's balancing is too.

---

[20] It would have been premature for Plaintiffs to assert imminent harm until Total announced in July it was moving to restart construction. JA0177. Plaintiffs filed the *same month*. Plaintiffs should not be penalized for not seeking relief prematurely. In any event, delay alone "is not a proper basis for denial of a preliminary injunction." *Gordon v. Holder*, 632 F.3d 722, 724 (2011).

## CONCLUSION

To avoid irreparable harm from EXIM's illegal and arbitrary loan, this Court should reverse and remand for the district court to enter a preliminary injunction to maintain the *status quo* pending resolution of the merits.

Date: November 19, 2025

Respectfully submitted
/s/ Richard L. Herz

Richard L. Herz*
Tamara A. Morgenthau
Lindsay A. Bailey
Michelle C. Harrison
EarthRights International
1400 K St. NW Suite 750
Washington, DC 20005
(202) 466 5188
rick@earthrights.org
*Counsel for Appellants*

* Based in CT; admitted in NY; does not practice in DC's court

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rules of Appellate Procedure 32(a)(7), that the foregoing brief contains 12,958 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century Schoolbook font.

Date: November 19, 2025                Respectfully submitted

/s/ *Richard Herz*
Richard Herz

## CERTIFICATE OF SERVICE

I hereby certify that on November 19, 2025, I caused the foregoing document to be electronically filed using the appellate CM/ECF system.

Date: November 19, 2025                Respectfully submitted

<u>/s/ Richard Herz</u>
Richard Herz

**ADDENDUM**

## TABLE OF CONTENTS

**12 U.S.C. § 635** ..................................................................................A-1
**12 U.S.C. § 635a** ...............................................................................A-6
**12 U.S.C. § 635a-2**............................................................................A-8
**12 U.S.C. § 635i-5**.............................................................................A-9
**42 U.S.C. § 4332** ...............................................................................A-10
**42 U.S.C. § 4336** ...............................................................................A-11
**42 U.S.C. § 4336e** ..............................................................................A-11
**12 C.F.R. § 408.4(b)(1)** .....................................................................A-11

## 12 U.S.C. § 635 Powers and functions of Bank

**12 U.S.C. § 635(b)(1)(B)** It is further the policy of the United States that loans made by the Bank in all its programs shall bear interest at rates determined by the Board of Directors, consistent with the Bank's mandate to support United States exports at rates and on terms and conditions which are fully competitive with exports of other countries, and consistent with international agreements. For the purpose of the preceding sentence, rates and terms and conditions need not be identical in all respects to those offered by foreign countries, but should be established so that the effect of such rates, terms, and conditions for all the Bank's programs, including those for small businesses and for medium-term financing, will be to neutralize the effect of such foreign credit on international sales competition. The Bank shall consider its average cost of money as one factor in its determination of interest rates, where such consideration does not impair the Bank's primary function of expanding United States exports through fully competitive financing. The Bank may not impose a credit application fee unless (i) the fee is competitive with the average fee charged by the Bank's primary foreign competitors, and (ii) the borrower or the exporter is given the option of paying the fee at the outset of the loan or over the life of the loan and the present

value of the fee determined under either such option is the same amount. It is also the policy of the United States that the Bank in the exercise of its functions should supplement and encourage, and not compete with, private capital; that the Bank, in determining whether to provide support for a transaction under the loan, guarantee, or insurance program, or any combination thereof, shall consider the need to involve private capital in support of United States exports as well as the cost of the transaction as calculated in accordance with the requirements of the Federal Credit Reform Act of 1990 [2 U.S.C. 661 et seq.]; that the Bank shall accord equal opportunity to export agents and managers, independent export firms, export trading companies, and small commercial banks in the formulation and implementation of its programs; that the Bank should give emphasis to assisting new and small business entrants in the agricultural export market, and shall, in cooperation with other relevant Government agencies, including the Commodity Credit Corporation, develop a program of education to increase awareness of export opportunities among small agribusinesses and cooperatives; that loans, so far as possible consistent with the carrying out of the purposes of subsection (a) of this section, shall generally be for specific purposes, and, in the judgment of the Board of Directors, offer reasonable assurance of repayment; and that in authorizing any loan or guarantee, the Board of Directors shall take into account any serious adverse effect of such loan or guarantee on the competitive position of United States industry, the availability of materials which are in short supply in the United States, and employment in the United States, and shall give particular emphasis to the objective of strengthening the competitive position of United States exporters and thereby of expanding total United States exports. Only in cases where the President,[1] after consultation with the Committee on Financial Services of the House of Representatives and the Committee on Banking, Housing, and Urban Affairs of the Senate, determines that such action would be in the national interest where such action would clearly and importantly

