# United States Court of Appeals
# for the District of Columbia Circuit

FRIENDS OF THE EARTH U.S.; JUSTIÇA AMBIENTAL,

*Plaintiffs-Appellants*,

v.

EXPORT-IMPORT BANK OF THE UNITED STATES; JAMES CRUSE, ACTING PRESIDENT AND CHAIRMAN; JAMES BURROWS, ACTING FIRST VICE PRESIDENT AND VICE CHAIRMAN; SPENCER BACHUS III, BOARD MEMBER,

*Defendants-Appellees*,

TOTALENERGIES EP MOZAMBIQUE AREA 1, LIMITADA;

*Intervenor for Defendant-Appellee.*

On Appeal from the United States District Court for the District of Columbia,
No. 1:25-cv-02235 (Hon. Carl J. Nichols)

**INTERVENOR-APPELLEE TOTALENERGIES EP MOZAMBIQUE
AREA 1, LIMITADA'S RESPONSE BRIEF
PUBLIC COPY—SEALED MATERIAL DELETED**

Nicholas L. Schlossman
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
(737) 910-7314
nicholas.schlossman@lw.com

Gregory G. Garre
Andrew D. Prins
Stacey L. VanBelleghem
Jonathan L. Williams
Rachael L. Westmoreland
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com
andrew.prins@lw.com
stacey.vanbelleghem@lw.com
jonathan.williams@lw.com
rachael.westmoreland@lw.com

December 19, 2025

*Counsel for Intervenor-Appellee*
*TotalEnergies EP Mozambique Area 1, Limitada*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), the undersigned counsel certifies as follows:

## A. Parties and Amici

Appellants Friends of the Earth U.S. and Justiça Ambiental were plaintiffs below.

Appellees Export-Import Bank of the United States; James Cruse, Acting President and Chairman of the Export-Import Bank of the United States; James Burrows, Acting First Vice President and Vice Chairman of the Export-Import Bank of the United States; and Spencer Bachus III, Board Member of the Export-Import Bank of the United States were defendants below.

TotalEnergies EP Mozambique Area 1, Limitada intervened in support of appellees below and remains an intervenor in this appeal. TotalEnergies EP Mozambique Area 1, Limitada is a subsidiary of TotalEnergies SE.

There were no other parties, intervenors, or amici before the District Court, and no amici have appeared in this Court.

**B.     Rulings Under Review**

Appellants Friends of the Earth U.S. and Justiça Ambiental appeal from the memorandum and order (ECF Nos. 52, 53) denying Friends of the Earth U.S. and Justiça Ambiental's motion for preliminary injunction, which was issued by the District Court (Nichols, J.) in *Friends of the Earth U.S. v. Export-Import Bank of the United States*, No. 1:25-cv-02235-CJN.

**C.     Related Cases**

This case has not been previously before this Court.  There are no related cases involving substantially the same parties or similar issues pending in this court or any other court of which counsel is aware.

 

                                 */s/ Gregory G. Garre*
                                   Gregory G. Garre

                                   *Counsel for Intervenor-Appellee*
                                   *TotalEnergies EP Mozambique*
                                   *Area 1, Limitada*

# RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1's and D.C. Circuit Rule 26.1's requirements to identify all parent companies and any publicly-held company that has a 10% or greater ownership interest, Intervenor-Appellee TotalEnergies EP Mozambique Area 1, Limitada ("TEPMA1") identifies the following entity: TotalEnergies SE.

*/s/ Gregory G. Garre*
Gregory G. Garre

*Counsel for Intervenor-Appellee*
*TotalEnergies EP Mozambique*
*Area 1, Limitada*

**TABLE OF CONTENTS**

Page

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

RULE 26.1 CORPORATE DISCLOSURE STATEMENT.................................. iii

TABLE OF AUTHORITIES ..................................................................vi

GLOSSARY.......................................................................................... xiii

INTRODUCTION .................................................................................1

ISSUES PRESENTED............................................................................4

STATUTES...........................................................................................4

STATEMENT OF THE CASE.................................................................5

    A.    The Bank's Statutory Framework .......................................5

    B.    The Bank Carefully Evaluates The Project...........................7

    C.    The Bank Approves The Project Loan Application In 2019 ...............9

    D.    The Bank Amends The Loan In 2020 ...................................9

    E.    TEPMA1 Invokes Force Majeure In 2021 .........................10

    F.    The Bank Amends The Loan In 2025 .................................10

    G.    Plaintiffs Wait Four Months, Then Sue .............................11

SUMMARY OF ARGUMENT .............................................................13

ARGUMENT .....................................................................................16

I.    PLAINTIFFS LACK STANDING............................................16

    A.    Plaintiffs' "Redress" Theory Fails .....................................18

    B.    Plaintiffs' "Services" Do Not Support Standing.................21

        1.    Plaintiffs' "Services" Are Mere Issue Advocacy ....................22

        2.    Increased Demand for Plaintiffs' Services Is Not An Injury .......................................................................23

3.    Plaintiffs' Security-Related Injuries Rest Upon An Impermissibly Attenuated Causal Chain ...................................26

C.    Plaintiffs Lack Informational-Injury Standing....................................29

II.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS..........32

A.    The Bank Act Does Not Require Notice And Comment For Amendments To Approved Transaction .............................................32

B.    EXIM Complied With Its Non-Binding Environmental And Social Due Diligence Procedures And Guidelines .............................39

C.    EXIM Complied With NEPA .............................................................42

D.    EXIM Was Not Required To Conduct Another, Detailed Economic Analysis For The Amendment ...........................................47

1.    Neither The Bank Act Nor EXIM's Procedures Required It To Conduct A Detailed Economic Impact Analysis .............48

2.    EXIM's Economic Analysis Was Reasonable .........................51

E.    EXIM Provided All Statutorily-Required Information.......................54

III.    PLAINTIFFS CANNOT SHOW THAT THE EQUITIES REQUIRE A PRELIMINARY INJUNCTION .................................................................55

CONCLUSION ......................................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allen v. District of Columbia,*
969 F.3d 397 (D.C. Cir. 2020)..............................................................38

*American Anti-Vivisection Society v. USDA,*
946 F.3d 615 (D.C. Cir. 2020)........................................................16, 28

*American Farm Lines v. Black Ball Freight Service,*
397 U.S. 532 (1970).............................................................................51

*American Hospital Association v. Bowen,*
834 F.2d 1037 (D.C. Cir. 1987).............................................................35

*Amoco Production Co. v. Village of Gambell,*
480 U.S. 531 (1987).............................................................................57

*Apotex, Inc. v. FDA,*
449 F.3d 1249 (D.C. Cir. 2006).............................................................55

*Appalachian Voices v. FERC,*
139 F.4th 903 (D.C. Cir. 2025)..............................................................45

*Apprio, Inc. v. Zaccari,*
104 F.4th 897 (D.C. Cir. 2024)........................................................42, 49

*Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic
Energy Commission,*
449 F.2d 1109 (D.C. Cir. 1971)........................................................45, 46

*Cboe Global Markets, Inc. v. SEC,*
155 F.4th 704 (D.C. Cir. 2025)..............................................................45

*Center for Biological Diversity v. Haaland,*
849 F. App'x 2 (D.C. Cir. 2021)............................................................30

*Center for Biological Diversity v. United States DOI,*
144 F.4th 296 (D.C. Cir. 2025)...........................................14, 18, 22, 47

*Center for Law & Education v. Department of Education*,
  396 F.3d 1152 (D.C. Cir. 2005) ............................................17, 19, 22

*Chaplaincy of Full Gospel Churches v. England*,
  454 F.3d 290 (D.C. Cir. 2006) .........................................................58

*Citizens Against Rails-To-Trails v. Surface Transportation Board*,
  267 F.3d 1144 (D.C. Cir. 2001) .......................................................45

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................53

*City of Port Isabel v. FERC*,
  130 F.4th 1034 (D.C. Cir. 2025) ......................................................57

*Clapper v. Amnesty International USA*,
  568 U.S. 398 (2013) ........................................................................27

*Clarian Health West, LLC v. Hargan*,
  878 F.3d 346 (D.C. Cir. 2017) .........................................................41

*Climate United Fund v. Citibank, N.A.*,
  154 F.4th 809 (D.C. Cir. 2025) ........................................................13

*Community Nutrition Institute v. Young*,
  818 F.2d 943 (D.C. Cir. 1987) .........................................................41

*Competitive Enterprise Institute v. National Highway Traffic Safety
  Administration*,
  901 F.2d 107 (D.C. Cir. 1990) .........................................................29

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ...................................................................16, 31

*Delta Air Lines, Inc. v. Export-Import Bank of the United States*,
  718 F.3d 974 (D.C. Cir. 2013) .........................................................58

*Delta Air Lines, Inc. v. Export-Import Bank of the United States*,
  85 F. Supp. 3d 387 (D.D.C. 2015) ..........................................6, 41, 50

*Department of Commerce v. New York*,
  588 U.S. 752 (2019) ...................................................................26, 27

**Page(s)**

*Dow AgroSciences LLC v. National Marine Fisheries Service,*
  707 F.3d 462 (4th Cir. 2013) ............................................................52

*Electronic Privacy Information Center v. Presidential Advisory
  Commission on Election Integrity,*
  878 F.3d 371 (D.C. Cir. 2017) ....................................................23, 29

*Financial Planning Association v. SEC,*
  482 F.3d 481 (D.C. Cir. 2007) ........................................................37

*Food & Water Watch, Inc. v. Vilsack,*
  808 F.3d 905 (D.C. Cir. 2015) ....................................................17, 19

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024)................................................14, 17-18, 21-25

*Foundation for Economic Trends v. Lyng,*
  943 F.2d 79 (D.C. Cir. 1991)......................................................29, 30

*Fund Democracy, LLC v. SEC,*
  278 F.3d 21 (D.C. Cir. 2002) ..........................................................19

*Fund for Animals v. Frizzell,*
  530 F.2d 982 (D.C. Cir. 1975)........................................................56

*Fund for Animals v. Thomas,*
  127 F.3d 80 (D.C. Cir. 1997)..........................................................44

*Havens Realty Corp. v. Coleman,*
  455 U.S. 363 (1982)................................................................17, 22

*IBP Inc. v. Alvarez,*
  546 U.S. 21 (2005)........................................................................48

*Idaho Conservation League v. Bonneville Power Administration,*
  826 F.3d 1173 (9th Cir. 2016) ........................................................43

*International Brotherhood of Teamsters v. TSA,*
  429 F.3d 1130 (D.C. Cir. 2005)..................................................13, 18

*Lewis v. Casey,*
  518 U.S. 343 (1996)......................................................................31

*Lujan v. Defenders of Wildlife*,
 504 U.S. 555 (1992)..................................................................26, 31

*National Association of Home Builders v. EPA*,
 667 F.3d 6 (D.C. Cir. 2011)...............................................................22

*National Mining Association v. McCarthy*,
 758 F.3d 243 (D.C. Cir. 2014)....................................................41, 50

*National Taxpayers Union, Inc. v. United States*,
 68 F.3d 1428 (D.C. Cir. 1995)....................................................23, 26

*Nken v. Holder*,
 556 U.S. 418 (2009)...........................................................................13

*Olu-Cole v. E.L. Haynes Public Charter School*,
 930 F.3d 519 (D.C. Cir. 2019).........................................................55

