# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――――

FRIENDS OF THE EARTH U.S., et. al.,

*Plaintiffs-Appellants,*

v.

EXPORT-IMPORT BANK OF THE UNITED STATES, et. al.,

*Defendants-Appellees,*

TOTALENERGIES EP MOZAMBIQUE AREA 1, LIMITADA,

*Intervenor-Appellee.*

―――――――――――――

On Appeal from the United States District Court for the District of Columbia, No. 1:25-cv-02235 (Hon. Carl J. Nichols)

## REPLY BRIEF OF PLAINTIFFS-APPELLANTS
## PUBLIC COPY SEALED MATERIAL DELETED

Richard L. Herz*
Tamara A. Morgenthau
Lindsay A. Bailey
Michelle C. Harrison
EarthRights International
1400 K St. NW Suite 750
Washington, DC 20005
(202) 466 5188
rick@earthrights.org
*Counsel for Appellants*

\* Based in CT; admitted in NY; does not practice in DC's courts

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .....................................................................iv

GLOSSARY OF ABBREVIATIONS............................................................x

ARGUMENT ...............................................................................................1

I.  PLAINTIFFS HAVE STANDING ......................................................4

    A.  Plaintiffs have standing under PETA to challenge their exclusion from EXIM's means of redress..................................4

    B.  EXIM's loan will harm Plaintiffs' direct services ...................10

    C.  Plaintiffs have informational standing. ...................................19

II.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS UNDER THE BANK ACT AND EXIM'S PROCEDURES. ...................................................................................23

    A.  The Bank Act required EXIM to permit comment because its 2025 approval was its "final consideration" of the Project. ...............................................................................23

    B.  EXIM was required to conduct an economic analysis prior to its 2025 decision. ........................................................29

    C.  EXIM's refusal to permit comment under the Environmental and Social Procedures violates the APA ......33

    D.  Plaintiffs were denied information they had a right to ........37

III.  PLAINTIFFS WILL LIKELY SUCCEED ON THEIR NEPA CLAIMS. .............................................................................................37

IV.  PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION. ........................................................41

V.  THE BALANCE OF THE EQUITIES FAVORS TEMPORARY RELIEF....................................................................................................44

VI.  THE COURT SHOULD REMAND WITH INSTRUCTIONS TO GRANT A PRELIMINARY INJUNCTION. .....................................47

CONCLUSION ........................................................................................... 49

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Am. Gateways v. U.S. DOJ,*
No. 25-01370, 2025 U.S. Dist. LEXIS 138893, 20 (D.D.C, 2025)......42

*Abigail All. for Better Access to Dev'l Drugs v. Von Eschenbach,*
469 F.3d 129 (D.C. Cir. 2006) ...........................................................12

*Am. Inst. of Certified Pub. Accountants v. IRS,*
804 F.3d 1193 (D.C. Cir. 2015) .........................................................33

*City of Port Isabel v. FERC,*
130 F.4th 1034 (D.C. Cir. 2025)........................................................49

*Clarian Health W., LLC v. Hargan,*
878 F.3d 346 (D.C. Cir. 2017) ...........................................................37

*Clevinger v. Advoc. Holdings, Inc.,*
134 F.4th 1230 (D.C. Cir. 2025)...................................................42, 44

*Cmty. Nutrition Inst. v. Young,*
818 F.2d 943 (D.C. Cir. 1987) ...........................................................37

*Competitive Enter. Inst. v. NHTSA,*
901 F.2d 107 (D.C. Cir. 1990) ...........................................................20

*CSL Plasma Inc. v. U.S. Customs & Border Protection,*
33 F.4th 584 (D.C. Cir. 2022)............................................................33

*Ctr. for Biological Diversity (CBD) v. U.S. DOI,*
144 F.4th 296 (D.C. Cir. 2025)......................................................6, 21

*Ctr. for Law & Educ. v. Dep't of Educ.,*
396 F.3d 1152 (D.C. Cir. 2005) .........................................................12

*Damus v. Nielsen,*
313 F. Supp. 3d 317 (D.D.C. 2018) ...................................................36

*Delta Airlines, Inc. v. Export-Import Bank,*
85 F. Supp. 3d 387 (D.D.C. 2015) ...............................................37, 49

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
591 U.S. 1 (2020) ...................................................................39

*Earthworks v. U.S. Dep't of the Interior*,
105 F.4th 449 (D.C. Cir. 2024).............................................41

*Electronic Priv. Info. Ctr. v. FAA*,
892 F.3d 1249 (D.C. Cir. 2018) ..............................................6

*Electronic Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*,
878 F.3d 371 (D.C. Cir. 2017) ..............................................19

*Equal Rts. Ctr. v. Post Prop's Inc.*,
633 F.3d 1136 (D.C. Cir. 2011) .......................................16, 18

*Esch v. Yeutter*,
876 F.2d 976 (D.C. Cir. 1989) ..............................................32

*Fair Emp. Council v. BMC Mktg. Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) ........................................12, 16

*\*FDA v. Alliance for Hippocratic Medicine*,
602 U.S. 367 (2024) ...................................... 2, 5, 10-16

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905, 920-21 (D.C. Cir. 2015) ...................................6

*Friends of Animals v. Bernhardt*,
961 F.3d 1197 (D.C. Cir. 2020) ..............................................6

*Friends of Animals v. Jewell*,
828 F.3d 989 (D.C. Cir. 2016) ........................................20, 21

*Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006) ..............................................48

*Fund for Animals v. Frizzell*,
530 F.2d 982 (D.C. Cir. 1975) ..............................................46

*Gordon v. Holder*,
632 F.3d 722 (D.C. Cir. 2011) ..............................................45

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982), ..............................................6, 12, 17

*Idaho Farm Bureau Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ................................................27

*Immigrant Defs. L. Ctr. v. Noem*,
   145 F.4th 972 (9th Cir. 2025) ....................................11, 12

*Int'l Brotherhood of Teamsters v. TSA*,
   429 F.3d 1130 (D.C. Cir. 2005) ..........................................8

*Int'l Union, United Auto., etc. v. NLRB*,
   459 F.2d 1329, (D.C. Cir. 1972) ........................................39

*June Med. Servs. LLC v. Russo*,
   591 U.S. 299 (2020) .........................................................44

*Koch v. Cox*,
   489 F.3d 384 (D.C. Cir. 2007) ..........................................29

*League of Women Voters of the United States v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ....................................42, 43, 48

*Lepelletier v. FDIC*,
   164 F.3d 37 (D.C. Cir. 1999) ............................................43

*Lewis v. Casey*,
   518 U.S. 343 (1996) .........................................................21

*LULAC v. Exec. Office of the President*,
   780 F. Supp. 3d 135 (D.D.C. 2025) ...................................11

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) .........................................................33

*Nat'l Ass'n of Home Builders v. EPA*,
   667 F.3d 6 (D.C. Cir. 2011) ..............................................12

*Nat'l Conservative Political Action Comm. v. FEC*,
   626 F.2d 953 (D.C. Cir. 1980) ..........................................36

*Nat'l Mining Ass'n v. McCarthy*,
   758 F.3d 243 (D.C. Cir. 2014) ..........................................37

*Nat'l Wildlife Fed'n v. Hodel*,
   839 F.2d 694 (D.C. Cir. 1988) ..........................................20

*NRDC v. United States NRC*,
   823 F.3d 641 (D.C. Cir. 2016) ..........................................41

*\*People for the Ethical Treatment of Animals (PETA) v. USDA*,
   797 F.3d 1087 (D.C. Cir. 2015) ....................2, 5, 6, 8, 9, 12

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989) ..................................................... 20

*Seven County Infrastructure Coalition v. Eagle County,*
  605 U.S. 168 (2025) ................................................ 38, 41

*Shawnee Tribe v. Mnuchin,*
  984 F.3d 94 (D.C. Cir. 2021) .................................... 46

*Sierra Club v. U.S. Dep't of Transp.,*
  125 F.4th 1170 (D.C. Cir. 2025)............................... 49

*Sierra Club v. U.S. DOT,*
  125 F.4th 1170 (D.C. Cir. 2025).......................... 13, 32

*Spann v. Colonial Village, Inc.,*
  899 F.2d 24 (DC Cir 1990) ...................................... 12