advance United States policy in such areas as international terrorism (including, when relevant, a foreign nation's lack of cooperation in efforts to eradicate terrorism), nuclear proliferation, the enforcement of the Foreign Corrupt Practices Act of 1977, the Arms Export Control Act [22 U.S.C. 2751 et seq.], the International Emergency Economic Powers Act [50 U.S.C. 1701 et seq.], or the Export Administration Act of 1979 [50 U.S.C. App. 2401 et seq.], environmental protection and human rights (such as are provided in the Universal Declaration of Human Rights adopted by the United Nations General Assembly on December 10, 1948) (including child labor), should the Export-Import Bank deny applications for credit for non-financial or noncommercial considerations. Each such determination shall be delivered in writing to the President of the Bank, shall state that the determination is made pursuant to this section, and shall specify the applications or categories of applications for credit which should be denied by the Bank in furtherance of the national interest.

**12 U.S.C. § 635(b)(3)** Except as provided by the fourth sentence of this paragraph, no loan or financial guarantee or general guarantee or insurance facility or combination thereof (i) in an amount which equals or exceeds $100,000,000 or (ii) for the export of technology, fuel, equipment, materials, or goods or services to be used in the construction, alteration, operation, or maintenance of nuclear power, enrichment, reprocessing, research, or heavy water production facilities, shall be finally approved by the Board of Directors of the Bank, unless in each case the Bank has submitted to the Congress with respect to such loan, financial guarantee, or combination thereof, a detailed statement describing and explaining the transaction, at least 25 days of continuous session of the Congress prior to the date of final approval. For the purpose of the preceding sentence, continuity of a session of the Congress shall be considered as broken only by an adjournment of the Congress sine die, and the days on which either House is not in session because of an adjournment of more than 3 days to a day certain shall be excluded in the computation of the 25

day period referred to in such sentence. Such statement shall contain—

> **(A)** in the case of a loan or financial guarantee— **(i)** a brief description of the purposes of the transaction; **(ii)** the identity of the party or parties requesting the loan or financial guarantee; **(iii)** the nature of the goods or services to be exported and the use for which the goods or services are to be exported. . .
>
> **(B)** a full explanation of the reasons for Bank financing of the transaction, the amount of the loan to be provided by the Bank, the approximate rate and repayment terms at which such loan will be made available and the approximate amount of the financial guarantee.
>
> If the Bank submits a statement to the Congress under this paragraph and either House of Congress is in an adjournment for a period which continues for at least ten days after the date of submission of the statement, then any such loan or guarantee or combination thereof may, subject to the second sentence of this paragraph, be finally approved by the Board of Directors upon the termination of the twenty-fiveday period referred to in the first sentence of this paragraph or upon the termination of a thirty-five-calendar-day period (which commences upon the date of submission of the statement), whichever occurs sooner.

**12 U.S.C. § 635(e) Limitation on assistance which adversely affect the United States.**

**12 U.S.C. § 635(e)(1) In general.**—The Bank may not extend any direct credit or financial guarantee for establishing or expanding production of any commodity for export by any country other than the United States, if—

> **(A)** the Bank determines that—
>
> > **(i)** the commodity is likely to be in surplus on world markets at the time the resulting commodity will first be sold; or

A-4

**(ii)** the resulting production capacity is expected to compete with United States production of the same, similar, or competing commodity; and

**(B)** the Bank determines that the extension of such credit or guarantee will cause substantial injury to United States producers of the same, similar, or competing commodity.

In making the determination under subparagraph (B), the Bank shall determine whether the facility that would benefit from the extension of a credit or guarantee is reasonably likely to produce a commodity in addition to, or other than, the commodity specified in the application and whether the production of the additional commodity may cause substantial injury to United States producers of the same, or a similar or competing, commodity.

**12 U.S.C. § 635(e)(3) Exception**.—Paragraphs (1) and (2) shall not apply in any case where, in the judgment of the Board of Directors of the Bank, the short- and long-term benefits to industry and employment in the United States are likely to outweigh the short- and long-term injury to United States producers and employment of the same, similar, or competing commodity.