*PETA v. USDA*,
 797 F.3d 1087 (D.C. Cir. 2015).....................................13, 18, 19, 20

*Perez v. Mortgage Bankers Association*,
 575 U.S. 92 (2015).............................................................................38

*Seven County Infrastructure Coalition v. Eagle County*,
 605 U.S. 168 (2025)..................................................43, 44, 45, 47

*Sierra Club v. FERC*,
 153 F.4th 1295 (D.C. Cir. 2025).......................................................45

*Sierra Club v. Jackson*,
 648 F.3d 848 (D.C. Cir. 2011)...........................................................19

*Sierra Club v. United States EPA*,
 671 F.3d 955 (9th Cir. 2012) ............................................................52

*Summers v. Earth Island Institute*,
 555 U.S. 488 (2009)....................................................................18, 30

*Syncor International Corp. v. Shalala*,
 127 F.3d 90 (D.C. Cir. 1997).............................................................41

Page(s)

*Teva Pharmaceuticals, USA, Inc. v. United States FDA,*
    182 F.3d 1003 (D.C. Cir. 1999) ........................................................55

*United States Army Corps of Engineers v. Hawkes Co.,*
    578 U.S. 590 (2016) ..........................................................................33

*United States v. Brock,*
    94 F.4th 39 (D.C. Cir. 2024) ............................................................37

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense*
    *Council, Inc.,*
    435 U.S. 519 (1978) ....................................................................38, 42

*Wertheimer v. Federal Election Commission,*
    268 F.3d 1070 (D.C. Cir. 2001) ........................................................31

*Wilderness Society, Inc. v. Rey,*
    622 F.3d 1251 (9th Cir. 2010) ....................................................30, 31

*Winter v. Natural Resources Defense Council, Inc.,*
    555 U.S. 7 (2008) ................................................................1, 13, 58

## STATUTES AND REGULATIONS

5 U.S.C. § 553(a)(2) ..............................................................................5

5 U.S.C. § 706 ....................................................................................42

5 U.S.C. § 706(1) ................................................................................55

7 U.S.C. § 940f(a) ..............................................................................37

7 U.S.C. § 940f(b) ..............................................................................37

12 U.S.C. § 635(a) ..............................................................................38

12 U.S.C. § 635(a)(1) ............................................................................5

12 U.S.C. § 635(b)(1)(B) ..............................................................5, 6, 38

12 U.S.C. § 635(b)(3) ....................................................................9, 36

12 U.S.C. § 635(e)(1) ......................................................6, 49, 51, 54

12 U.S.C. § 635(e)(3)................................................................6

12 U.S.C. § 635(e)(7)................................................................7

12 U.S.C. § 635(e)(7)(A) ................................................6, 48, 50

12 U.S.C. § 635(e)(7)(B) ..........................................................48

12 U.S.C. § 635(e)(7)(B)(i)........................................................30

12 U.S.C. § 635(e)(7)(B)(iii) .....................................................49

12 U.S.C. § 635(e)(7)(B)(iii)(I)..................................................30

12 U.S.C. § 635(e)(7)(G) ...........................................................50

12 U.S.C. § 635a(c)(10) ..............................................5, 9, 33, 34

12 U.S.C. § 635a(c)(10)(A) ........................................5, 14, 32, 36

12 U.S.C. § 635a(c)(10)(C) ................................................18, 34

12 U.S.C. § 635a(c)(10)(C)(i)(I)..................................................5

12 U.S.C. § 635a(c)(10)(C)(i)(II)...............................................35

12 U.S.C. § 635a(c)(10)(C)(ii)....................................................35

12 U.S.C. § 635a(c)(10)(C)(ii)(III).............................................34

12 U.S.C. § 635a(c)(10)(D)(i).....................................................36

12 U.S.C. § 635a(c)(10)(D)(ii)....................................................36

12 U.S.C. § 635a(c)(10)(E) ................................................18, 34

12 U.S.C. § 635a(c)(10)(F) .........................................................34

12 U.S.C. § 635i-5(a)(1) ..............................................................7

12 U.S.C. § 635i-5(b)..................................................................41

42 U.S.C. § 4332(2)(C)........................................................42, 46

**Page(s)**

42 U.S.C. § 4336e(10)(A) ......................................................42, 45, 46

42 U.S.C. § 4336e(10)(B)(iii) .....................................................43, 46

42 U.S.C. § 4336e(10)(B)(vi) .....................................................43, 44

49 U.S.C. § 22403(d) ...........................................................................37

12 C.F.R. §§ 408.1-408.7 ....................................................................43

12 C.F.R. § 408.3 ..........................................................................43, 44

12 C.F.R. § 408.5(a) ...........................................................................44

## OTHER AUTHORITIES

83 Fed. Reg. 61,379 (Nov. 29, 2018) .................................................8

*Black's Law Dictionary* (4th ed. 1968).............................................33

*Economic Impact Procedures and Methodological Guidelines*
(Feb. 2025), https://tinyurl.com/53euznve.................................7, 49, 50

Environmental and Social Due Diligence Procedures and
Guidelines (rev. 2025), https://tinyurl.com/4jxjdhxb ............ 7, 18, 20, 39-41, 43

S. Rep. No. 99-274 (1986) ..................................................................5

*Webster's New World College Dictionary* (2010)..........................33, 36

*Webster's Ninth New Collegiate Dictionary* (1988)..............................49

# GLOSSARY

Amendment                March 2025 amendment approved by the Board
                         of the Export-Import Bank of the United States

Application              2015 application for final
                         commitment to the Export-Import Bank of the
                         United States

AWA                      Animal Welfare Act

Bank Act                 12 U.S.C. § 635 *et seq.*

EIS                      Environmental Impact Statement

ESPG                     Environmental and Social Due Diligence
                         Procedures and Guidelines

EXIM                     Export-Import Bank of the United States

JA                       Plaintiff Justiça Ambiental

LNG                      Liquefied Natural Gas

NEPA                     National Environmental Policy Act

Project                  TEPMA1's natural gas project off the coast of
                         Mozambique

TEPMA1                   TotalEnergies EP Mozambique Area 1, Limitada

## INTRODUCTION

The District Court properly exercised its discretion to deny Plaintiffs' request for the drastic and "extraordinary remedy" of a preliminary injunction, *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), after carefully considering Plaintiffs' arguments. Plaintiffs have identified no basis for this Court to upset that decision.

Six years before this lawsuit, and after years of study and public comment, the Export-Import Bank of the United States ("EXIM") approved a loan to support the use of U.S. exports in a large natural gas project ("Project") off the coast of Mozambique—one of the world's most impoverished nations. The $4.7 billion loan ensures that American exports will make up a sizable portion of the Project, contributes to 16,400 jobs across the United States, and provides net trade benefits of more than $2 billion. The loan thus directly advanced EXIM's mission to promote the competitiveness of U.S. exports and American jobs.

Shortly afterward, incidents of terrorism driven by the jihadist group al-Shabaab intensified in the Project's region, leading the Project's operator, TotalEnergies EP Mozambique Area 1, Limitada ("TEPMA1") to declare *force majeure* and suspend progress. After several years of government work to stabilize the situation, the *force majeure* has ended and the Project has resumed work.

Now, trying to delay the Project even more, two affiliated environmental groups opposed to fossil fuels seek a preliminary injunction against disbursing the loan's proceeds. Seizing on an amendment approved in March 2025 to conform the loan to the Project's new schedule following *force majeure*, Plaintiffs argue that EXIM must re-do the years of analysis it already performed before authorizing the loan and provide additional opportunities for public comment. But the statutory provisions and procedures they invoke apply only to applications for new loans, not to later amendments to a loan like the one here. And Plaintiffs' argument that EXIM had to prepare an environmental impact statement ("EIS") under the National Environmental Policy Act ("NEPA") finds no basis in that law, either.

The District Court saw through these claims and concluded that a preliminary injunction was not warranted. To begin with, the court recognized that Plaintiffs likely lacked standing to pursue nearly all their claims, given that Plaintiffs—which are based over 1,000 miles away from the Project in Mozambique's capital and Washington D.C., respectively—will not *themselves* be injured by the Project and cannot derive standing from alleged injuries to third parties. The District Court also correctly determined that each of Plaintiffs' many claims likely fails on its merits. And, given Plaintiffs' weak and uncertain showing of any irreparable harm as compared with the significant harm that halting the loan would do to American jobs

and Mozambique itself, the District Court also properly found that there was no basis for a preliminary injunction after balancing the various factors.

This Court should affirm the District Court's well-reasoned decision.

**ISSUES PRESENTED**

I.      Whether Plaintiffs showed a substantial likelihood of standing.

II.     Whether 12 U.S.C. § 635 *et seq.* (the "Bank Act"), EXIM procedures, or NEPA requires EXIM to provide notice and comment or conduct new economic and environmental analyses before amending an already approved loan.

III.    Whether the equities require issuance of a preliminary injunction.

**STATUTES**

All applicable statutes are contained in the Opening Brief of Plaintiffs-Appellants.

## STATEMENT OF THE CASE

### A.    The Bank's Statutory Framework

EXIM is a federally chartered bank and independent federal agency dedicated to "maintaining or increasing employment of United States workers" by financing exports of American goods.  12 U.S.C. § 635(a)(1).

To accomplish this mission, Congress broadly authorized EXIM to conduct a "general banking business."  *Id.*  Congress has directed EXIM to provide "fully competitive financing" so that it may "strengthen[] the competitive position of United States exporters" and "neutralize the effect of . . . foreign credit on international sales competition."  *Id.* § 635(b)(1)(B); *see also* S. Rep. No. 99-274, at 8 (1986) (The Bank Act "should . . . not reduce [EXIM]'s competitiveness and flexibility.").

For large loans like this one, EXIM provides notice and comment.  Before any meeting of EXIM's Board "for final consideration of a long-term transaction the value of which exceeds $100,000,000," the Bank provides an opportunity to comment on the "application proposing the transaction."  12 U.S.C. § 635a(c)(10)(A), (C)(i)(I).  EXIM is not required to respond to any of the comments. *See id.* § 635a(c)(10); *see also* 5 U.S.C. § 553(a)(2) (notice and comment is not generally required for federal "loans" or "contracts").

The Bank Act prescribes various factors for EXIM's Board to consider when "authorizing any loan or guarantee," generally leaving to EXIM how to balance these "competing statutory mandates." 12 U.S.C. § 635(b)(1)(B); *Delta Air Lines v. EXIM*, 85 F. Supp. 3d 387, 410 (D.D.C. 2015).

For one, EXIM must "give particular emphasis" to "strengthening the competitive position of United States exporters" and "expanding" U.S. exports, while taking into account any "serious adverse effect" on the competitive position of U.S. industry and employment. 12 U.S.C. § 635(b)(1)(B). EXIM generally cannot "extend any direct credit . . . for establishing or expanding production of any commodity" if the Bank determines that "the commodity is likely to be in surplus on world markets at the time the resulting commodity will first be sold" and the commodity produced will cause "substantial injury" to U.S. producers of a competing commodity. *Id.* § 635(e)(1). Recognizing that such loans may still be in U.S. interests, Congress allowed the Board to bypass this limitation if, in its "judgment," the "short- and long-term benefits" of the loan to U.S. industry and employment outweigh the costs to U.S. producers of the commodity. *Id.* § 635(e)(3). In making these determinations, EXIM has discretion whether to "conduct[] a detailed economic impact analysis or similar study" of the "proposed transaction." *Id.* § 635(e)(7)(A). If EXIM conducts such an analysis, it must provide notice and comment. *Id.* To guide its economic analyses, EXIM developed non-binding

*Economic Impact Procedures and Methodological Guidelines* (Feb. 2025), https://tinyurl.com/53euznve. *See* 12 U.S.C. § 635(e)(7) (authorizing EXIM to adopt "appropriate" "procedures" for economic analysis).