*Steenholdt v. FAA,*
  314 F.3d 633 (D.C. Cir. 2003) ................................. 36

*Sugar Cane Growers Co-op of Florida v. Veneman,*
  289 F.3d 89 (D.C. Cir. 2002) ..................................... 9

*Syncor Int'l Corp. v Shalala,*
  127 F.3d 90 (D.C. Cir. 1987) ................................... 37

*United States v. Powers,*
  885 F.3d 728 (D.C. Cir. 2018) ................................. 42

*Vanover v. Hantman,*
  77 F. Supp. 2d 91 (D.D.C. 1999) ............................ 37

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,*
  435 U.S. 519 (1978) ................................................ 36

*Vietnam Veterans of Am. v. Sec'y of the Navy,*
  843 F.2d 528 (D.C. Cir. 1988) ................................ 37

*Whitman-Walker Clinic v. HHS,*
  485 F. Supp. 3d 1 (D.D.C. 2020) ............................ 44

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ................................................... 49

## STATUTES

12 U.S.C. § 635(e)(1) ..................................................................30

12 U.S.C. § 635(e)(7)(A)-(B) ......................................................34

12 U.S.C. § 635(e)(7)(B)(i) ...........................................................4

12 U.S.C. § 635a-2 .....................................................................31

12 U.S.C. § 635a(c)(10)(A) ..........................................4, 23, 24

12 U.S.C. § 635a(c)(10)(C)(i)(I) ................................................26

12 U.S.C. § 635a(c)(10)(D) .........................................................28

12 U.S.C. § 635a(c)(10)(D)(i) ....................................................29

12 U.S.C. § 635i-5(a)(1) ..............................................................37

42 U.S.C. § 4321 .........................................................................41

42 U.S.C. § 4332(2)(I) ................................................................41

42 U.S.C. § 4336e(10)(A), (B)(iii) .............................................40

42 U.S.C. § 4336e(10)(B)(vi) .....................................................41

5 U.S.C. § 706(2)(A) ...................................................................27

## OTHER AUTHORITIES

EXIM, Environmental and Social Due Diligence Procedures and
Guidelines (rev. 2025), https://www.exim.gov/policies/exim-bank-
and-environment/procedures-and-guidelines .........................7, 34, 36

Nicholas Earl, *UK, Netherlands drop funding for TotalEnergies'
massacre-linked gas project*, Politico (Dec. 1, 2025),
https://www.politico.eu/article/uk-drops-funding-massacre-linked-
gas-project-mozambique/. ...................................................................1

Richard Halsey *et. al.*, *Navigating Decisions: The risks to Mozambique
from liquified natural gas export projects*, iii, 6, 8-9, 12 (Int'l Inst. for
Sustainable Dev., 2023) .................................................................47

The Editorial Board, *Trump and a Mozambique LNG Boondoggle*, The
Wall Street Journal (Dec. 5, 2025),

https://www.wsj.com/opinion/totalenergies-mozambique-lng-ex-im-
bank-trump-administration-c7719299.................................................1

# GLOSSARY OF ABBREVIATIONS

**EXIM**  Defendant-Appellee Export-Import Bank of the United States

**FOE**  Plaintiff-Appellant Friends of the Earth—U.S.

**JA**  Plaintiff-Appellant Justiça Ambiental

**NEPA**  National Environmental Protection Act

**PETA**  People for Ethical Treatment of Animals

# STATUTES AND REGULATIONS

All pertinent statutes and regulations are included in the Addendums to Plaintiffs-Appellants' Opening Brief and Defendants-Appellees' Brief.

## INTRODUCTION AND SUMMARY OF ARGUMENT

After Plaintiffs' opening brief, the United Kingdom and Dutch export credit agencies withdrew $2.2 billion in Project support—due in part to recent security risks and human rights concerns.[1] Noting that the deteriorating security situation renders the Project "a calamity waiting to happen," the Wall Street Journal asked: "Why should U.S. taxpayers finance an energy project that Europeans won't and that would compete with American LNG exports?"[2]

The Bank Act requires EXIM to permit comment and conduct an economic analysis before approving large transactions, to ensure EXIM carefully considers the transactions and that they do not harm the U.S economy. EXIM refused to do so prior to the 2025 approval. EXIM argues it is enough that it found the Project was a good idea six years ago. And it says this Court should let it send billions of taxpayer dollars

---

[1] Nicholas Earl, *UK, Netherlands drop funding for TotalEnergies' massacre-linked gas project*, Politico (Dec. 1, 2025), https://www.politico.eu/article/uk-drops-funding-massacre-linked-gas-project-mozambique/.

[2] The Editorial Board, *Trump and a Mozambique LNG Boondoggle*, The Wall Street Journal (Dec. 5, 2025), https://www.wsj.com/opinion/totalenergies-mozambique-lng-ex-im-bank-trump-administration-c7719299.

to Mozambique while the district court decides if the loan is even legal. EXIM is wrong.

Plaintiffs' claims that EXIM violated the Bank Act and the National Environmental Protection Act (NEPA) are likely to succeed. Plaintiffs have standing. As the district court found, EXIM shut Plaintiffs out of means of redress they would use to protect the local people they serve, just as in *People for the Ethical Treatment of Animals (PETA) v. USDA*, 797 F.3d 1087 (D.C. Cir. 2015). Defendants cannot show *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367 (2024), eviscerates *PETA*; *Alliance* never addressed *PETA*'s commonsense holding that organizations denied a means of redress suffer concrete injury.

Plaintiffs also have standing because the Project restart will impair the counseling and other services Plaintiffs provide local people, and because, as the district court found, EXIM denied Plaintiffs information central to their activities that EXIM was required to produce. The Supreme Court and this Court have time and again found these exact bases support standing.

Defendants' merits arguments would subvert the Bank Act's text. Their mantra is that the statute exempts amendments, *sub silentio*. Defendants assume that when Congress required comment before "final consideration" of a "transaction," it meant only "first consideration of an application." For the economic analysis, they assume that when the 2025 Board approved the loan, it did not "extend" credit. The text is not so malleable.

Nor did the Board just approve an amendment. EXIM admits the 2025 Board approval was necessary *to permit funding*. Thus, the Board did not amend a loan, it approved a loan where no operative loan existed. To Defendants then, the 2019 approval is like Schrödinger's cat: dead, since it concededly does not authorize the 2025 loan, yet also somehow alive to satisfy the Act's requirements. The text precludes such a reading.

As for NEPA, EXIM simply declared that its then-largest *ever* loan was not a major federal action, with no explanation. EXIM pleads for deference, but there is no finding to defer to, and whether NEPA applies is a legal question.

The district court found the lack of temporary relief would cause irreparable harm. And given the real, immediate harms to Plaintiffs and local people they serve, and the lack of harms to Defendants from a temporary pause, the balance of equities favors relief. This Court should reverse and order EXIM to pause disbursement while the district court considers the merits.

## ARGUMENT

## I. Plaintiffs have standing.

### A. Plaintiffs have standing under *PETA* to challenge their exclusion from EXIM's means of redress.

EXIM's failure to permit public input and objections, under four separate provisions—12 U.S.C. § 635(e)(7)(B)(i), § 635a(c)(10)(A), EXIM's Environmental & Social Procedures and NEPA—denied Plaintiffs access to means of redress under *PETA*.

The district court agreed Plaintiffs satisfy *PETA* but impermissibly refused to apply it. AOB 25-30. EXIM suggests *Alliance* eviscerated *PETA*, EXIM 22, but it did no such thing. AOB 25-29. Defendants' claim that the district court erred in finding Plaintiffs satisfy *PETA* also fails. AOB 22-25.

**1.** *PETA* and *Alliance* are consistent. *PETA* held that an organization denied access to a means of redress it would use to prevent harms within its mission suffers a "concrete" "injury to its activities," and this "suffice[d] for standing." 797 F.3d at 1093, 1097 (citation modified); AOB 22. *Alliance* applied the same "concrete injury" standard. AOB 26-27.

One reason *PETA* and *Alliance* reached different results turned on a central question Defendants ignore: standing to do *what*? *PETA* held that an organization denied the opportunity to participate in a means of redress had standing to challenge *its exclusion*. 797 F.3d at 1095. *Alliance* considered a challenge to a substantive regulation, and the Court—like *PETA, id.* at 1093-94—reiterated that an organization's advocacy against a government action alone does not give it standing to challenge *that action*. 602 U.S. at 394-95; AOB 26-27. Since *Alliance* did not involve a means of redress, it did not consider, let alone eviscerate, *PETA*'s holding that a plaintiff denied a means of redress suffers a concrete injury. AOB 26-28.