**12 U.S.C. § 635(e)(4) Definition**. For purposes of paragraph (1)(B), the extension of any credit or guarantee by the Bank will cause substantial injury if the amount of the capacity for production established, or the amount of the increase in such capacity expanded, by such credit or guarantee equals or exceeds 1 percent of United States production.

**12 U.S.C. § 635(e)(7)** Procedures to reduce adverse effects of loans and guarantees on industries and employment in United States.

**(A)** Consideration of economic effects of proposed transactions.—If, in making a determination under this paragraph with respect to a loan or guarantee, the Bank conducts a detailed economic impact analysis or similar study, the analysis or study, as the case may be, shall include consideration of— (i) the factors set forth in subparagraphs (A) and (B) of paragraph (1); and (ii) the views of the public and interested parties.

A-5

**(B)** Notice and comment requirements.

**(i)** In general. If, in making a determination under this subsection with respect to a loan or guarantee, the Bank intends to conduct a detailed economic impact analysis or similar study, the Bank shall publish in the Federal Register a notice of the intent, and provide a period of not less than 14 days (which, on request by any affected party, shall be extended to a period of not more than 30 days) for the submission to the Bank of comments on the economic effects of the provision of the loan or guarantee, including comments on the factors set forth in subparagraphs (A) and (B) of paragraph (1). In addition, the Bank shall seek comments on the economic effects from the Department of Commerce, the Office of Management and Budget, the Committee on Banking, Housing, and Urban Affairs of the Senate, and the Committee on Financial Services of the House of Representatives

. . .

**(iii)** Procedure regarding materially changed applications.

**(I)** In general. If a material change is made to an application for a loan or guarantee from the Bank after a notice with respect to the intent described in clause (i) is published under this subparagraph, the Bank shall publish in the Federal Register a revised notice of the intent, and shall provide for a comment period, as provided in clauses (i) and (ii).

**(II)** Material change defined. As used in subclause (I), the term "material change", with respect to an application, includes—

**(aa)** a change of at least 25 percent in the amount of a loan or guarantee requested in the application; and
**(bb)** a change in the principal product to be produced as a result of any transaction that would be facilitated by the provision of the loan or guarantee.

**(C)** - Requirement to address views of adversely affected persons.— Before taking final action on an application for a loan or guarantee to

which this section applies, the staff of the Bank shall provide in writing to the Board of Directors the views of any person who submitted comments pursuant to subparagraph (B).

**12 U.S.C. § 635a Management of Bank**

**12 U.S.C. § 635a(c) Board of Directors; composition; oath; terms; duties; quorum; bylaws.**

**12 U.S.C. § 635a(c)(10) Notice and comment requirements.**

**(A) In general-** Before any meeting of the Board for final consideration of a long-term transaction the value of which exceeds $100,000,000, and concurrent with any statement required to be submitted under section 2(b)(3) with respect to the transaction, the Bank shall provide a notice and comment period.

**(C) Specific requirements.**

**(i) In general. T**he Bank shall—

**(I)** publish in the Federal Register a notice of the application proposing the transaction;

**(II)** provide a period of not less than 25 days for the submission to the Bank of comments on the application; and

**(III)** notify the Committee on Banking, Housing, and Urban Affairs of the Senate, and the Committee on Financial Services of the House of Representatives of the application, and seek comments on the application from the Department of Commerce and the Office of Management and Budget.

**(ii) Content of notice**—The notice published under clause (i)(I) with respect to an application for a loan or financial guarantee shall include appropriate information about—

**(I)** a brief non-proprietary description of the purposes of the transaction and the anticipated use of any item being exported, including, to the extent the Bank is reasonably aware, whether the item may be used to produce exports or provide services in competition with the exportation of goods or the provision of services by a United States industry;

**(D) Procedure regarding materially changed applications.**
**(i)** In general. If a material change is made to an application to which this paragraph applies, after a notice with respect to the application is published under subparagraph (C)(i)(I), the Bank shall publish in the Federal Register a revised notice of the application and provide for an additional comment period as provided in subparagraph (C)(i)(II).

**(ii)** Material change defined. In clause (i), the term "material change", with respect to an application for a loan or guarantee, includes an increase of at least 25 percent in the amount of a loan or guarantee requested in the application.

**(E) Requirement to address views of commenters.** Before taking final action on an application to which this paragraph applies, the staff of the Bank shall provide in writing to the Board of Directors the views of any person who submitted comments on the application pursuant to this paragraph.