Congress also directed EXIM to "establish procedures to take into account the potential beneficial and adverse environmental effects of goods and services" the Bank finances "consistent with" its primary objectives: increasing employment and maintaining competitiveness. *Id.* § 635i-5(a)(1). EXIM must also establish procedures to make certain "environmental assessments and supplemental environmental reports required to be submitted to the Bank" available to the public. *Id*. EXIM accordingly developed its non-binding Environmental and Social Due Diligence Procedures and Guidelines ("ESPG") to guide its environmental analysis of credit "applications." ESPG § I.2 (rev. 2025), https://tinyurl.com/4jxjdhxb.

None of these provisions or procedures specifies any obligations after the Board approves a loan application.

## B.    The Bank Carefully Evaluates The Project

This case involves an EXIM loan for a liquefied natural gas ("LNG") project to develop natural gas reserves in "Area 1" of the Rovuma Basin off Mozambique's northern coast. JA240, 287.

TEPMA1 operates the Project for a joint venture of global energy companies in cooperation with the Government of Mozambique. JA241. The Project will

include an onshore LNG facility, offshore wells, and a pipeline. JA240. The Project's onshore facilities share space and certain facilities with another LNG project in the Rovuma Basin, Exxon's proposed Area 4 Rovuma project. JA294.

In April 2015, EXIM received an application for final commitment ("Application") for a loan financing up to $5 billion of U.S. exports for the Project. JA269, 273-82. During the next four years, EXIM conducted extensive due diligence, including expert staff assessments from technical and environmental engineers and security and policy experts. JA269. Senior management reviewed the proposed transaction three separate times. *Id.*

EXIM made its environmental and social impact assessment public in January 2016. Dkt. 25 at 7.

In 2018, EXIM published a "notice" of "Intent To Conduct Detailed Economic Analysis" in the Federal Register and invited comment. 83 Fed. Reg. 61,379, 61,379 (Nov. 29, 2018). Nine months later, EXIM finalized its economic analysis in August 2019. JA344. EXIM concluded that an LNG supply-demand gap would open "in the early-to-mid 2020s," leading to a 5-10% gap by 2024 that "would grow from there." JA349. EXIM also found that "LNG demand is set to grow substantially over the next [10-15] years" (through the mid-2030s) and that "it is unlikely that structural oversupply develops in the LNG market any time in the foreseeable future." JA350. Using a set of "generally conservative" assumptions,

the analysis projected net U.S. trade benefits of about $2.31 billion.  JA351-52.

### C. The Bank Approves The Project Loan Application In 2019

EXIM's Board first considered the Application in August 2019, when it approved the transaction for public notice and comment and further notice to Congress under 12 U.S.C. §§ 635(b)(3) and 635a(c)(10).  JA269.

After the comment period, EXIM's Board unanimously approved the Application in September 2019.  JA270; JA403.  As EXIM explained, the loan advances EXIM's mission to contribute to U.S. employment by supporting over 16,000 domestic jobs across the country.  JA250.  The loan advances America's competitive position relative to other countries, including China.  JA251.  And it provides "the stimulus that Mozambique needs to jump-start its economy and improve the lives of its people."  JA252.

### D. The Bank Amends The Loan In 2020

In May 2020, EXIM's Board unanimously voted to amend the 2019 final commitment.  JA270; JA405-06.  The amendment decreased the loan from $5 billion to $4.7 billion ($1.8 billion of which was allocated to offshore facilities) and designated TEPMA1 the Project's operator.  JA244, 270.

The amendment increased the number of U.S. suppliers from 37 to 68, further "advanc[ing] American and African prosperity."  JA256-58.

### E.     TEPMA1 Invokes Force Majeure In 2021

Since before EXIM approved the Application, Mozambique's northern Cabo Delgado Province has faced ongoing terrorist activity by al-Shabaab, an ISIS-affiliated group seeking to establish an Islamic state. JA244. Before approving the Application in 2019, EXIM staff cited the threat posed by Islamist extremists as a "significant downside risk" to both the Project and Exxon's adjacent Rovuma project. JA338.

In March 2021, al-Shabaab attacked the town of Palma, close to the Project site. JA244. The attack caused the death and displacement of many people. *Id.* The next month, TEPMA1 declared *force majeure* and suspended work on the Project. JA245.

### F.     The Bank Amends The Loan In 2025

Security in Cabo Delgado has improved significantly since 2021, after intervention by the Mozambican military and regional partners, including South Africa and notably Rwanda. JA247.

TEPMA1 has since resumed work on the Project following the end of *force majeure*. Due to the improved security situation, EXIM's Board unanimously approved an amendment to the credit agreement on March 13, 2025 (the "Amendment"). JA260-66. EXIM recounted the "lengthy and transparent" due diligence the Project underwent before the 2019 approval and reaffirmed the original

reasons for approving the Application. JA264. To accommodate the delays from the al-Shabaab insurgency, the Amendment "extends certain dates and makes related changes" and "contains no material change from the original approval." JA263.

Before approving the Amendment, EXIM "thoroughly reviewed the physical security situation," JA263, ███████████████████████, JA721-22. EXIM "determined that the security risks to the project had been properly addressed, with substantial systems in place and appropriate management plans and mitigation applied to respond appropriately to evolving security concerns." JA263; JA720-21; JA731-39.

EXIM also reaffirmed that the Project would "not compete in any harmful way with the production of U.S. LNG." JA264; JA725. Instead, EXIM and independent experts found that "the transaction would likely have a net positive impact on the U.S. economy, based on supply/demand over the life of the loan." JA264; JA725.

## G. Plaintiffs Wait Four Months, Then Sue

Plaintiffs waited four months after EXIM's public announcement of the Amendment—and nearly six years after EXIM approved the Application—before suing to block the Amendment on July 14, 2025, seeking a preliminary injunction a week later. JA5-6. After oral argument, the District Court denied Plaintiffs' motion on October 10, 2025, in a carefully reasoned, 33-page opinion. JA9.

At the outset, the District Court concluded that Plaintiffs lacked standing for nearly all their claims, except a subset of claims based on informational injury. JA574-76; JA585-91. The District Court nonetheless analyzed the merits of *all* of Plaintiffs' claims, finding that each likely failed. JA576-91. The Court first rejected Plaintiffs' claim that EXIM's Board was unlawfully constituted, JA577-79, a claim Plaintiffs have abandoned on appeal, *see* Opening Br. 5-6. The Court next rejected each of Plaintiffs' claims that EXIM should have undertaken additional notice and comment for the Amendment, finding that nothing in the Bank Act or EXIM's procedures required a public comment process before approving an amendment to a previously approved loan. JA580-86. The District Court also found that no EIS was required under NEPA because EXIM reasonably determined that financing the Project was not a "major federal action." JA588-91.

After determining that the irreparable harm factor only "slightly favor[ed] Plaintiffs" due to questions about the certainty and imminence of any potential injury, JA593, and that the balance of the equities and public interest factors were in "relative equipoise," JA595, the District Court concluded that Plaintiffs were not entitled to a preliminary injunction, JA596.

Nineteen days later, Plaintiffs appealed. JA10.

## STANDARD OF REVIEW

The Court reviews denial of a preliminary-injunction motion for abuse of discretion, its underlying legal conclusions *de novo*, and any factual findings for clear error. *Climate United Fund v. Citibank, N.A.*, 154 F.4th 809, 819 (D.C. Cir. 2025). A preliminary injunction is only appropriate where the movant establishes that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter*, 555 U.S. at 20. Where the government is the opposing party, the final two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## SUMMARY OF ARGUMENT

The District Court acted well within its discretion in denying Plaintiffs' belated request for a preliminary injunction.

I.      Plaintiffs fail to show they likely possess Article III standing.

I.A.    Contrary to their claims, Plaintiffs cannot demonstrate standing based on their desire to participate in agency notice and comment. Plaintiffs assert that the lack of comment denied them a "means of redress" under *PETA v. USDA*, 797 F.3d 1087, 1093-97 (D.C. Cir. 2015). But *PETA* does not govern cases involving alleged denial of notice and comment or other procedural violations. *See id.*; *see also International Bhd. of Teamsters v. TSA*, 429 F.3d 1130, 1135 (D.C. Cir. 2005) (the

"opportunity to comment" is a procedural injury that is not, on its own, an injury in fact). And, in any event, the Supreme Court has recently "cautioned against extending" cases like *PETA* to new facts. *Center for Biological Diversity v. United States DOI*, 144 F.4th 296, 315 (D.C. Cir. 2025) (citing *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 395-96 (2024)).

I.B. The District Court also correctly concluded that Plaintiffs' speculation that restarting the Project might lead to more social and environmental harms to third parties was insufficient to establish that the Amendment would impede Plaintiffs—based over 1,000 miles away in Mozambique's capital and Washington, D.C.—from performing their core business activities.

I.C. Finally, Plaintiffs cannot show an informational injury under the Bank Act or NEPA. And in any event, standing based on an informational injury to obtain additional information from an agency is totally divorced from the actual relief Plaintiffs seek—preliminarily enjoining any disbursements under the loan.

II. Plaintiffs' claims also are not likely to succeed on the merits.

II.A. The District Court correctly held that the Bank Act's requirement to provide notice and comment before the Board's "final consideration of a long-term transaction the value of which exceeds $100,000,000" does not apply to amendments to an already approved loan. 12 U.S.C. § 635a(c)(10)(A). As the District Court observed, the provision requiring notice and comment repeatedly refers to

"*applications*" for a loan in the first instance, not later amendments. "EXIM's decision to extend the dates in a previously approved loan by four years therefore appears fundamentally different than the kind of 'final consideration of a long-term transaction' at the end of the application process contemplated by the Bank Act." JA581.

II.B. Because the ESPG are similarly concerned with applications, not amendments to approved transactions, the District Court correctly held that the ESPG did not require notice and comment.

II.C. The District Court also correctly found that the Bank Act did not require EXIM to conduct a new, detailed economic analysis in connection with the 2025 Amendment. Plaintiffs' newfound argument on appeal that EXIM's non-binding guidance documents require such a detailed economic analysis is forfeited and meritless.

II.D. The District Court also properly deferred to EXIM's determination that financing of the Project is not a "major federal action" under NEPA. As the District Court correctly explained, EXIM was unlikely to have sufficient control over the Project, and the Project was unlikely to have environmental effects in the United States sufficient to constitute a "major federal action" subject to NEPA.

III. Finally, the District Court appropriately concluded that the remaining equitable factors did not justify the extraordinary remedy of a preliminary injunction.