EXIM attempts to recast participating in an agency mechanism to prevent specific harm to those the organization serves as "issue

advocacy," EXIM 21-22, 25, but *PETA* held otherwise. This Court recognized standing does not lie where the "service impaired is pure issue-advocacy," but found the organization's exclusion from a means of redress harmed its "concrete," not "abstract social" interests. 797 F.3d at 1093-95 (citation modified).

Subsequent panels have not purported to overturn *PETA*. EXIM 21-22. A panel cannot overturn circuit precedent. AOB 25. And EXIM's cases explicitly apply *PETA*. EXIM 21, 25; *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1208 (D.C. Cir. 2020); *Ctr. for Biological Diversity (CBD) v. U.S. DOI*, 144 F.4th 296, 315 (D.C. Cir. 2025). Indeed, *Electronic Priv. Info. Ctr. v. FAA*, 892 F.3d 1249, 1256 (D.C. Cir. 2018) and *Food & Water Watch, Inc. v. Vilsack,* 808 F.3d 905, 920-21 (D.C. Cir. 2015), found standing lacking precisely because the plaintiff did not allege the denial of a means of redress, as in *PETA.*

EXIM concedes *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), permits standing where the defendant directly impeded the organization's ability to carry out its mission. EXIM 23-24. That is exactly what *PETA* held. AOB 27-28.

*PETA* is binding precedent, and the district court's refusal to apply it was error.

**2.** The district court correctly held Plaintiffs satisfy *PETA*. AOB 22-25. EXIM's processes allow Plaintiffs to prevent specific harms, from a specific project, to specific people Plaintiffs protect as part of their mission. AOB 23-24. For example, EXIM ensures Projects can comply with their Environmental and Social Due Diligence Procedures and Guidelines. *See* EXIM, *Environmental and Social Due Diligence Procedures and Guidelines* (*"Environmental and Social Procedures"*) § I ¶¶ 21-22, § IV(B) ¶¶ 3, 6, § V, Annex A-1 § 4 (rev. 2025) https://www.exim.gov/policies/exim-bank-and-environment/procedures-and-guidelines; *see also infra* § II(C). Had EXIM not excluded Plaintiffs, they could have demonstrated that the Project cannot comply with their standards, or identified necessary conditions on funding, such as requiring mitigation measures to prevent harm and fully compensating people for the land the Project took. JA0133-34, JA0606-07, JA0776-77, JA0784-85; AOB 24-25. Since EXIM's exclusion impaired Plaintiffs' ability to protect local people just as USDA impaired PETA's ability to

protect birds, Plaintiffs "suffered a comparable injury." JA0572-73; AOB 22-25.

EXIM suggests Plaintiffs "challenge [a] lack of notice-and-comment rulemaking," EXIM 25, but there was no rulemaking here. The injury in *PETA* was PETA's exclusion from a redress process, what EXIM calls a "mechanism" for "substantive relief." EXIM 24-25. And as the district court found, Plaintiffs were injured by their exclusion from EXIM's processes, which permit Plaintiffs to seek substantive relief for harms within their mission, just like the process in *PETA*. JA0573.

Defendants cite the principle that a bare procedural violation that does not harm a concrete interest does not provide standing. EXIM 22; Total 18-19. But *PETA* held denying a means of redress to an organization that uses it in service of its mission *is* a "concrete" injury to its activities. 797 F.3d at 1094-95. And the district court found that here. Thus, Plaintiffs' have a clear "particularized interest" beyond "mere inability to comment," and distinct from just any member of the public. *Int'l Brotherhood of Teamsters v. TSA*, 429 F.3d 1130, 1135 (D.C. Cir. 2005).

Total further claims (19-20) the means of redress denied in *PETA* was USDA's refusal to investigate complaints of law violations, not the denial of a right to submit complaints. Not so. Standing lay because USDA "precluded PETA from preventing [harm within its mission] through [USDA's] normal [complaint] process." *PETA*, 797 F.3d at 1094; *accord* EXIM 24 (USDA "deprived PETA of the ability to file complaints"). Whether the agency would prevent harm by investigating violations (*PETA*) or by denying or conditioning funding (here) is immaterial.

Total argues (20) PETA was deprived of *any* means of redress, whereas Plaintiffs communicated with EXIM in other ways. But exclusion from "a" means of redress is a concrete injury. *PETA*, 797 F.3d at 1095. Other communication attempts do not allow an agency to exclude a party from its formal mechanisms. *Sugar Cane Growers Co-op of Florida v. Veneman*, 289 F.3d 89, 96-97 (D.C. Cir. 2002).

Last, Total claims denying a means of redress alone cannot suffice, noting USDA separately deprived PETA of information. Total 20-21 (citing *PETA*, 797 F.3d at 1094). But USDA impaired PETA's mission "in two respects," causing two "injuries." *PETA*, 797 F.3d at

1094-95. Plaintiffs need only suffer "a[n]" injury, not two. *Id.* at 1093. Regardless, Plaintiffs have been denied information. AOB 70-71.

### B. EXIM's loan will harm Plaintiffs' direct services.

An organization suffers concrete injury where a defendant's conduct "perceptibly impaired [the organization's] ability to provide…services." *Alliance*, 602 U.S. at 395. Plaintiffs suffered this injury here. AOB 30-34.

 As Plaintiffs explained in detail, they work to protect local people's health, livelihoods, and human rights from Project-related harm by providing a host of services that are not "issue advocacy." AOB 11-14. Justiça Ambiental (JA) offers social work, support for legal action, environmental monitoring, and representation; documents harm, shares Project-related information, advises the communities on their rights; and assists them in seeking protections and remedies. JA0778. This includes counseling people on the Projects' impacts and helping them navigate mechanisms to seek compensation for displacement. JA0602-06, JA0608, JA0613, JA0778.

Restarting the Project will displace people from their land, damage the environment, limit fisherpeoples' sea access and otherwise

harm livelihoods, and exacerbate the conflict and abuses in the Project area. This will increase the number of people needing Plaintiffs' services, render Plaintiffs' services more burdensome, less effective, or futile, and force Plaintiffs to provide new services they have not previously offered. AOB 30-35. These harms provide standing to challenge EXIM's approval of the Project. *Id.*

### 1. Plaintiffs' services are not "mere issue advocacy."

Defendants' claim that Plaintiffs' services are mere issue advocacy, EXIM 21, 26; Total 22-23, ignores the particular services providing standing here. "[*D*]*irect services* designed to offset the harmful effects of the challenged conduct," are not mere issue advocacy. *LULAC v. Exec. Office of the President*, 780 F. Supp. 3d 135, 179-80 (D.D.C. 2025) (applying *Alliance* and collecting cases); *accord Immigrant Defs. L. Ctr. v. Noem*, 145 F.4th 972, 988 (9th Cir. 2025). Plaintiffs likewise provide direct services to mitigate EXIM's decision's *impacts* on community members they serve. Their injury is not to their advocacy, but to their ability to provide these services.[3]

---

[3] Where standing is based on services, it is irrelevant that a plaintiff may "also" engage in issue advocacy. *Alliance,* 602 U.S. at 395.

Counseling affected people on complex compensation and redress processes is not issue advocacy. Rather, it is indistinguishable from services helping people with other complex processes that have been held to confer standing, like registering to vote, *LULAC*, 780 F. Supp. 3d at 179-80, 188-90; accessing medication, *Abigail All. for Better Access to Dev'l Drugs v. Von Eschenbach*, 469 F.3d 129, 132-33 (D.C. Cir. 2006), securing employment, *Fair Emp. Council v. BMC Mktg. Corp.*, 28 F.3d 1268, 1276 (D.C. Cir. 1994), immigrating, *Immigrant Defs. L. Ctr.*, 145 F.4th at 988, and finding housing, *Havens*, 455 U.S. at 379.

Likewise, monitoring Project impacts and counseling people about how to avoid them is not issue-advocacy. *See Havens*, 455 U.S. at 379; *Spann v. Colonial Village, Inc.*, 899 F.2d 24, 29-30 (DC Cir 1990); *PETA*, 797 F.3d at 1095-96.