## § 635a-2. Implementation of regulations and procedures to lessen adverse effect of loans and guarantees on industries in United States; report by International Trade Commission; written consideration of views of adversely affected parties.

The Bank shall implement such regulations and procedures as may be appropriate to insure that full consideration is given to the extent to which any loan or financial guarantee is likely to have an adverse effect on industries, including agriculture, and employment in the United States, either by reducing demand for goods produced in the United

States or by increasing imports to the United States. To carry out the purposes of this subsection [section], the Bank shall request, and the United States International Trade Commission shall furnish, a report assessing the impact of the Bank's activities on industries and employment in the United States. Such report shall include an assessment of previous loans or financial guarantees and shall provide recommendations concerning general areas which may adversely affect domestic industries, including agriculture, and employment. After October 1, 1983, there are authorized to be appropriated such sums as may be necessary to carry out the provisions of this section. In all cases to which this section applies, the Bank shall consider and address in writing the views of parties or persons who may be substantially adversely affected by the loan or guarantee prior to taking final action on the loan or guarantee. This requirement does not subject the Bank to the provisions of subchapter II of chapter 5 of title 5, United States Code [5 USCS §§ 551 et seq.].

## 12 U.S.C. § 635i-5. Environmental policy and procedures
### (a) Environmental Effects Consideration.

**(1) In general.** Consistent with the objectives of section 2(b)(1)(A), the Bank shall establish procedures to take into account the potential beneficial and adverse environmental effects of goods and services for which support is requested under its direct lending and guarantee programs. Such procedures shall provide for the public disclosure of environmental assessments and supplemental environmental reports required to be submitted to the Bank, including remediation or mitigation plans and procedures, and related monitoring reports. The preceding sentence shall not be interpreted to require the public disclosure of any information described in section 1905 of title 18, United States Code. Such procedures shall apply to any transaction involving a project—

**(A)** for which long-term support of $25,000,000 (or, if less than $25,000,000, the threshold established pursuant to international

agreements, including the Common Approaches for Officially Supported Export Credits and Environmental and Social Due Diligence, as adopted by the Organisation for Economic Co-operation and Development Council on June 28, 2012, and the risk-management framework adopted by financial institutions for determining, assessing, and managing environmental and social risk in projects (commonly referred to as the "Equator Principles")) or more is requested from the Bank;

**(B)** for which the Bank's support would be critical to its implementation; and

**(C)** which may have significant environmental effects upon the global commons or any country not participating in the project, or may produce an emission, an effluent, or a principal product that is prohibited or strictly regulated pursuant to Federal environmental law.

**(2)** Authority to withhold financing. The procedures established under paragraph (1) shall permit the Board of Directors, in its judgment, to withhold financing from a project for environmental reasons or to approve financing after considering the potential environmental effects of a project.

## 42 U.S.C. § 4332 - Cooperation of agencies; reports; availability of information; recommendations; international and national coordination of efforts

**§ 4332(2)** The Congress authorizes and directs that, to the fullest extent possible: **(1)** the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth in this chapter, and **(2)** all agencies of the Federal Government shall

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on- (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided

A-10

should the proposal be implemented, (iii) alternatives to the proposed action, (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of title 5, and shall accompany the proposal through the existing agency review processes;

## 42 U.S.C. § 4336 - Procedure for determination of level of review
### § 4336 (b) - Levels of review

**(1)** Environmental impact statement — An agency shall issue an environmental impact statement with respect to a proposed agency action requiring an environmental document that has a reasonably foreseeable significant effect on the quality of the human environment.

## 42 U.S.C. § 4336e - Definitions
### § 4336e(10) Major Federal action

**(A)** In general: The term "major Federal action" means an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility.

**(B)** Exclusion: The term "major Federal action" does not include—. . .

(iii)loans, loan guarantees, or other forms of financial assistance where a Federal agency does not exercise sufficient control and

responsibility over the subsequent use of such financial assistance or the effect of the action; . . .

(vi)extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States;

**12 C.F.R. § 408.4 - Early involvement in foreign activities for which Eximbank financing may be requested. § 408.4(b)** To implement the requirements of § 1501.2(d) with respect to these Transactions, Eximbank:

**(1)** Will provide on a project-by-project basis to applicant seeking financing from Eximbank guidance as to the scope and level of environmental information to be used in evaluating a proposed Transaction where:

(i) The proposed Eximbank financing would be a major action and

(ii) A Transaction may significantly affect the quality of the human environment in the United States, its territories or possessions.