As the District Court observed, any alleged irreparable harm to Plaintiffs is slight and highly uncertain.  Indeed, Plaintiffs waited *four months* after the Amendment to even seek preliminary relief, undercutting any claim of imminent harm.  The remaining equitable factors also favor TEPMA1.  Apart from the obvious harms to TEPMA1 of unwinding the Project's financing, enjoining disbursements to the Project would endanger the 16,400 American jobs the loan is expected to support and Mozambique's prosperity.

Accordingly, the District Court's decision should be affirmed.

## ARGUMENT

## I.    PLAINTIFFS LACK STANDING

Every plaintiff—including organizational plaintiffs—bears the burden of establishing that they have Article III standing to press their claims.  Plaintiffs here have not shown a likelihood of standing to assert their claims.

To show a likelihood of standing, Plaintiffs must show "an actual or threatened injury in fact that is fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by a favorable court decision."  *American Anti-Vivisection Soc'y v. USDA*, 946 F.3d 615, 618 (D.C. Cir. 2020).  They must do so for each claim and each type of relief that they seek.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  In cases involving claims of procedural injury, a plaintiff must do more than show that an agency failed to follow procedures required

by law; it must separately show that the agency's action (here, the Amendment), causes "injury to [its] concrete, particularized interest." *Center for Law & Educ. v. Department of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005).

An organization has the same obligation to show standing as any other litigant. *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Where, as here, an organization seeks to show injury to itself, rather than its members, it must show that it "suffered a concrete and demonstrable injury to its activities." *Id.* A necessary element of this showing is that the defendant's conduct "perceptibly impaired" the organization's "ability to provide services." *Id.*

After the Supreme Court's recent *Alliance* decision, the precise type of "services" is critical: An impairment to a plaintiff's issue advocacy activities does not count. *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 395 (2024). Instead, the defendant must have "directly affected and interfered with [the organization's] core business activities." *Id.* An organization cannot "spend its way into standing by expending money to gather information and advocate against the defendant's actions" through actions such as "drafting citizen petitions" or "engaging in public advocacy." *Id.* at 394. Were it otherwise, an organization could "manufacture its own standing." *Id.*

As this Court recently recognized, *Alliance* expressly "cautioned against extending" the "foundation of [this Court's] organizational injury precedents,"

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), to the extent *Havens* suggested impairment to issue advocacy alone might qualify as a sufficient injury to an organization's interest. *Center for Biological Diversity v. United States DOI*, 144 F.4th 296, 315 (D.C. Cir. 2025). *Havens* was an "unusual case," the Court warned, that should not be "extend[ed] . . . beyond its context." *Alliance*, 602 U.S. at 396.

Yet that is exactly what Plaintiffs attempt to do here. Plaintiffs' standing arguments all fail.

### A. Plaintiffs' "Redress" Theory Fails

Plaintiffs first contend (at 22) that they have an injury under *PETA v. USDA*, 797 F.3d 1087, 1095 (D.C. Cir. 2015), which they claim held that an organization suffers a concrete injury whenever "an agency denies an organization a means of redress it would use to advance its mission." Here, the "means of redress" that Plaintiffs claim EXIM denied them is their alleged right under the Bank Act and EXIM's ESPG to "comment before its March 2025 decision." Opening Br. 22-24 (citing 12 U.S.C. § 635a(c)(10)(C), (E); ESPG §§ I, III, IV).

Plaintiffs' reading of *PETA* conflicts with Supreme Court and Circuit precedent, under which an agency's failure to "provide public notice" and allow an organization "the opportunity to comment" is not, on its own, an injury in fact. *International Bhd. of Teamsters v. TSA*, 429 F.3d 1130, 1135 (D.C. Cir. 2005); *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). As the District Court

correctly recognized, *see* JA572, Plaintiffs must separately show that EXIM's approval of the Amendment impairs a "concrete interest apart from the procedural injury" of denial of notice and comment. *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 28 (D.C. Cir. 2002); *Center for Law & Educ.*, 396 F.3d at 1159-60.

*PETA* is not to the contrary. Although *PETA* used the term "means of redress," it did not involve any alleged deprivation of a procedural right, much less notice and comment. 797 F.3d at 1091-97. There, PETA challenged the Department of Agriculture's ("USDA") refusal to apply its regulations under the Animal Welfare Act ("AWA") to protect birds; the court did not consider a procedural denial of notice and comment in the course of agency decisionmaking. *Id.* at 1092. The unavailable "means of redress" was USDA's refusal to investigate complaints of bird mistreatment because, in the agency's view, the AWA "does not regulate birds." *Id.* at 1095-96; *see Food & Water Watch*, 808 F.3d at 920-21. Nothing about *PETA* suggests that denying notice and comment or other procedural violations alone establish standing. Had *PETA* so held, the Court would still be bound to follow the contrary Supreme Court and earlier panel precedents, including *Summers* and *Teamsters*. *See Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011).

*PETA* is distinguishable in other ways, as well. First, *PETA*'s redress theory concerned "redress for a violation of law" administered by the agency, *i.e.*, injuries to birds. *Food & Water Watch*, 808 F.3d at 921. But here, Plaintiffs do not allege a

comparable third-party violation of an EXIM-administered law that EXIM could "redress" by halting the violation.

Second, USDA's refusal to apply the AWA deprived PETA of *any* means of redress from the agency for bird-mistreatment complaints. But here, Plaintiffs can— and have—sought redress through other EXIM procedures. *See, e.g.*, ESPG § III.C (providing a grievance procedure for "[p]roject stakeholders, NGOS, and interested parties" to provide "information or comments" on "environmental and social issues"). Indeed, the record overflows with examples of Plaintiffs petitioning EXIM against funding of the Project generally, and the Amendment specifically. JA607 (███████████████████████████████████████████ ██████████████████████), JA123-24 (similar); JA125 (reflecting six meetings with EXIM); JA721-22 (███████████); JA296-97 (similar). EXIM's alleged denial of a single, formal comment opportunity is not analogous to USDA's systematic refusal to act on bird-mistreatment complaints that "perceptibly impaired" PETA's animal-protection activities. 797 F.3d at 1095.

Third, *PETA* did not hold that denying a means of redress, standing alone, could show perceptible impairment. USDA's refusal to investigate bird-mistreatment claims separately deprived PETA of information from investigation reports that the organization used to educate the public about cruelty to animals— "one of the primary ways" that it carried out its animal-protection mission. *PETA*,

797 F.3d at 1094. Plaintiffs' *PETA*-based injury, meanwhile, rests exclusively on a discrete, denied comment opportunity.

For all these reasons, Plaintiffs' "redress" theory fails.

## B. Plaintiffs' "Services" Do Not Support Standing

Unable to show that denying notice and comment alone confers standing, Plaintiffs must show that the Amendment itself will harm their core business activities. *Alliance*, 602 U.S. at 395. Plaintiffs assert two theories (at 30-35): (1) restarting the Project will cause increased social and environmental harms that will, in turn, cause more individuals to seek more of Plaintiffs' advocacy services and (2) restarting the Project will increase jihadist incidents, making it harder and more burdensome for Plaintiffs to provide these "services."

Plaintiffs' theory fails from the jump because their "services" are all non-qualifying issue advocacy. And in any event, they fail to clear the common barriers in cases challenging government action toward third parties: Causal links must not be "speculative"; it must be "predictable how third parties would react to government action." *Alliance*, 602 U.S. at 383. And the causal links cannot be too attenuated; government action cannot be "far removed from its distant (even if predictable) ripple effects." *Id.* These problems each doom Plaintiffs' "services" theory.

### 1. Plaintiffs' "Services" Are Mere Issue Advocacy

At the outset, any impairment to Plaintiffs' "services" cannot confer standing because they are the wrong kind of services. *Havens* itself recognized that an organization cannot claim injury when "the only 'service' impaired is pure issue-advocacy.'" *Center for Law & Educ.*, 396 F.3d at 1162 (citing *Havens Realty*, 455 U.S. at 379).

Plaintiffs' services are just advocacy by another name. Plaintiffs generally contend (at 11-13, 31-33) that they investigate the Project, provide information about it, participate in redress processes, and make comments or complaints on behalf of community members. This is the type of advocacy activity the Supreme Court and this Court have held inadequate to support injury. *See Alliance*, 602 U.S. at 370 (organizations' decision to "'expend considerable time, energy, and resources' drafting citizen petitions" cannot create standing); *Center for Biological Diversity*, 144 F.4th at 315 (additional resources to "lobby the federal government, file rulemaking petitions, request improved policies, and in other ways urge the government to better protect endangered and threatened species and habitats" were issue advocacy); *National Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (organization's time and money spent "submitting comments to the EPA" was a part of an "advocacy mission" and insufficient for standing).

An organization cannot "manufacture its own standing in this way." *Alliance*, 602 U.S. at 394. Any impairment to Plaintiffs' activities, and any resources Plaintiffs expended to counteract purported harms from EXIM, constitute non-qualifying issue advocacy—"a self-inflicted budget choice that cannot qualify as an injury in fact." *Electronic Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017). Without a qualifying injury to their interests, Plaintiffs' "services" theory crumbles.

### 2. Increased Demand for Plaintiffs' Services Is Not An Injury

Even if Plaintiffs' "services" were not mere issue advocacy, Plaintiffs have not shown that EXIM's action will perceptibly impair them. Plaintiffs first fault the District Court (at 31-33) for failing to grapple with Plaintiffs' theories of harm unrelated to the security situation. They argue (at 31) that restarting the Project will "displace more people from their land, damage the environment, limit fisherpeoples' sea access and otherwise harm livelihoods." This, Plaintiffs assert (at 32), will cause "community members [to] turn to Plaintiffs" and cause "Plaintiffs to provide more and more burdensome services."

But government action that *increases demand* for an organization's services does not *impair* the organization's activities, even if the organization chooses to use its resources to meet the new demand. *See National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995) (rejecting attempt to "convert ordinary

program costs into an injury in fact" where the challenged law did not prevent organization from "pursuing its true purpose").

*Alliance* held as much. There, doctors alleged that FDA's mifepristone approval harmed them because they would have to "treat patients with mifepristone complications." 602 U.S. at 390. The Court held the causal chain "too attenuated." *Id.* at 391. Accepting the theory would give all manner of service providers standing to challenge government actions they did not like: Firefighters could challenge "relaxed building codes that increase fire risks" and teachers near the border could challenge "lax immigration policies that lead to overcrowded classrooms." *Id.* at 392. All these well-intentioned plaintiffs could credibly claim that the government's action would cause them to deliver "more and more burdensome services," Opening Br. 32—whether fighting more fires or teaching in overcrowded classrooms. But that is not enough under *Alliance*.

*Havens*, although now limited to its facts, shows the kind of perceptible impairment that Plaintiffs lack. There, the organizational plaintiff had standing because the defendant's conduct "directly . . . interfered" with the organization's housing counseling service. *Alliance*, 602 U.S. at 395. The defendant lied directly to the plaintiff about housing availability, preventing the organization from providing truthful information to its clients. *See id.* Here, instead, Plaintiffs assert (at 31-32) a highly attenuated chain that might cause them to *increase* their services,

not impair them: that EXIM's approval will lead to the Project's construction, which may lead to Mozambicans experiencing harm, who may seek help from Plaintiffs. That is not the direct impairment that *Havens* requires.