In contrast with these direct services cases finding standing, Total's cases, Total 22, involved efforts encouraging the government to implement or change a regulation or policy. *Alliance*, 602 U.S. at 370; *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011); *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C.

Cir. 2005). The services providing Plaintiffs' standing do not aim to change EXIM's policies or its funding decision.

### 2. EXIM's approval will directly harm the communities Plaintiffs serve.

EXIM's acts will directly cause Plaintiffs harm. *See* AOB 31-35. Contrary to EXIM's assertions, EXIM 28-30, Plaintiffs injuries are neither too attenuated from EXIM's approval nor speculative.

Plaintiffs' harms are not attenuated. Downstream injuries from government action toward a third-party are cognizable if "how third parties would react to government action or cause downstream injury" is "sufficiently predictable." *Alliance*, 602 U.S. at 383. A third party's "intent" to act suffices. *Sierra Club v. U.S. DOT*, 125 F.4th 1170, 1181-82 (D.C. Cir. 2025). Total (a defendant, not a third party), is the only actor between EXIM and most of the communities' harms. *See* AOB 31. EXIM approved financing to restart the Project. AOB 8. The resulting harms here are directly traceable to EXIM's 2025 approval.

Nor are the Project's harms "speculative." Total 25. JA's declaration is ███████████████████████████████████ ███████████████████████ JA0598-99, JA0601, JA0613, JA0763, JA0765. Impacts Total calls "speculative," Total 25, are virtually

entirely within its control. Yet despite presumably having the best access to evidence that could contradict Plaintiffs', Total provides none.

For example, Total says resettlement is "complete," Total 25, a conclusory statement Plaintiff refuted, AOB 31 n.7, but Total does not refute it needs more land. And Defendants do not deny Project security will block fisherpeople's access to the sea, or that the Project will harm the environment, which Total anticipated. JA0771-77. Both are already underway. *Id.*; JA0614-16, JA0768. For instance, dredging is impacting fishing grounds. JA0775.

The only harms not entirely within Total's control are from exacerbating the conflict. But the fact that the Project is a terrorist target that puts local villages in harm's way is unrebutted; the Project's own consultant warned of this. AOB 33-34. Total is now taking extraordinary security measures *because* it is a target. AOB 10-11. Total (28) asserts that since the insurgency "pre-date[s]" the 2019 approval, the increased risk is not "traceable" to the Project. But an active Project is far more of a target than a dormant one. JA0654-56. Indeed, al-Shabab has recently attacked in the Project area. AOB 10.

Finally, Plaintiffs submitted ample evidence that community members will seek, and already have sought, Plaintiffs' services. AOB 32-33. Plaintiffs have shown "a predictable chain of events" from EXIM's action to their injuries. *Alliance*, 602 U.S. at 385.

### 3. Increased demand for more and more burdensome services, and impairment of their services, harms Plaintiffs' core activities.

Defendants do not dispute approval will increase the need for Plaintiffs' services, force them to provide more burdensome services, and foreclose some of its services forcing them to switch to less effective ones. Instead, they argue that having to provide "more" of services they already provide does not "impair" Plaintiffs' ability to provide services. EXIM 27-28; Total 23-24. But having to serve more people with the same limited resources obviously impairs effectiveness. Regardless, rendering existing services obsolete and forcing Plaintiffs to provide new ones suffices even under Defendants' crabbed approach.

**1.** Plaintiffs suffer injury where they must provide direct services to *more* people to counteract defendants' acts or must provide their services less *effectively. Equal Rts. Ctr. v. Post Prop's Inc.*, 633 F.3d

1136, 1139 (D.C. Cir. 2011); *Fair Emp. Council*, 28 F.3d at 1276; AOB 30.[4]

Defendants suggest *Alliance* overturned this precedent. *See* EXIM 27-28; Total 24. On the contrary, *Alliance* recognized that impacts on services confer standing. 602 U.S. at 395. While the Court noted a claim that doctors have standing whenever a broadly applicable regulation impacting public safety *might* increase the number of people needing care would be "too attenuated," *id.* at 391, that does not bar standing where, as here, the harm is not attenuated. *Supra* § I(B)(2). This case concerns not a broadly applicable regulation, but a specific project that will cause direct, predictable harms to a specific group of people who Plaintiffs serve specifically by helping them redress those unique impacts.

**2.** Regardless, EXIM's approval *impairs* services Plaintiffs already provide. And it forces Plaintiffs to provide new, different services that

---

[4] Total (23-24) cites *Nat'l Taxpayers Union v. U.S.*, but in that case there was "no evidence" the challenged regulation caused plaintiffs "operational costs beyond those normally expended." 68 F.3d 1428, 1434 (D.C. Cir. 1995). Here there is.

are more burdensome and less effective, instead of more of the same services. This suffices.

First, by enabling the restart, EXIM impairs Plaintiffs' pre-existing efforts to help impacted people receive land to replace what the Project took. AOB 33. EXIM's approval decreases the amount of available land because the Project will compete for the same land, and removes Total's incentive to fulfill its resettlement and compensation obligations. JA0783-84. Just as in *Havens*, where false information harmed an organization's ability to help people rent apartments, 455 U.S. at 379, the acts here that reduce land availability harm an organization that helps people secure replacement land.

Moreover, enabling the restart during a conflict makes it far more difficult and dangerous for Plaintiffs to provide the services that the restart requires. AOB 34-35.

Second, Plaintiffs will have to institute new, less effective services. The Project's construction will cause new types of harms to local people's homes, property, environment and livelihoods. To respond, Plaintiffs will have to investigate these impacts and counsel those they serve about them. JA0778-83. For example, Plaintiffs will have to

monitor dredging's impacts on fishing communities, pipeline construction to ensure compliance with promised mitigation measures, and pollution's effects on human health. JA0779-80. And Plaintiffs will need to procure expensive equipment to provide these new services. *Id.*

Indeed, the restart will render many of Plaintiffs' efforts to prevent harms largely obsolete. Before, Plaintiffs sought *ex ante* protections for communities to avoid harm. AOB 12-13. Now they will have to focus on seeking after-the-fact remedies for specific people's individual harms. This work is more resource intensive and less effective, and may even result in Plaintiffs benefitting less people. AOB 32.

In short, Plaintiffs are not merely "continuing existing activities." Total 26. While they provide some remedial services, particularly regarding Total's land seizures, they will now have to shift away from their preventive approach to a remedial one that seek remedies in new ways for new types of harms. That "impairs" their services.

Defendants suggest by "choosing" to provide services, Plaintiffs' harm is "self-inflicted." EXIM 59; Total 23. But service providers always "could have chosen instead not to respond." *Equal Rts. Ctr.*, 633 F.3d at

1140. The "voluntariness" of Plaintiffs provision of services does not defeat standing. *Id.*

Total (23) cites *Electronic Priv. Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 379 (D.C. Cir. 2017), but the harm there was self-inflicted because the organization spent money to counteract an action in which it had "no cognizable interest." Plaintiffs here have a concrete interest; they serve the injured communities and their core activities are impaired. That they *chose* to continue serving local people rather than abandoning them does not undercut standing.

## C. Plaintiffs have informational standing.

The district court correctly held Plaintiffs likely have informational standing to challenge EXIM's inadequate economic analysis and failure to apply NEPA. JA0574-75, JA0585, JA0589. EXIM deprived Plaintiffs of information regarding economic and environmental impacts that, on their interpretation, statutes require

EXIM to disclose. JA0574-75 (*citing Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)).[5]

Plaintiffs' harms "align with Congress's intent" to make information available that informs interested parties of EXIM's projects' impacts so "they can respond." JA0575. EXIM disagrees, arguing the Bank Act only required disclosure to ensure it considers adverse effects. EXIM 31. But EXIM's failure to provide required information prevents that. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989) (EIS publication provides "springboard for public comment"). Regardless, NEPA has an additional purpose: "broad dissemination of relevant environmental information." *Id.* at 350.