Plaintiffs' theory is also speculative, as the District Court identified. *See* JA571. Arguing that Plaintiffs may submit additional complaints regarding resettlement, Plaintiffs take it as fact that the Project will cause additional resettlement activities. *But resettlement is already complete.* JA246. In response, Plaintiffs cite a declaration asserting, without any showing of personal knowledge, that community members will be displaced to provide places for Project subcontractors to build roads or source materials. JA211. This speculation is not enough. *See Alliance*, 602 U.S. at 383. The same holds true for Plaintiffs' claim that the Project will disrupt the lives of farmers and fisherman: it is based on Plaintiffs' speculation that the Project will displace more people from more land. JA211; JA766-68.[1] Plaintiffs also broadly claim (at 9, 31-32) that the Project will cause "damage [to] the environment," and unidentified individuals may someday turn to Plaintiffs—■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ ■■■■■■■■■—for some unknown form of help. *See e.g.*, JA778. Such a

---

[1]  Plaintiffs also argue that restarting the Project ■■■■■■■■■■■■■ ■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■ JA768. Such "distant . . . ripple effects" cannot establish standing. *Alliance*, 602 U.S. at 383.

conclusory contention does not meet Plaintiffs' burden to show a concrete injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992) ("'[S]omeday intentions' . . . do not support a finding of the 'actual or imminent' injury that our cases require.").

Plaintiffs complain (at 32) that they will now have to pursue "after-the-fact remedies," but continuing existing activities is not an injury. For "twenty years," Plaintiffs have "provided services to local people to protect their rights and prevent or address injuries" from the Project by providing them information, monitoring compliance with legal obligations, and facilitating participation in redress procedures. Opening Br. 11. That Plaintiffs may continue or expand their existing operations does not impair their core business activities. *See National Taxpayers Union, Inc.*, 68 F.3d at 1434 (rejecting attempt to "convert ordinary program costs into an injury in fact"). Plaintiffs' continuing services cannot establish standing, even if EXIM's loan increases demand.

### 3. Plaintiffs' Security-Related Injuries Rest Upon An Impermissibly Attenuated Causal Chain

Alternatively, Plaintiffs theorize (at 35) that their work will become harder because resuming the Project will worsen nearby violence.

Plaintiffs seek (at 34) to analogize their claim to *Department of Commerce v. New York*, 588 U.S. 752, 768 (2019) and assert it is sufficient that these results are "predictable." But the causal chain in *New York* was straightforward: A change in

26

a census question would directly alter respondents' response to the census.  *See id.*

That case did not consider the wildly speculative, five-step attenuated chain that

Plaintiffs have presented here, *i.e.*, that (1) approval of the Amendment will restart

the Project; (2) restarting the Project will increase the desire of jihadists to launch

attacks, over and above existing attacks; (3) security forces will not prevent the

attacks; (4) the attacks will be in an area near the Project where Plaintiffs may

provide services in the future; and (5) that will impair Plaintiffs' activities *above and*

*beyond* the existing security situation, which Plaintiffs ████████████████

████████████████████████.  Opening Br. 34-35.  Each step requires

improper speculation on whether additional terrorist activities might lead to a

certainly impending injury for plaintiffs.  *See Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 410 (2013) (theory that relied upon a five-step "highly attenuated chain of

possibilities" was insufficient to show standing).  The District Court rightly found

such "speculation" insufficient for standing.  JA571 n.1.

Attenuation aside, the claim that increased, Project-inspired violence will

impair Plaintiffs' activities beyond the status quo ignores that the existing security

situation ████████████████████████████████████████

████.  JA635 (████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

27

██████████████████████████████); *see also* JA632-33.  These

challenges that pre-date the Amendment are not traceable to EXIM's approval of the

Amendment.

To show that the Amendment perceptibly impairs Plaintiffs' services,

Plaintiffs must show that the Amendment will worsen the security situation in a way

that makes it harder for Plaintiffs to render their services.  *American Anti-Vivisection*

*Soc'y*, 946 F.3d at 618 (injury must be "fairly traceable to the defendant's allegedly

unlawful conduct").  This they cannot do.

Plaintiffs' assertion (at 33) that "[u]nrebutted evidence" shows that "the

Project fuels the conflict" is wrong .  Even a charitable reading of Plaintiffs' evidence

is equivocal on whether the Project restart will ████████████████████

████.  JA636, 642; JA768-69.  No wonder:  As Plaintiffs concede, ███████

█████████████████████████████, *see* JA644-50, and has

continued for years during *force majeure*, Opening Br. 10; JA620-29 (████████

████████████████).  Plaintiffs' declarant concedes, moreover, ███████

███████████████████████████████████

████████████████████████████.  JA654.  Setting

aside the inherently speculative enterprise of predicting how an insurgent group will

respond to a single changed variable, Plaintiffs do not explain why, given ████████

████████████████, a worsening in the security situation would

make it perceptibly harder to provide services. The years-long, ongoing terrorist campaign is a human tragedy, but it provides no basis for enjoining the loan.

### C.     Plaintiffs Lack Informational-Injury Standing

The District Court accepted that Plaintiffs showed informational standing for several claims. JA574-76. This Court's precedent, however, points to the opposite conclusion.

To show a concrete and particularized informational injury, the plaintiff must show that "(1) it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and (2) it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Electronic Priv. Info. Ctr.*, 878 F.3d at 378. Plaintiffs cannot make this showing.

Congress enacted NEPA to ensure that the government gives appropriate consideration to the environment, not to convey a free-floating public right to obtain environmental information. *See Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 123 (D.C. Cir. 1990). Accordingly, this Court has "never sustained an organization's standing in a NEPA case solely on the basis of 'informational injury." *Foundation for Econ. Trends v. Lyng*, 943 F.2d 79, 84 (D.C. Cir. 1991). Indeed, finding to the contrary "would potentially eliminate any standing requirement in NEPA cases." *Id.*

Plaintiffs' claimed informational injury under the Bank Act also falls short. For their economic analysis claim, Plaintiffs asserted an informational injury based off the Bank Act's notice-and-comment provisions. Dkt. 13-1 at 27-28, 38 (citing 12 U.S.C. § 635(e)(7)(B)(i), (iii)(I)). But a statute requiring notice and comment does not create a *right* to information sufficient for an informational injury. *See, e.g.*, *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1259 (9th Cir. 2010) (so holding and explaining that even when public's rights under statute "necessarily involve the dissemination of information, they are not thereby *tantamount* to a right to information per se"); *accord Center for Biological Diversity v. Haaland*, 849 F. App'x 2, 4 (D.C. Cir. 2021) (per curiam) (applying *Wilderness Society*).

These limitations on an informational injury make sense. As the Supreme Court has explained, losing the ability to comment on agency action in the abstract is a procedural injury insufficient to confer standing. *See Summers*, 555 U.S. at 496-97. A party cannot change this conclusion by labeling its injury as informational instead: If a party could "simply reframe every procedural deprivation in terms of informational loss," it could make "an end run around the Supreme Court's procedural injury doctrine and render [the Court's] direction in *Summers* meaningless." *Wilderness Soc'y, Inc.*, 622 F.3d at 1260; *Lyng*, 943 F.2d at 83-85 (explaining that allowing a NEPA claim without requiring an injury to "the

environmental, recreational, or aesthetic interests of its members" would transform a "mere 'interest in a problem'" into a cognizable injury).

Separately, an informational injury would not provide standing for the relief sought by Plaintiffs: a preliminary injunction against loan disbursements. Plaintiffs must show standing "for each form of relief sought," *DaimlerChrysler Corp.*, 547 U.S. at 352, and the relief for any injury "must be limited to the inadequacy that produced the injury in fact the plaintiff has established," *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Thus, the remedy for a plaintiff injured by the government's failure to provide information is "additional factual information." *See, e.g.*, *Wertheimer v. Federal Election Comm'n*, 268 F.3d 1070, 1074 (D.C. Cir. 2001). Any other remedy would not be "limited to" the deprivation of information that caused the informational injury. *Lewis*, 518 U.S. at 357. To obtain an injunction against the agency's action taken without providing information, the plaintiff must show that the agency's action (not merely the deprivation of information) harmed the plaintiff, as *Summers* and its progeny require. *Wilderness Soc'y, Inc.*, 622 F.3d at 1259. Because Plaintiffs cannot show that the loan will cause them any particularized injury, *supra* at 21-29, they have no interest in enjoining the loan beyond the non-cognizable "undifferentiated public interest in executive officers' compliance with the law." *Lujan*, 504 U.S. at 577. Their appeal fails for this reason alone.

## II.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS

In any event, even if Plaintiffs possessed standing, the District Court correctly concluded that their laundry list of claims is likely to fail on its merits.

### A.    The Bank Act Does Not Require Notice And Comment For Amendments To Approved Transaction

Plaintiffs argue (at 35-50) that EXIM needed to provide another round of notice and comment in connection with the Amendment, even though it conducted notice and comment when it approved the loan Application.

That is wrong.  The statute provides:  "Before any meeting of the Board for final consideration of a long-term transaction the value of which exceeds $100,000,000, . . . the Bank shall provide a notice and comment period."  12 U.S.C. § 635a(c)(10)(A).  Plaintiffs claim (at 36) this means that EXIM had to provide a notice and comment period before approving the 2025 Amendments, because the Board then gave "final [last-in-time] consideration" to a "transaction"—in effect, creating a potentially never ending, notice-and-comment obligation.

Plaintiffs' interpretation means that there are *many* times when EXIM gives "final consideration of a long-term transaction,"—whatever happens to be the latest-in-time revision to a loan agreement.  On Plaintiffs' view, from the perspective of someone in October 2019, the September 2019 approval of the loan was the "final consideration of a long-term transaction."  But, viewed from someone in June 2020, the May 2020 amendment became the "final consideration of a long-term

transaction"—*i.e.*, the last-in-time amendment as of that date.  And, if the loan is amended *again* in 2027, that, too, would be another "final consideration."

Congress provided multiple textual clues that it did not mean every necessary revision to a loan constitutes another "final consideration of a long-term transaction" that requires notice and comment.  12 U.S.C. § 635a(c)(10).  "Final" in the context of agency decisionmaking does not just mean "last-in-time," but refers to the "consummation of the agency's decisionmaking process" "from which legal consequences will flow." *United States Army Corps of Eng'rs v. Hawkes Co*., 578 U.S. 590, 597 (2016).  "Consideration" refers to "careful thought." *Webster's New World College Dictionary* 311 (2010).  And a "transaction" is an "act or agreement, or several acts or agreements having some connection with each other . . . by which the legal relations of [] persons between themselves are altered."  Opening Br. 36-37 (quoting *Transaction*, *Black's Law Dictionary* (4th ed. 1968)).  The Bank Act's text, structure, and purpose all point to the "final consideration of a long-term transaction" as the consummation of the agency's decisionmaking over whether to enter into the "transaction" (the loan) pursuant to an application for a loan.  That occurred in September 2019, not in connection with the March 2025 Amendment.

Congress's instruction to conduct notice and comment on the "final consideration of a long-term transaction" does not exist in a textual vacuum, as Plaintiffs suggest, but within a comprehensive set of statutory instructions regarding

*how* to undertake this required notice and comment on the *application* for a loan. 12 U.S.C. § 635a(c)(10). As the District Court explained, the statute "repeatedly mak[es] clear that this requirement is concerned with applications for a loan," using the word "application" *fifteen* times to describe the notice-and-comment process. JA580-82.