Total suggests (29) informational standing is impermissible in a NEPA case, but this Court has recognized that where, as here, the nondisclosure of NEPA-mandated information injures an organization's programs, it is a sufficient injury. *Competitive Enter. Inst. v. NHTSA*, 901 F.2d 107, 122-23 (D.C. Cir. 1990); *accord Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 712 (D.C. Cir. 1988). Nothing in NEPA exempts it

---

[5] Plaintiffs have not "forfeited" this standing, EXIM 30; they *won* the issue below, and raised it here. AOB 14, 21, 64 n.16.

from the ordinary standing analysis this Court conducts when an agency denies a plaintiff statutorily-required information. *See Jewell*, 828 F.3d at 992.

Total again argues denial of notice and comment "in the abstract" is insufficient, Total 30, but Plaintiffs have a "concrete" programmatic interest, *supra* § I(A)(2). This is information they "share with the communities they serve," and it will help Plaintiffs "provid[e] more effective services." JA0574-75; *see Center for Biological Diversity*, 144 F.4th at 315; *supra* § I(B).

The district court recognized it could redress the injury by vacating the approval and requiring EXIM to provide the information before disbursal. JA0576. According to Total, because relief is "'limited to the inadequacy that produced the injury,'" only the provision of additional information is warranted. Total 31 (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)). But the inadequacy here is the approval without providing the information. Congress required EXIM to release this information *prior* to approval and disbursement, so affected people "can respond." JA0575. That inadequacy cannot be cured by disclosure *after* disbursement. Nor would such disclosure ensure EXIM considers

adverse environmental effects. Total's suggestion that EXIM can do a NEPA analysis after EXIM disburses makes no sense.

EXIM argues barring disbursement would not redress Plaintiffs' injury; rather, it would "negate" the need for EXIM to release the information, making it "less likely" Plaintiffs would obtain it. EXIM 32 (citation modified). Not so. A preliminary (or permanent) injunction against disbursement of the 2025 loan does not "negate" EXIM's obligation to provide such information; it just prevents EXIM from disbursing funds pursuant to an improper approval; EXIM could still "engage in the substantive action" of approval *after* disclosure. EXIM 32.

Disclosure without preventing disbursement of the loan approved without providing such information would not remedy Plaintiffs' injury. Temporary relief that prevents EXIM from disbursing while the district court considers the merits is warranted.

In any event, Plaintiffs also have standing to challenge EXIM's economic analysis and failure to apply NEPA based on *PETA* and services standing. *Supra* §§ I(A)(B).

## II. Plaintiffs are likely to succeed on the merits of their claims under the Bank Act and EXIM's procedures.

### A. The Bank Act required EXIM to permit comment because its 2025 approval was its "final consideration" of the Project.

The Bank Act requires comment before the Board's "final consideration of a long-term transaction" over $100 million. 12 U.S.C. § 635a(c)(10)(A). This provision distinguishes decisions that require notice and comment from those that do not. Decisions by the Board require notice and comment, but not those delegated to staff. *See* JA0413-16. The requirement applies to transactions, not other board decisions, and only to "final consideration" of those transactions, not interim ones. And it only applies to large transactions. But for this subset of Board decisions, Congress was explicit that Board decisionmaking must be informed by public input.

Defendants seek to amend Congress's carefully crafted comment regime with a new limitation. They argue the statute's comment process can apply only once, EXIM 36-37, Total 35, and propose an exemption for "amendments to previously approved transactions." EXIM 34; *accord* Total 35. The statute's plain meaning permits no such exemption: the comment requirement applies to "*any* meeting … for final

consideration" of a transaction over $100 million, 12 U.S.C. § 635a(c)(10)(A), even if the Project had been considered before.

Defendants point instead to what they say are "textual clues," Total 33, but there is no reason to follow breadcrumbs where Congress speaks this clearly. And far from creating a "never-ending" obligation, Total 32, circumstances like those here are exceedingly rare. This was not a "routine amendment," EXIM 43, nor were the changes minor, Total 43. The approval rendered the almost-five-billion-dollar loan accessible where it previously was not and made substantial changes to the prior agreement. AOB 37-38, 44; *infra* 28-29. There is no dispute the Board needed to consider it. JA0271. It therefore requires comment.

**1.** Defendants insist the "final consideration" occurred in 2019, when the Board *first* considered supporting the Project. EXIM 34-35; Total 34-35. This, they say, is because the loan application "has already been granted." EXIM 34; *accord* Total 34. Defendants assume the 2025 Board only considered an amendment, because the 2019 approval remained operative. This argument fails.

First, nothing in the Bank Act supports limiting notice and comment to "the first instance," Total 34-35, where the Board considers

a "new application." EXIM 34-35. Even when the Board considers an amended loan, it still considers a "transaction." The last time the Board considers that transaction is plainly final.

Total argues "final" does not mean last-in-time, but the 2025 consideration was final even under Total's definition: the "consummation of the agency's decisionmaking process from which legal consequences will flow." Total 33 (citation modified). This perfectly describes the 2025 approval. AOB 38.

Second, as the district court found and Defendants concede, the loan could not proceed without the 2025 approval. JA0580, n.6. A prior, inoperative approval does not free EXIM from its statutory obligations. Since the 2025 approval was necessary to permit financing, it, not the 2019 approval, was the "final consideration."

The Act's references to "applications," EXIM 34-37; Total 34-36, cannot overcome the plain meaning of "final consideration of a []" transaction." AOB 39-42. Defendants cite § 635a(c)(10)(C)(i)(I), which specifies *how* EXIM must *provide notice*, not *when* EXIM must *permit comment*. AOB 41-42. Neither this provision about "the nature and content of the notice," nor one about how submitted comments are

provided to the Board, EXIM 35-36, obviate the requirement to solicit

comment before "any" "final consideration" of a "transaction." *See also*

*infra* § I(B)(4) (material change provision not applicable).

**2**. Even if the application language could narrow the meaning of

"final consideration of a [] transaction," the comment requirement still

applies here. AOB 40-42.

EXIM claims the requirement is triggered only by applications

proposing transactions, and the 2024 request proposed an amendment,

not a transaction. EXIM 37-38. But no EXIM financing was available to

Total before the 2025 Board meeting, JA0580 n.6; Total 37 (approval

was "necessary"); had Total not requested funding, there would be no

loan. Thus, the application considered in 2025 necessarily proposed a

transaction. It makes little sense to suggest an amendment is distinct

from the underlying application. And it was not here. The 2025 Board

finally considered the 2015 application as amended. AOB 41. They use

the ██████████████████ JA0284, JA0719.

**3.** EXIM (38-39) asserts that even if the 2025 approval was the

final consideration, the 2019 comments suffice—despite the changed

terms and circumstances—because the Act only requires notice

"[b]efore" final consideration, without specifying how long before. That would defeat the provision's purpose.

Agencies must permit comment close in time to their decision, and permit new comments when circumstances change; otherwise, input is meaningless. AOB 48-50. This principal applies to the APA *and* where other statutes have comment requirements. *See Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1401-02, 1404 (9th Cir. 1995). EXIM's argument (43) that it is exempt from APA notice and comment requirements for rulemaking is irrelevant. EXIM is bound by APA standards barring unreasoned decisions. *See id*. at 1401; 5 U.S.C. § 706(2)(A).

As under the APA, comment under the Act gives EXIM the "information it needs," EXIM 34, regarding the "administrative problem it is considering." Total 35 (citation modified). The Board considered whether to provide funding in *2025*. Reasoned decisionmaking required comments on whether it makes sense to fund a Project, under new terms and conditions, in a war zone, that will hurt U.S. producers and workers. AOB 43, 53, 67-68.

**4.** The district court thought the Bank Act's "material change" provision provided context for interpreting "final consideration." JA0581-82 (citing 12 U.S.C. §§ 635a(c)(10)(D)). But it applies only to changes to an application "after notice" is published; it cannot absolve EXIM from *actually publishing* notice before "final consideration." AOB 42-43. EXIM does not argue otherwise.

Instead, EXIM disputes only Plaintiffs' alternative argument that the 2025 loan differs materially from the 2019 loan, and thus required comment. EXIM 39; AOB 43-46. As the district court recognized, changes to "financial obligations or anything else of substance" are material. JA0582. The 2025 approval involved many such changes, including creating an operative loan ███████████████ and new ███████████████ AOB 37-38, 44-45; JA0726 & n10.[6]

Defendants say these changes differ from the Act's example, a 25% funding increase. EXIM 40, Total 37. But the new production date is material under the Bank Act's economic provisions. AOB 44-45, 63,

---

[6] EXIM's waiver arguments (39, 42) are meritless. Plaintiffs do not waive arguments by arguing in the alternative. ████████████ ███████████████████████████ Regardless, they may present "additional support" showing EXIM changed more than dates. *Koch v. Cox*, 489 F.3d 384, 391 (D.C. Cir. 2007).