First, EXIM publishes "a notice of the application proposing the transaction" and allows 25 days for submission of "comments on the application." 12 U.S.C. § 635a(c)(10)(C). The description of the "application for a loan" must describe "the purposes of the transaction," the items to be exported, and the obligor. *Id.* The statute thus equates commentary on the relevant "transaction" with commentary on the "application for a loan." *Id.* Confirming as much, the notice-and-comment opportunity must occur when "financing is being sought," not when financing has already been obtained. *Id.* § 635a(c)(10)(C)(ii)(III).

EXIM's *post*-commenting procedures likewise confirm that there is no notice-and-comment period after the Bank approves an application for a loan, here, in 2019. The "comments on the application" must be conveyed to the Board "[b]efore taking final action on an application." *Id.* § 635a(c)(10)(E). And "after [the Board's] final decision on [the] application," EXIM must disclose any detailed analysis "with respect to the loan . . . that is the subject of the application." *Id.* § 635a(c)(10)(F). The approved "loan" in the "application" is the relevant transaction. And

§ 635a(c)(10) uses "application" exclusively in connection with applications for one of EXIM's financial products in the first instance, not amendments. *See, e.g.*, *id.* § 635a(c)(10)(C)(ii) ("application for a loan").

The key point here is that there is only one notice-and-comment process under § 635a(c)(10)(C), and it provides only for notice and comment on applications proposing transactions, such as an application for a loan. Because there is no notice-and-comment process for amendments to transactions that have already been approved, saying, as Plaintiffs do (at 35), that those other decisions require notice and comment because the Board is "consider[ing]" the "transaction" makes no sense. There is no notice-and-comment procedure for amendments to approved transactions, and it would not serve the purposes of notice and comment to require comments on an already approved application when the Board considers an amendment to the approved transaction. Notice and comment exists to give an agency "facts and information relevant to [the] particular administrative problem" it is considering. *American Hosp. Ass'n v. Bowen*, 834 F.2d 1037, 1044 (D.C. Cir. 1987). In 2025, EXIM's Board was not considering the original 2015 application. "[C]omments on [the 2015] application," 12 U.S.C. § 635a(c)(10)(C)(i)(II), would not have addressed the particular administrative problem before the Board (whether to amend the loan) in 2025.

There is more.  The section 635a(c)(10) comment period occurs "concurrent with any statement required to be submitted [to Congress] under section 635(b)(3) of this title with respect to the transaction."  *Id.* § 635a(c)(10)(A).  And the cross-referenced § 635(b)(3) is clear that this occurs before the Board approves the loan: "[N]o loan . . . in an amount which . . . exceeds $100,000,000 . . . shall be finally approved by the Board . . . unless . . . the Bank has submitted to the Congress with respect to such loan . . . a detailed statement describing and explaining the transaction."  *Id.* § 635(b)(3).  Here, that approval occurred in September 2019.

Congress also specifically provided when it would require renewed notice-and-comment opportunities.  "If a material change is made to an application," EXIM must publish a "revised notice of the application and provide for an additional comment period."  *Id.* § 635a(c)(10)(D)(i).  Congress provided that such a "material change" with respect to an application for a loan "includes an increase of at least 25 percent in the amount of a loan . . . requested in the application."  *Id.* § 635a(c)(10)(D)(ii); *see also Material*, *Webster's New World College Dictionary* 311 (2010) ("[I]mportant, essential, or pertinent[.]").  Congress did *not* provide for renewed notice if a "material change is made **to a loan**" or "**to its schedule**," as Plaintiffs suggest.

And even if the Amendment were viewed as a "change" to an "application," the District Court correctly recognized it would not constitute a "material change."

JA581-82.  It is uncontested that the Amendment made no change in the amount or purpose of the loan, just the disbursement schedule and other minor changes. Plaintiffs cannot use inclusive language like "includes" to "redefine or otherwise avoid specific requirements" in the statutory language.  *Financial Plan. Ass'n v. SEC*, 482 F.3d 481, 489 (D.C. Cir. 2007); *see also United States v. Brock*, 94 F.4th 39, 57 (D.C. Cir. 2024) (similar).  The *de minimis* changes at issue here, principally extending the loan schedule, were far more like a change in loan amount *under* 25% (which does *not* amount to a "material change") than a change exceeding 25%.[2]

Plaintiffs' observation (at 37-38, 40, 44) that the Amendment enabled TEPMA1 to "draw on" its approved financing and made other changes to the loan's terms is of no moment.  If Congress had wanted to subject modifications necessary for the loan to be drawn to be subject to the same notice-and-comment obligations as new applications, it could have expressly addressed such modifications, as it has done in other statutes that expressly address loan amendments.  *See, e.g.*, 7 U.S.C. § 940f(a)-(b) (providing for "extension of the final maturity of the outstanding principal balance" of certain loans subject to specific limitations); 49 U.S.C.

---

[2]  Continuing the theme of divorcing text from context, Plaintiffs grasp at the 2025 board memorandum's statement that the Amendment involved "material changes."  That was a reference ████████████████████████████████, which supplies its own definition of when a change to an existing agreement requires Board approval, as opposed to staff approval.  JA408-10; *see also* JA750.  It does not purport to interpret the Bank Act.

§ 22403(d) (setting procedures for the "modification of any term or condition" of loans). Congress made a different policy choice: It chose to authorize EXIM "to do a general banking business" that must be "competitive" with other countries' export banks, 12 U.S.C. § 635(a), (b)(1)(B), not to hamstring EXIM from operating as an actual, commercially competitive bank to promote U.S. exports.

Plaintiffs' claim fares even worse cloaked in passing as an arbitrary-and-capricious claim. *See Allen v. District of Columbia*, 969 F.3d 397, 405 (D.C. Cir. 2020) ("We do not consider arguments raised in such skeletal form."). Plaintiffs seek an end-run around the "longstanding principle" that "courts lack authority 'to impose upon an agency its notion of which procedures are 'best.'" *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 101-02 (2015). Congress did not require EXIM to conduct notice and comment under the Bank Act before amending the loan. *Supra* at 32-36. What procedure an agency must follow is for Congress to establish in advance, not for disappointed litigants to urge after the fact. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 541 (1978) ("[A]bsent extraordinary circumstances it is improper for a reviewing court to prescribe the procedural format an agency must follow . . . .").

For all these reasons, the District Court was right to conclude that "EXIM's decision to extend the dates in a previously approved loan by four years therefore appears fundamentally different than the kind of 'final consideration of a long-term

transaction' at the end of the application process contemplated by the Bank Act."

JA581. The Amendment did not require notice and comment.

**B.     EXIM Complied With Its Non-Binding Environmental And Social Due Diligence Procedures And Guidelines**

The District Court correctly held that EXIM did not violate the Bank's ESPG. JA583-85. The crux of Plaintiffs' contrary argument (at 51) is that the ESPG required EXIM to re-screen the Project for environmental and social risks and impact in connection with the 2025 Amendment, including by re-posting the Project on a pending transactions website and eliciting another round of notice and comment.

Putting aside that EXIM ███████████████████████████████████████ █████████████████████████████████████████████████████████████, *see* JA745-46; JA721-22, Plaintiffs never engage with the ESPG's text, which is dispositive. Section I.8 of the ESPG provides that the notice process in § I.9 applies "when EXIM Bank receives and processes a final application for long-term financing for a project." ESPG § I.8. Section I.9, in turn, provides that EXIM will post the project for which the application was submitted on its "Pending and Approved Transactions List" in addition to providing a link to the proposed project's Environmental and Social Impact Assessment, when required. *Id.* § I.9.

There are two glaring problems with Plaintiffs' claim that these procedures apply to the Amendment. For starters, the most reasonable construction of "application for long-term financing" in a document that EXIM authored is that it

refs exclusively to the form that it created bearing the same name. And the only document called an "Application For Long-Term Loan or Guarantee" associated with the Project is the one filed April 10, 2015. JA273-81. No such document was filed in connection with the Amendment. Many other ESPG provisions confirm that the ESPG requires public notice only for "applications," not amendments. The ESPG contemplate screening "applications" for "their potential for environmental and social risks." *See* ESPG § I.2. The ESPG ask "[a]pplicants" to "provide information sufficient to permit EXIM Bank to evaluate the nature and extent of risks and impacts of a project," *id.* § I.7, and encourage "[a]pplicants" to submit any environmental data "at the time the application for financing is made," *id.* § II (Category A). And EXIM commits to disclosing "information concerning the risks and impacts of projects" when it "receives and processes a final application." *Id.* § I.8. As described *supra* 7-9, all of these conditions were met, and fulfilled, in 2019, when the ESPG process was completed, and the Application approved. Thus, as the District Court correctly concluded, the ESPG apply to "*applications* for a loan—not amendments to a previously approved loan." JA584.

The ESPG's definition of a "project" removes any doubt that the Amendment needed to be re-screened under the ESPG. Only transactions "pertaining to a 'project'" are subject to any review under the ESPG. ESPG § I.2. The ESPG specifically define "a project" as "any existing undertaking that is *undergoing*

*material change in output or function*, which may result in changes to the operation's environmental and social risks and/or impacts." *Id.* (emphasis added). It is undisputed that the Project itself is not "undergoing material change in output or function." *Id.* It has been and remains an LNG project. The ESPG do not apply.

In any event, EXIM did not need to comply with the ESPG, because they are not binding. They are mere policy statements that "appris[e] the regulated community of the agency's intentions [and] inform[] the exercise of discretion by agents and officers in the field," *Community Nutrition Inst. v. Young*, 818 F.2d 943, 949 (D.C. Cir. 1987) (per curiam), but bind neither the agency nor the public, *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). The ESPG have been adopted and amended without notice and comment. *See* ESPG (Introduction). The ESPG do not purport to impose legal rights or obligations. *See id.*; *see also National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) ("The most important factor concerns the actual legal effect (or lack thereof) of the agency action in question."). And EXIM remains free to exercise its discretion in approving a loan notwithstanding the ESPG. *See Clarian Health W., LLC v. Hargan*, 878 F.3d 346, 357 (D.C. Cir. 2017); 12 U.S.C. § 635i-5(b). In evaluating EXIM's analogous economic procedures, multiple courts have noted that they "might more accurately be described as non-binding internal guidelines," *Delta Air Lines, Inc. v. EXIM*, 85 F. Supp. 3d 387, 409 (D.D.C. 2015). Because the ESPG are not law, any departure

from them was not "without observance of procedure[s] required by law" or "not in accordance with law." 5 U.S.C. § 706.

Finally, Plaintiffs' attempt to repackage their argument under an "arbitrary and capricious" banner fares no better. Plaintiffs' argument (at 53-54) is not just that EXIM should have considered the security situation and other issues (which it did, Opening Br. 53-54), but that EXIM was required to provide a comment opportunity that the Bank Act does not require. Plaintiffs cite no authority supporting that bold claim, nor did they preserve it below. *Apprio, Inc. v. Zaccari*, 104 F.4th 897, 910 (D.C. Cir. 2024). Even were the issue preserved, it runs ashore against the "very basic tenet of administrative law that agencies should be free to fashion their own rules of procedure." *Vermont Yankee*, 435 U.S. at 544.