69. And EXIM defines a four year extension as , JA0750, *see also* AOB 44; it is double what EXIM deems JA0719, JA050, JA0414. EXIM cites the same definition. EXIM 40 (citing JA0414).

Moreover, §635a(c)(10)(D)(i) refers to material changes to "an application," not just the loan's terms. EXIM cannot meaningfully consider an application without considering factors like the conflict and the LNG market.

## B. EXIM was required to conduct an economic analysis prior to its 2025 decision.

This Project is exactly what Congress was worried about when it directed EXIM to ensure its financing does not harm the American economy. The Project will produce *seven times* the Bank Act's threshold for causing "substantial injury" to the United States during a global glut. JA0191; AOB 63. Yet Defendants say Congress was indifferent to its impacts because it cared only about harm from initial financing decisions and exempted amendments from its due diligence requirements. EXIM 47. The Bank Act includes no such exemption.

The Act's restrictions apply whenever EXIM "extends credit." AOB 61. Under Defendants' definitions—"to make credit available to the

borrower," EXIM 47; *accord* Total 49 ("placed at a person's disposal")—

EXIM's 2025 approval "extend[ed] credit," since none was "available" to

Total or at its "disposal" beforehand. *See* JA0580, n.6.

**1.** Defendants claim EXIM has broad discretion to assess economic

impacts however it wants, or not at all. EXIM 48; Total 48, 50. But as

they acknowledge, 12 U.S.C. § 635(e)(1) is a "substantive prohibition"

restricting approval. EXIM 48; Total 49.

Yet EXIM claims this one can be evaded simply by choosing not to

determine whether the conditions of oversupply or substantial injury

exist. In fact, Section 635(e)(1) requires EXIM to determine whether the

conditions are met. Because EXIM was extending credit in 2025, it was

required to make a new determination. It failed to do so. The

procedures Congress required EXIM to adopt, 12 U.S.C. § 635a-2, set

the terms and methodology of the analysis, and require EXIM to

conduct a detailed economic impact analysis here. AOB 62-67.

Total (50) seeks support for such broad discretion in the principle

that agencies may revise their procedures. But the question is whether

EXIM, having adopted procedures at Congress's direction, can ignore them. It cannot. AOB 65-66.[7]

The factors Congress set out and EXIM's own policies for assessing them required EXIM to recognize that its previous analysis was obsolete, and conduct a new economic analysis based on the best available evidence. AOB 68-69.

Defendants nonetheless insist EXIM could rely on the now inaccurate 2019 analysis. Total dismisses (54) expert evidence of a global glut by 2030 as "biased." But the expert compiled the world's leading energy forecasters' conclusions. JA0193-95. Defendants offer no contrary evidence. Nor could they: Total *agrees* a global glut is coming. Christian Drolshagen, *TotalEnergies warns of 2030s overbuild*, InstaNext (Oct. 3, 2025), https://instanext.com/insights/daily-first-look/2025-10-03.

Total nonetheless asks (53-54) the Court to ignore the evidence for an emerging glut because EXIM did not consider it in its decision. But Plaintiffs may cite evidence outside the administrative record where the

---

[7] Total's contention (49) that Plaintiffs did not raise arguments about EXIM's policies below is incorrect. ECF 28 at 24, 25.

agency failed to consider relevant factors. *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989).

Total claims (52-53) EXIM did not rely on "its 2019 analysis standing alone," but EXIM (50) *admits* it relied only on that analysis. A "new" memo, Total 52, merely ███████████████████████, JA0726, cannot cure that assessment's obsolescence. AOB 68 n.17. Nor does it bring EXIM into compliance with its own policies or *Sierra Club v. EPA*, 671 F.3d 955 (9th Cir. 2012), which require an up-to-date analysis. AOB 68.

Even if EXIM could permissibly rely on only the 2019 analysis in 2025, EXIM ignored the 2019 report's forecast (now proven correct) of the possibility of a massive glut emerging well before 2030. AOB 69 n.18 (citing JA0350). This was arbitrary.

**2.** EXIM suggests (46) Plaintiffs cannot challenge EXIM's analysis because Plaintiffs are not "arguably within the [Bank Act's] zone of interests." But this is "a merits issue, not a jurisdictional one," *CSL Plasma Inc. v. U.S. Customs & Border Protection*, 33 F.4th 584, 588 (D.C. Cir. 2022), that is forfeited where, as here, defendants failed to

raise it below. *Am. Inst. of Certified Pub. Accountants v. IRS*, 804 F.3d 1193, 1199 (D.C. Cir. 2015).

EXIM is also wrong. The test "is not … demanding"; it suffices if Plaintiffs' interests are among those the statute "arguably" protects and plaintiffs receive the "benefit of any doubt." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (citation modified). In APA cases, "agency action [is] presumptively reviewable." *Id.*

Plaintiffs are within the zone of interest because Congress explicitly gave them the right to inform EXIM's decision-making. EXIM must "consider" input from "the public and interested parties." 12 U.S.C. § 635(e)(7)(A)-(B).

### C. EXIM's refusal to permit comment under the Environmental and Social Procedures violates the APA.

Here again, the question is not whether the 2025 Board approved an amendment. EXIM 44; Total 39-40. EXIM's Procedures require it to post information and invite comments on the environmental and social risks of projects like this one before "any Bank action with respect to financing of the application," and "any decision … to authorize a Final

Commitment." *Environmental and Social Procedures,* § I ¶¶ 8-9, § IV(B) ¶ 2. The 2025 decision was both. AOB 51-53.

Even if EXIM previously took such "action" or decided "to authorize a Final Commitment," EXIM did these things in 2025. EXIM approved the Project's 2015 application with the requested amendments. *Supra* 26; AOB 40-41, 52-53.

Total says the "ESPG process was completed" in 2019, and does not apply to amendments, Total 39-41, but the Procedures apply throughout the loan's life; they apply to the transaction, the loan for a particular project, AOB 52 n.11, not to an initial form. Total 40.

Total (40) acknowledges "transactions 'pertaining to a 'project,''' are subject to the Procedures. EXIM already determined this transaction pertains to a project. JA0296, ███████████████ ██████ Total's claim (40-41) that the Project is not a "project," and thus not subject to the Procedures, ignores the definition's relevant half. "Project" includes *new* projects, "any commercial … undertaking" with potential impacts, *or* "existing" projects, "existing" undertakings "undergoing material change in output or function." *Environmental and Social Procedures* § I ¶ 2. Total's argument that there is no changed

output or function here is irrelevant; this loan is for a new undertaking, not an "existing" plant.

█████████████████████████████████████████ AOB 53-54; yet did not allow comment. Total cites █████████████████████████████████

████ Total 39 (citing JA0721-22), and EXIM █████████████████████

███████████████████████████ JA0744. This is no substitute for the formal process. *Supra* 9.

Defendants assert the Procedures are non-binding and EXIM can ignore them. But they are established procedures and agency practice, *see, e.g.*, JA0253, JA0325-0333, and thus EXIM's departure without a reasonable explanation—they provided none—is arbitrary. *Nat'l Conservative Political Action Comm. v. FEC*, 626 F.2d 953, 959 (D.C. Cir. 1980). Total's reliance (42) on *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* is misplaced; EXIM "fashion[ed]" the Procedures. 435 U.S. 519, 544 (1978). Plaintiffs made this argument below; it is not waived. JA0533.

Moreover, "agencies [must] follow their own rules, even gratuitous procedural rules that limit otherwise discretionary actions." *Steenholdt v. FAA*, 314 F.3d 633, 639 (D.C. Cir. 2003). Procedures and policies that

have not been formally promulgated can be binding, particularly when intended by the agency and if the deviation prejudices others. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 335-36 (D.D.C. 2018) (collecting cases).