## C.  EXIM Complied With NEPA

Plaintiffs also fail to show that the District Court's rejection of their NEPA challenge was error. JA585-90.

NEPA requires federal agencies to prepare an EIS only for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Congress in 2023 amended the statute to define "major Federal action" to "mean[] an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility." *Id.* § 4336e(10)(A). The statute also includes an extraterritoriality exception, which excludes "agency

activities or decisions with effects located entirely outside of [U.S.] jurisdiction" from the definition of "major federal action." *Id.* § 4336e(10)(B)(iii), (vi). Courts play only a limited role when reviewing NEPA compliance. *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 179 n.2 (2025). And given that EXIM's decisions fund international projects, its NEPA implementing procedures, 12 C.F.R. §§ 408.1-408.7, acknowledge that EXIM anticipates only "relatively rare cases where [EXIM] financing . . . may affect environmental quality in the United States." *Id.* § 408.3.[3]

EXIM did not err in concluding that the 2025 Amendment was not a "major Federal action." Nothing in the NEPA statute, EXIM's procedures, or the ESPG requires an EIS for an amendment—particularly where, as here, it does not materially change the original approval. *See Idaho Conservation League v. Bonneville Power Admin.*, 826 F.3d 1173, 1177 (9th Cir. 2016) ("Requiring an agency to prepare an EIS every time it takes an action consistent with past conduct would grind agency decisionmaking to a halt.").

To the extent that Plaintiffs also challenge EXIM's compliance with NEPA in 2019, EXIM expressly concluded that the 2019 approval was not a "major Federal

---

[3] EXIM gave the public the notice of its "NEPA determination associated with the pending transaction" for the original 2019 decision. ESPG § I.18; *see* JA182-85.

action" requiring an EIS. *See* JA184. EXIM's 2019 determination was entitled to deference, both as to whether the action is subject to sufficient federal control to trigger NEPA and as to whether the action affects environmental quality *in the United States*. 42 U.S.C. § 4336e(10)(B)(vi) (excluding "extraterritorial activities" with effects outside the United States); 12 C.F.R. § 408.3 (reflecting EXIM's judgment that its financing of U.S. exports will only "rare[ly]" "affect environmental quality in the United States"); *Seven Cnty.*, 605 U.S. at 179 n.2 ("[C]ourts must conduct their review with significant deference to the agency."). Nor did EXIM err in concluding that the 2025 Amendment was also not a "major Federal action." The Amendment simply maintains the "substantive *status quo*" of the loan without any changes that would affect its environmental impact. *See Fund for Animals v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997); 12 C.F.R. § 408.5(a) (EXIM NEPA regulation focusing on "evaluating applications").

Plaintiffs quibble (at 54-55) with the deference that the District Court afforded EXIM's determination, arguing that *de novo* review applies. But EXIM did not engage in a purely legal statutory-interpretation exercise of the sort that is subject to *de novo* review. It made a project-specific, fact-bound determination that the loan did not constitute a "major federal action," precisely the type of agency finding or conclusion subject to deferential review under the Administrative Procedure Act. Moreover, Congress's 2023 amendment to the definition of "major Federal action"

expressly granted discretion to the agency to "determine[]" whether an action "is subject to substantial Federal control and responsibility." 42 U.S.C. § 4336e(10)(A). And, contrary to Plaintiffs' argument, *Seven County* makes clear that "when an agency exercises discretion granted by a statute," judicial review is conducted with deference to the agency's determination. 605 U.S. at 179-80; *see also Cboe Glob. Mkts., Inc. v. SEC*, 155 F.4th 704, 722 (D.C. Cir. 2025). As this Court recently observed, "[a]fter *Seven County*, the era of searching NEPA review is over." *Sierra Club v. FERC*, 153 F.4th 1295, 1311 (D.C. Cir. 2025).

Plaintiffs' reliance on *Citizens Against Rails-To-Trails* and *Calvert Cliffs*—20- and 50-year-old decisions pre-dating the 2023 amendment—is thus misplaced. *See* Opening Br. 55 (citing *Citizens Against Rails-To-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150-51 (D.C. Cir. 2001) and *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1114-15 (D.C. Cir. 1971)). As the District Court explained, "[t]he 2023 amendments to NEPA call into question earlier decisions that interpreted 'major Federal action' more expansively." JA590 (citing *Appalachian Voices v. FERC*, 139 F.4th 903, 927 (D.C. Cir. 2025) (Henderson, J., concurring)). In any event, those cases both involved questions of statutory interpretation, not the question of whether a particular agency's decision based on specific facts was reasonable. *See Citizens Against Rails-To-Trails*, 267 F.3d at 1150-53 (reviewing the agency's determination that NEPA is inapplicable to

the Trails Act); *Calvert Cliffs' Coordinating Comm., Inc.*, 449 F.2d at 1111 ("[W]e must for the first time interpret" NEPA).

Deference aside, Plaintiffs' arguments in favor of classifying approval of the loan as a "major federal action" prove too much. Plaintiffs suggest (at 57-58) that, because EXIM set the terms and conditions of the loan, it has substantial control over the Project, giving rise to "substantial Federal control and responsibility." 42 U.S.C. §§ 4336e(10)(A), 4332(2)(C). But, as the District Court pointed out, "that degree of control exists over almost any loan that an agency makes." JA590. "NEPA requires more for a loan to qualify as a 'major Federal action,'—the control must be 'substantial,' as 'the agency carrying out such action determines.'" *Id.* (quoting 42 U.S.C. § 4336e(10)(A), (B)(iii)). And nothing in NEPA's text suggests, as Plaintiffs do (at 59), that the amount of money at issue in a loan itself makes something a "major federal action." That view is inconsistent with the statutory definition of "major federal action," which defines the term in reference to actions subject to "substantial Federal control and responsibility," not a monetary threshold. 42 U.S.C. § 4336e(10)(A).

Plaintiffs also argue (at 59) that NEPA's extraterritoriality exception does not apply here because "[g]reenhouse gases mix in the atmosphere." While greenhouse gases do mix in the atmosphere, that does not mean it is unreasonable for EXIM to conclude that a construction project 8,000 miles away from the United States does

not have environmental effects in the United States.  JA184.  Unsurprisingly, Plaintiffs cite no precedent to this effect.  Indeed, in the standing context, this Court recently acknowledged that, because "climate change results from the combined effects of greenhouse gas emissions around the globe," a party basing injury on climate change must do more than "speak generally" about the risks of climate change.  *Center for Biological Diversity*, 144 F.4th at 314.  The extent of potential connection between greenhouse gases mixing somewhere in the atmosphere and environmental effects anywhere in the world is precisely the type of "predictive or scientific judgments" to which the Supreme Court in *Seven County* held courts must be "most deferential."  605 U.S. at 182.  Plaintiffs also erroneously discount the potential for the Project's natural gas to displace coal consumption in China and other countries.  *See* JA294.

In sum, the District Court reasonably credited EXIM's determination that ministerial amendments to a loan for a project built by a private consortium 8,000 miles away from the United States is not a "major federal action."

### D.     EXIM Was Not Required To Conduct Another, Detailed Economic Analysis For The Amendment

Plaintiffs acknowledge (at 6) that EXIM conducted a detailed economic impact analysis before approving the loan in 2019.  This analysis carefully considered the likely impacts of the Project and projected net U.S. trade benefits to the United States of $2.31 billion.  JA352.  But Plaintiffs argue (at 63) that EXIM

had to re-do that analysis in 2025 based on "current data" before approving the Amendment. Plaintiffs also argue (at 68-69) that EXIM acted arbitrarily and capriciously by relying, in part, on its 2019 analysis. Both arguments are wrong.

### 1. Neither The Bank Act Nor EXIM's Procedures Required It To Conduct A Detailed Economic Impact Analysis

Plaintiffs are simply wrong in suggesting (at 61-62, 65) that the Bank Act required a new economic analysis with the Amendment.

Putting aside for the moment that the Bank Act only contemplates that EXIM may choose to engage, in its discretion, in a "detailed economic impact analysis" before the *approval of the loan*, not an amendment, *infra* at 49-50, the more fundamental point is that conducting such a "detailed economic impact analysis" is always discretionary. Only "*[i]f*, in making a determination under this subsection with respect to a loan or guarantee, the Bank intends to conduct a detailed economic impact analysis or similar study, the Bank shall publish in the Federal Register a notice" and accept public comments. 12 U.S.C. § 635(e)(7)(B) (emphasis added).

Like notice and comment under § 635a(c)(10), the detailed economic impact analysis that the Bank Act contemplates occurs when EXIM is considering "applications" for "proposed transactions," not amendments to transactions already approved. *See id.* § 635(e)(7)(A), (B)(iii). These are the same terms as in § 635a(c)(10), so they convey "the same meaning"; the provision does not apply to the Amendment. *See IBP Inc. v. Alvarez*, 546 U.S. 21, 34 (2005). That makes sense,

48

because the detailed economic impact analysis exists to inform EXIM's decision whether to "extend any direct credit." 12 U.S.C. § 635(e)(1). "Extend" means "to make available" such as "[extend]ing credit to customers." *Extend*, *Webster's Ninth New Collegiate Dictionary* 439 (1988). "Credit" is defined as "an amount or sum placed at a person's disposal by a bank." *Credit*, *id.* at 305. Together, "extend credit" means "to make available" "an amount or sum placed at a person's disposal by a bank," which occurred when EXIM approved the loan in 2019, not the 2025 Amendment. *See id.*

Because § 635(e)(7) says nothing about any mandatory economic analysis, let alone for amendments, Plaintiffs recast their argument on appeal to argue (at 62) that EXIM's Economic Impact Procedures impose some additional obligation to conduct a detailed economic impact analysis, beyond the Bank Act. Plaintiffs forfeited the argument by failing to raise it below, *Apprio*, 104 F.4th at 910, and it also fails on the merits.

Like the statute itself, the Economic Impact Procedures do not mention *any* mandatory economic analysis that EXIM must conduct in connection with an amendment. *See, e.g.*, *Economic Impact Procedures*, at 2 (putting only certain transactions "through a more extensive economic impact analytical process"). Consistent with § 635(e)(7), the procedures explain that the detailed economic impact analysis exists to "[d]etermine if the [§ 635(e)(1)] Prohibition" on extending

direct credit "is Applicable"—a prohibition that, as just explained, does not apply to the Amendment. *Id.* at 5. That makes sense. Congress authorized EXIM to adopt such "procedures as may be appropriate to carry out" its entirely *optional*, discretionary authority to conduct "a detailed economic impact analysis" under § 635(e)(7), if warranted. 12 U.S.C. § 635(e)(7)(A), (G). EXIM did not obligate itself through the Economic Impact Procedures to do more.

What is more, like the ESPG, the Economic Impact Procedures are not binding. The Procedures make no assertion they are binding, are not promulgated through notice and comment, and do not purport to impose legal rights and obligations. *See generally Economic Impact Procedures*; *National Mining Ass'n*, 758 F.3d at 252. As noted, two federal courts have found these procedures "might more accurately be described as non-binding internal guidelines." *Delta*, 85 F. Supp. 3d at 409. The fact that Plaintiffs may disagree with the Bank on how it applies its non-binding internal procedural rules is beside the point: "it is always within the discretion of . . . an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it." *American Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 539 (1970).