The Procedures are binding because the Bank Act required EXIM to create them and apply them to transactions like this one. 12 U.S.C. § 635i-5(a)(1). *See Vanover v. Hantman,* 77 F. Supp. 2d 91, 107 (D.D.C. 1999). And EXIM intended to abide by them. EXIM describes its Procedures as "requirements" for which they assess "compliance," and that EXIM "will" follow. *See generally Environmental & Social Procedures*; *id.* Annex A-1 §§ 3-4; JA0325-333; JA0253 (due diligence required "in accordance with the [Bank Act]"). The Procedures are intended to minimize harm to the environment and communities, *Environmental & Social Procedures* § I ¶ 3, Annex A-1 §§ 2, 4; JA0251-52. Deviation here has prejudiced Plaintiffs and the people they support. *Supra* §§ I(A)(2), I(B)(2)(3).

Total's cases (41) are inapposite. The question is not whether agency action is "final," *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 253 (D.C. Cir. 2014), due *Chevron* deference, *Delta Airlines, Inc. v. Export-Import Bank,* 85 F. Supp. 3d 387, 408-09 (D.D.C. 2015), or a

legislative rule requiring APA notice and comment,[8] an issue "independent of whether [agency] procedures will be binding." *Vietnam Veterans of Am. v. Sec'y of the Navy*, 843 F.2d 528, 538 (D.C. Cir. 1988).

## D. Plaintiffs were denied information they had a right to.

Defendants' argument that Plaintiffs are unlikely to succeed on the merits of their claims for information, EXIM 57; Total 54-55, are addressed above. And since disclosure is required before approval and disbursement to inform EXIM's decisionmaking and affected people, EXIM should not be permitted to disburse before providing the required information. *Supra* § I(C).

## III. Plaintiffs will likely succeed on their NEPA claims.

The district court erred in deferring to EXIM's bald assertion that the loan is not a major federal action. AOB 54-60. Agencies lack discretion to decide whether NEPA applies; this is a legal question. AOB 55. Total (45) quotes the statement in *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, that "when an agency exercises discretion granted

---

[8] *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 947 (D.C. Cir. 1987); *Syncor Int'l Corp. v Shalala,* 127 F.3d 90, 93, 96 (D.C. Cir. 1987); *Clarian Health W., LLC v. Hargan,* 878 F.3d 346, 357 (D.C. Cir. 2017).

by a statute," review is deferential, but omits key language: a decision is "arbitrary" if not "reasonably explained." 605 U.S. 168, 179-180 (2025); AOB 56-57. EXIM never explained its assertion. That ends the inquiry.

EXIM suggests (54) it did not need to make a separate determination in 2025, but EXIM *never* explained its refusal to apply the law. That EXIM has not yet produced the administrative record is also irrelevant. EXIM 54-55. It submitted cherry-picked documents below, JA0267-452; JA0661-762, and could have submitted documents explaining why it believed NEPA did not apply, if any exist.

Given the absence of any explanation, Plaintiffs have carried their burden to show that EXIM's decision is unexplained. Indeed, since EXIM controls any relevant documents, this Court "infer[s]" they are "unfavorable." *Int'l Union, United Auto., etc. v. NLRB*, 459 F.2d 1329, 1336 (D.C. Cir. 1972).

EXIM now suggests (55-56) it *could* have reasonably found no "major Federal action." But it must provide the reasons it gave "when it acted," not "*post hoc* rationalizations." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20-21, 23-24 (2020) (citation modified). EXIM provided no such reasons.

Indeed, EXIM posits two *possible* bases to refuse to apply NEPA—that it lacked sufficient control and that the harms are extraterritorial—but that just highlights that we do not know which EXIM relied on or *why* it reached its conclusion. Total insists (44) EXIM made a "fact-bound determination," but can cite no factual findings. Without knowing what EXIM decided and on what grounds, there is nothing to which this Court could defer.

Even if this Court could guess what EXIM decided, and even if whether the law applies *could* be a factual question rather than a legal one, EXIM's decision gets no deference. In addition to the lack of evidence EXIM made a factual determination, EXIM's brief, as noted below, does not dispute any facts. So whether there was a major federal action here is necessarily a legal question.

In any event, neither possible basis is persuasive. First, EXIM exercises "substantial" control over the use of its loan and its effects. 42 U.S.C. § 4336e(10)(A), (B)(iii). EXIM (56-57) does not deny the Project needs EXIM's money to proceed or that the loan imposes myriad conditions that allow it to revoke funding. AOB 57-59. If such control is

not "substantial," it is hard to see what loan would satisfy this requirement.

Second, EXIM's claim (56) that it is not "clear" that NEPA applies because the harms are indirect and Mozambique is far away conflicts with NEPA's text. NEPA applies to overseas projects unless their effects are "entirely" extraterritorial. 42 U.S.C. § 4336e(10)(B)(vi). EXIM does not deny the Project will harm the U.S. That is enough.

Moreover, NEPA protects the global "biosphere," and requires agencies to "recognize the worldwide and long-range character of environmental problems." 42 U.S.C. §§ 4321, 4332(2)(I). Effects "may fall within NEPA" even if they are "indirect" and "outside the [project's] geographical territory." *Seven Cnty.*, 605 U.S. at 187.

EXIM now claims (53-54) the 2025 approval was not a major federal action because it did not change the *status quo*, but the Board approved financing where none was available. JA0580 n.6.[9] Regardless, even renewing an existing license can be a major federal action. *NRDC v. United States NRC*, 823 F.3d 641, 643 (D.C. Cir. 2016). EXIM's

---

[9] Plaintiffs challenge the Board's 2025 approval without ever having applied NEPA; it was unnecessary to separately challenge the 2019 approval. EXIM 53-54 and n.6.

reliance (54) on *Earthworks v. U.S. Dep't of the Interior*, is misplaced; the agency action there had *no* on-the-ground impacts. 105 F.4th 449, 459 (D.C. Cir. 2024).

## IV. Plaintiffs will suffer irreparable harm without an injunction.

The district court held Plaintiffs "made a strong showing" of irreparable harm. JA0593. That was correct.

EXIM recycles its argument that procedural injuries alone are not concrete. EXIM 58. But there is concrete injury here under *PETA*. *Supra* § I(A)(1). Regardless, at a minimum, this injury bolsters Plaintiffs' other claims of irreparable harm.

The Project will cause environmental harm, farmers will lose their farms, and fisherpeople will lose access to the sea. AOB 8-9, JA0771-77, JA0613-17, JA0766-68. It will likely escalate the conflict and increase human rights abuses. AOB 10-11, JA0641-42, JA0654-60.

EXIM argues (59) that Plaintiffs cannot raise environmental harms because they will be suffered by others, but Plaintiffs will have to provide services to those injured. *Supra* § I(B), I(B)(3). Approval will interfere with Plaintiffs' existing services and force Plaintiffs to provide more, more burdensome and new services to local people. Below,

Defendants did not dispute that such obstacles to Plaintiffs' activities "provide injury for … irreparable harm." *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016); AOB 72. EXIM's new, contrary argument (59-60) is waived and conflicts with *Newby*. EXIM's assertion that Plaintiffs' injuries are just expending time and money "misses the point;" Plaintiffs suffered a "programmatic injury" to their activities. *Newby*, 838 F.3d at 9. This was absent in *Clevinger v. Advoc. Holdings, Inc.*, where for-profit plaintiffs only claimed lost customers and reputational harm. 134 F.4th 1230, 1234-35 (D.C. Cir. 2025).

Additionally, harms to people Plaintiffs have third-party standing to represent also count towards irreparable harm. *See, e.g.*, *Am. Gateways v. U.S. DOJ*, No. 25-01370, 2025 U.S. Dist. LEXIS 138893, *20, 31 (D.D.C. July 21, 2025) (considering harm to clients under irreparable harm analysis).[10]

---

[10] Plaintiffs did not argue this in their opening brief because the district court found irreparable harm without it. But Plaintiffs raised it below, and do so now in response to EXIM's argument that third-party harm does not count. *United States v. Powers*, 885 F.3d 728, 732 (D.C. Cir. 2018).