## 2. *EXIM's Economic Analysis Was Reasonable*

Plaintiffs next argue (at 68-69) that EXIM's economic analysis erred because it relied on outdated analysis that failed to recognize that natural gas markets will be in surplus when the Project comes online in 2030.  That, too, is incorrect.

Most fundamentally, Plaintiffs' argument presumes that the Bank was required to reconsider the loan's economic impact in connection with the Amendment at all.  The only provision requiring a consideration of economic impact they cite concerns EXIM's decision to "extend . . . direct credit," which occurred in 2019.  *See supra* at 5-9.

Insofar as EXIM had to revisit economic impact at all, the District Court properly found that EXIM's continued reliance, in part, on the 2019 Detailed Economic Impact Analysis in connection with the 2025 Amendment was reasonable given that the 2019 analysis covered the market through 2031, more than two years after Plaintiffs claim that the Project will be operational under the Amendment.  JA585-87; *see also* JA725-26 (⬛⬛⬛⬛⬛⬛⬛⬛).  As a reminder, § 635(e)(1)'s bar on "extend[ing] any direct credit . . . for establishing or expanding production of any commodity" applies only "if" *the Bank* determines in its discretion that "the commodity is likely to be in surplus on world markets at the time the resulting commodity will first be sold."  12 U.S.C. § 635(e)(1).  EXIM analyzed that question and determined that a surplus would not occur.

EXIM's 2019 analysis specifically concluded that LNG "is not currently, and is not likely to become, in structural oversupply during the repayment of the EXIM Bank facility," a term of 12.5 years, lasting until approximately 2031, after the Project comes online. JA344-45. Noting initial "fears of an oversupply of LNG capacity occurring in the early 2020s," the memorandum discussed why those fears were misplaced: "industry observers generally agree that there will be a supply-demand gap opening in the early-to-mid 2020s," and the "gap would grow from there." JA348-49. Importantly, the memorandum also explained that "[a]dditional sources indicate that LNG demand is set to grow substantially over the next ten to fifteen years, beyond the 2025 level." JA350.

But EXIM did not rest its Amendment on its 2019 analysis standing alone: Before approving the 2025 Amendments, the Board was presented with a new memorandum prepared by EXIM staff ███████████████████████████ ████████████████████. JA719-62.[4] That memorandum reflected staff's contemporaneous conclusion that ████████████████████████████

---

[4] This contemporaneous analysis rebuts Plaintiffs' contention (at 68) that EXIM improperly based its decision on stale data. Those cases are distinguishable, in any event. *See Sierra Club v. United States EPA*, 671 F.3d 955, 963 (9th Cir. 2012) (interpreting a statute that expressly required "accurate" and "current" information); *Dow AgroSciences LLC v. National Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013) (noting that an "agency need not revise its action every time new data or a new model is announced," but requiring some explanation when "an agency acknowledges that its data are either outdated or inaccurate").

████████████████████████████████████████████.”  JA725. ███████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████.”  JA725-26.

Consistent with EXIM's mission to promote domestic exports, ██████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████.”  JA726.

Plaintiffs fail to acknowledge any of these statements or conclusions.  Instead, they rely on a purported "expert" declaration from an anti-fossil fuel advocate—not an economist.  Opening Br. 63, 69 (citing JA191-96).  He asserts that there is "strong reason to believe" a natural gas surplus will exist in 2030, before conceding his "uncertainties" in conditions five years into the future in light of potential future "curtailment of output" and "significant financial challenges" facing the industry.  JA195-96.  But EXIM's conclusions may only be judged based on the administrative record, comprising what the decisionmaker considered at the time the decision was made.  *See Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420

(1971). An "expert" declaration prepared by an obviously biased advocate of Plaintiffs' choosing and submitted for the first time in post-decisional litigation should not, and cannot, be used to evaluate the agency's decision when made, and neither EXIM nor TEPMA1has an obligation to respond to these purported "facts."[5]

Instead, the Bank Act makes express that a prohibition on extending credit may only arise if "*the Bank* determines that" the product is likely to be in surplus or compete with U.S. production. 12 U.S.C. § 635(e)(1) (emphasis added).

EXIM has done more than enough analysis of the loan's economic impact in connection with the Amendment. The Bank Act required no such analysis, and Plaintiffs' belated declaration cannot justify second-guessing EXIM's consideration of the loan's economic impact.

### E. EXIM Provided All Statutorily-Required Information

Plaintiffs' claim under 5 U.S.C. § 706(1) that notice, economic analysis, and NEPA analysis should have been disclosed to the public fails for the same reasons discussed above. *See supra* at 32-54. As for Plaintiffs' argument (at 70-71) that 12 U.S.C. § 635i-5(a)(2) required "public disclosure" of any "environmental assessments and supplemental environmental reports": Even if Plaintiffs were right,

---

[5] In any event, Plaintiffs' statements (at 63, 69) that TEPMA1 does not dispute Plaintiffs' characterization of the LNG market are false. As it has here, TEPMA1 explained below that EXIM's own economic analysis contradicted Plaintiffs' assertions and pointed out that it is inappropriate to rely on purported "expert" testimony in Administrative Procedure Act cases. Dkt. 25 at 32.

the remedy under 5 U.S.C. § 706(1) would only be to "compel" public disclosure of the documents—the only "agency action" allegedly "withheld" under 12 U.S.C. § 635i-5(a)(2).

## III. PLAINTIFFS CANNOT SHOW THAT THE EQUITIES REQUIRE A PRELIMINARY INJUNCTION

Because the District Court properly concluded that Plaintiffs failed to show a likelihood of success, the Court should affirm without considering the remaining equitable factors. *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253-54 (D.C. Cir. 2006) (per curiam). If the Court disagrees with this merits assessment, it should not require the District Court to enter a preliminary injunction, as Plaintiffs request (at 76). Even if one or more of Plaintiffs' claims were likely to succeed, there remain strong reasons not to enter a preliminary injunction. At most, the Court should remand for the District Court to consider "anew [Plaintiffs'] request for injunctive relief." *See Teva Pharms., USA, Inc. v. United States FDA*, 182 F.3d 1003, 1012 (D.C. Cir. 1999).

The District Court has already explained that irreparable harm would only "slightly" favor Plaintiffs, even if they could show standing and a likelihood of success on the merits. JA593. No wonder: The District Court explained that it was speculative that *any* harm would materialize during the term of a preliminary injunction. JA596; *cf. Olu-Cole v. E.L. Haynes Pub. Charter Sch.*, 930 F.3d 519, 529 (D.C. Cir. 2019) (irreparable harm is not "potential" harm but harm that is

"certain" and "actual"). Plaintiffs' own conduct buttresses this conclusion. Plaintiffs knew about the Amendment when it was approved, JA130, yet waited for over four months —and nearly six years after EXIM approved the original Application—to seek emergency relief. JA5-6. After the District Court denied their motion in a carefully reasoned opinion, Plaintiffs waited another 19 days to file their notice of appeal, JA10, and 22 days to seek expedited briefing. Plaintiffs' lack of urgency undermines their claim of an irreparable injury. *See Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975) (per curiam) (criticizing 44-day delay seeking preliminary injunctive relief as "inexcusable").

The District Court also appreciated that an injunction would "significantly harm[] the reliance interests of several countries and corporations that have been working for over a decade" on the Project—a harm that would likely be "increased" by Plaintiffs' four-month delay. JA595. The Project is a multi-billion-dollar operation with complex international funding structures. *See* JA248. As TEPMA1 demonstrated, and the District Court recognized, temporarily enjoining disbursements would have the cascading effect of creating uncertainty for other lenders and foreign governments, and upending or delaying other parts of the financing and Project. JA247-48; JA595.

Enjoining disbursements would also cause harm throughout the United States and Mozambique. The Project is expected to support "16,400 good-paying

American jobs," including "workers and families at more than 68 companies across 14 states." JA260. These economic benefits and American jobs are in the public interest. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987) (concluding that economic concerns of enjoining an oil project outweighed potential environmental concerns).[6] A preliminary injunction would also injure American foreign policy interests and the interests of Mozambique, which is relying on the Project for its economic security and to help transition the country to clean energy. *See* JA240-41, 257-58 (noting that EXIM's funding would "advance American and African prosperity and security"). A pause in funding may also jeopardize services that the Project provides to communities throughout the region—effects antithetical to Plaintiffs' purported aims and Mozambique's goals. *See* JA241, 245.

This is precisely the kind of situation where an injunction is too stiff a remedy. Courts justifiably hesitate to "upend" construction schedules of "large-scale [energy] projects" with complicated financing arrangements, wary of preventing those projects "from supporting thousands of jobs" and supplying important resources. *City of Port Isabel v. FERC*, 130 F.4th 1034, 1038-39 (D.C. Cir. 2025) (remanding without vacatur where the agency, *inter alia*, failed to provide an EIS for a Texas

---

[6] Plaintiffs offer no support for their assertion (at 74) that allowing the Project to proceed will irreparably harm the U.S. economy. EXIM's judgment and TEPMA1's evidence show the opposite is true.

LNG project).  Indeed, this Court remanded without vacatur in a challenge to a $3.4 billion EXIM loan guarantee when it was "conceivable" that EXIM could remedy the problem on remand.  *Delta Air Lines, Inc. v. EXIM*, 718 F.3d 974, 978 (D.C. Cir. 2013) (per curiam).  If EXIM needs to do no more than formally invite comments rather than accept Plaintiffs' comments informally, that is no reason to hold up the loan.  Likewise, if EXIM needs to better explain its NEPA decision (or conduct an EIS, as distinct from the environmental analysis it has already conducted), then a preliminary injunction is too harsh a remedy.  *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 32-33 (2008) (holding that a court may allow agency action to proceed while an EIS is prepared).

Because the District Court found no likelihood of success, it had no occasion to carefully consider these remaining equitable issues.  If the Court finds a likelihood of success on the merits and does not believe that affirming the District Court's order is appropriate, it should remand to the District Court "to pick up where it left off" with its consideration of the equitable factors.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 109 (D.C. Cir. 2006).

Under a proper weighing of those factors, Plaintiffs are not entitled to the drastic remedy of a preliminary injunction.

## CONCLUSION

The Court should affirm the District Court's order denying the preliminary-injunction motion.

Dated: December 19, 2025

Respectfully submitted,

Nicholas L. Schlossman
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
(737) 910-7314
nicholas.schlossman@lw.com

*/s/ Gregory G. Garre*
Gregory G. Garre
Andrew D. Prins
Stacey L. VanBelleghem
Jonathan L. Williams
Rachael L. Westmoreland
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004
(202) 637-2207
gregory.garre@lw.com
andrew.prins@lw.com
stacey.vanbelleghem@lw.com
jonathan.williams@lw.com
rachael.westmoreland@lw.com

*Counsel for Intervenor-Appellee*
*TotalEnergies EP Mozambique*
*Area 1, Limitada*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,973 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word and Times New Roman 14-point font.

*/s/ Gregory G. Garre*
Gregory G. Garre

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2025, I electronically filed the foregoing brief with the United States Court of Appeals for the District of Columbia Circuit through the Court's CM/ECF system and the Court's Box.com system for sealed documents.

I further certify that the public and confidential versions of the foregoing were served on counsel for all parties by electronic transfer.

*/s/ Gregory G. Garre*
Gregory G. Garre