Plaintiffs have third-party standing to raise these injuries because they have their own injury, and a close relationship with the people whose rights they assert and who face hindrances to pursuing their own rights. *Lepelletier v. FDIC*, 164 F.3d 37, 43-44 (D.C. Cir. 1999). JA provides many services to these people, and represents their interests in a variety of venues. JA0602, JA0604-609, JA0765, JA0778, AOB 12-13. Below, neither Defendant denied that Project-affected people face harm and meet the hindrance requirement, due in part to fear of reprisals. The district court incorrectly concluded that "people living near the Project" who are harmed was a too "broad, generalized group." JA0571 n. 1. But this is a "limited universe," like people who might seek a specific medical procedure. *Whitman-Walker Clinic v. HHS*, 485 F. Supp. 3d 1, 35-36 (D.D.C. 2020) (citing *June Med. Servs. LLC v. Russo*, 591 U.S. 299, 318) (2020)).

Those harmed by the Project should not be denied relief simply because the Project injures too many people. Such "rigid rules and equity principles mix like oil and water." *Clevinger*, 134 F.4th at 1234. Even if their injuries do not factor into irreparable harm, they weigh heavily in favor of an injunction under the balance of the equities.

Defendants' arguments that these harms are speculative, not connected to EXIM's acts, or self-inflicted, are wrong. *Supra* § I(B)(2). The district court correctly held that Plaintiffs' harms were certain and imminent because there was "sufficient evidence" EXIM will disburse funds before a ruling on the merits. JA0594-95. Total's claim that the district court found irreparable harm was "speculative" is incorrect. Total 55 (citing JA0596), JA0593-95; *see also supra* § I(B)(2). Moreover, the "clear and present need for equitable relief," JA0591, has grown since Total lifted *force majeure*, "the Project resumed work," Total 1, and nearby villages have been attacked. AOB 10. Total—the actor with the greatest control over the harm—provides no evidence that these harms are not certain and imminent.

## V.    The balance of the equities favors temporary relief.

Plaintiffs seek temporary relief preventing EXIM from disbursing unreleased funds to maintain the *status quo* while the court determines whether the funding is legal. The district court recognized that, absent such relief, Plaintiffs and the communities they serve will likely be harmed. JA0595. And while it found the equities are balanced, by

discounting Plaintiffs' likelihood to succeed, it undercounted the equities favoring Plaintiffs. AOB 73-74.

EXIM (60-61) and Total (56) emphasize Plaintiffs' alleged delay, but Plaintiffs reacted swiftly to Total's announcements that it would lift *force majeure* and resume construction. AOB 75 n.20. Delay is not a "proper basis for denial." *Gordon v. Holder*, 632 F.3d 722, 724 (D.C. Cir. 2011). It can only "bolster" denial where there is no likelihood of success and delay renders relief "futile." *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975).

EXIM (60-61) and Total (56) point to alleged "reliance interests" and "uncertainty" for foreign lenders; but short-term uncertainty for a company and banks does not outweigh severe harm to people, and to the U.S. economy. AOB 74-75. Moreover, Total provides no evidence lenders would change course due to a temporary pause, it cites only its director's conclusory declaration. JA0247-48. If anything, lenders are likely to change course because Total is plunging ahead despite the highly unstable security situation, as the U.K. and the Netherlands did. In any event, they no longer have any reliance interests.

Total—but not EXIM—speculates (56-57) that enjoining disbursements may cause harm, but does not show that harm will arise at all, let alone from a *temporary* pause, as it must. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 103 (D.C. Cir. 2021) (rejecting equities argument based on consequences of potential merits decision).

Total's arguments highlight EXIM's failure to undertake the economic analyses the Bank Act requires. It cites EXIM's 2019 unsupported claim that the Project will "support" (not create) 16,000 U.S. jobs, but ignores both the U.S. renewable energy and LNG jobs the Project will *cost* and the Bank Act's presumption that this Project will cause "substantial injury" in the United States. AOB 50, 63; JA0113. Given EXIM's failure to actually analyze the economic effects, the Court should not credit its outdated and self-serving assertions.

Total alludes to unspecified foreign policy interests EXIM does not assert. And temporary relief will not injure Mozambique, which will only receive revenue in 2030 at the earliest, but more likely, never.[11] Total cannot assert Mozambique's alleged interest in avoiding delay, or

---

[11] Richard Halsey *et. al.*, *Navigating Decisions: The risks to Mozambique from liquified natural gas export projects*, iii, 6, 8-9, 12 (Int'l Inst. for Sustainable Dev., 2023).

its own interest in construction schedules, when Mozambique has not finally approved the Project. AOB 9.

Finally, Total (57) suggests it may withhold unnamed services from communities during an injunction, but fails to explain how they depend on future disbursements; Total cannot avoid relief by threatening retaliation.

The equities thus favor preserving the *status quo* while the district court determines if EXIM's 2025 loan was lawful.

## VI. The court should remand with instructions to grant a preliminary injunction.

Since each factor either favors relief or, for balance of equities, is at worst neutral, this Court should order temporary relief. Defendants say the district court should start over. EXIM 61-63; Total 55, 58. The Court should avoid unnecessary delay and order relief now. *See Newby*, 838 F.3d at 7.

This Court could order relief even if the district court had not considered all of the relevant factors, because it can weigh them itself. *Id*. But Total's allegation (58) that the district court did not "carefully consider" every factor is baseless; it did consider them, on a full record. JA0591-596. Thus, "unlike in *Chaplaincy* [*of Full Gospel Churches v.*

*England*, 454 F.3d 290 (D.C. Cir. 2006)] where remand allowed for further development of the injunction factors," remand is unwarranted. *Newby*, 838 F.3d at 7. There is nothing for the district court to decide. It cannot deny relief where no factor weighs against it. *Id.*

EXIM (62) suggests new facts change the analysis because Total and others' reliance interests have strengthened since the district court ruled, but does not explain how, especially while suit challenging EXIM's decision was pending. AOB 75. The harms to Plaintiffs and the communities they serve—which have only increased with new attacks— still outweigh Total's reliance interest.

Total (57-58) claims Plaintiffs are not entitled to vacatur, so an injunction is inappropriate. But "[r]emand with vacatur is the ordinary remedy for unlawful agency action." *Sierra Club v. U.S. Dep't of Transp.*, 125 F.4th 1170, 1186 (D.C. Cir. 2025). Exemptions are for exceptional cases. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32-33 (2008) (national security). Courts may remand without vacatur to permit agencies to justify decisions that are not "reasonably explained." *Delta Air Lines, Inc. v. Exp.-Imp. Bank of the United States*, 718 F.3d 974, 978 (D.C. Cir. 2013). But EXIM cannot explain away its failure to

permit comment or to make a finding that the benefits exceed the costs—the procedure is the only cure.

In *City of Port Isabel v. FERC*, 130 F.4th 1034, 1036-38 (D.C. Cir. 2025) this Court noted it would typically vacate a decision involving a fundamental procedural error, such as failing to issue an EIS or "bypass[ing] required notice and comment." Here, EXIM bypassed *both* procedures the Court found fundamental. That would warrant vacatur at the merits stage, and justifies preliminary relief now.

Total's argument (58) that the Court should permit EXIM to disburse money while EXIM considers comments or conducts an EIS is exactly the approach—"build first" and review only after suit—*Port Isabel* criticized. *Id.* at 1037-38.

## CONCLUSION

EXIM claims it can hand billions of taxpayer dollars to a foreign project that will exacerbate a humanitarian crisis, degrade the environment, and compete with U.S. producers, without allowing comment or considering the consequences. The Court should maintain the status quo by pausing disbursement while the district court decides whether EXIM is right.

Date: January 9, 2026

Respectfully submitted

/s/ *Richard L. Herz*
Richard L. Herz*
Tamara A. Morgenthau
Lindsay A. Bailey
Michelle C. Harrison
EarthRights International
1400 K St. NW Suite 750
Washington, DC 20005
(202) 466 5188
rick@earthrights.org

*Counsel for Appellants*

\* Based in CT; admitted in
    NY; does not practice in
    DC's court

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rules of Appellate Procedure 32(a)(7), that the foregoing brief contains 8,976 words, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) and Circuit Rule 32(e). I further certify that the document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century Schoolbook font.

Date: January 9, 2026

Respectfully submitted

*/s/ Richard Herz*

Richard Herz

**CERTIFICATE OF SERVICE**

I hereby certify that on January 9, 2026, I caused the foregoing document to be electronically filed using the appellate CM/ECF system.

Date: January 9, 2026

Respectfully submitted

*/s/ Richard Herz*

Richard Herz